# EXHIBIT A

ICC Case No. 22527/ASM/JPA                                    **29 JULY 2019**

---

**CONOCOPHILLIPS GULF OF PARIA B.V.**
CLAIMANT

v.

**CORPORACIÓN VENEZOLANA DE PETRÓLEO, S.A.**
**PETRÓLEOS DE VENEZUELA, S.A.**
RESPONDENTS

---

**FINAL AWARD**

---

**Arbitral Tribunal**
Dr. Laurent Lévy (President)
Prof. Laurent Aynès
Prof. Andrea Giardina

**Secretary to the Arbitral Tribunal**
Ms. Eva Kalnina

## TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ....................................................................................5

I.    INTRODUCTION ............................................................................................10

A.    The Parties and the Tribunal ....................................................................10

      1.  The Claimant ......................................................................................10

      2.  The Respondents ...............................................................................11

      3.  The Tribunal ......................................................................................12

B.    Main Facts ..................................................................................................13

      1.  Overview ............................................................................................13

      2.  Historical Context .............................................................................14

      3.  Apertura Petrolera and the Corocoro Contracts ...........................14

      4.  The Nationalization of the Corocoro Project .................................23

C.    Overview of the Parties' Positions ...........................................................28

      1.  The Claimant's Position ...................................................................29

      2.  The Respondents' Position ...............................................................31

D.    Arbitration Agreement ...............................................................................31

E.    Place of Arbitration and Language of the Proceedings .........................32

F.    Applicable Law ...........................................................................................33

      1.  Applicable substantive law .............................................................33

      2.  Applicable procedural rules ............................................................33

G.    Procedural History .....................................................................................34

      1.  Initiation of the Arbitration ............................................................34

      2.  The Written and Pre-Hearing phases .............................................36

      3.  The Oral phase ..................................................................................38

      4.  The Post-Hearing phase ...................................................................41

      5.  Time-limit for rendering the Award ...............................................43

II.   REQUESTED RELIEF ..................................................................................44

III.  LIABILITY .....................................................................................................45

A.    Preliminary matters ...................................................................................45

      1.  Arbitrability of the Claimant's claims and the Tribunal's Jurisdiction ............45

      1.1   The Parties' positions ....................................................................45

      1.2   Analysis...........................................................................................49

      2.  Amiable compositeur .......................................................................54

      2.1   The Claimant's position .................................................................54

2.2    The Respondents' Position ........................................................55

2.3    Analysis .....................................................................................56

**3.    The Claimant's Conduct and the Notification of its Claims ............................57**

3.1    The Respondents' position ........................................................57

3.2    The Claimant's position ............................................................59

3.3    Analysis .....................................................................................59

**B.    The Alleged Breach of the Corocoro AA, the Corocoro Guarantee and the Corocoro CA ...........................................................................................63**

**1.    The Claimant's position .............................................................63**

1.1    Non-Performance Claim ...........................................................63

1.2    Surviving Obligations Claim .....................................................64

1.3    Particular Breaches Claim .......................................................68

1.4    Impossibility to Invoke Force Majeure .....................................70

**2.    The Respondents' position .......................................................72**

2.1    Surviving Obligations Claim .....................................................74

2.2    Particular Breaches Claim .......................................................75

2.3    Force majeure and Clause 28.1 of the Corocoro AA ...............77

2.4    No causation .............................................................................81

**3.    Analysis .....................................................................................82**

3.1    Non-Performance Claim ...........................................................86

a.     The characterization of Clause 28.1 as a risk-allocation clause ......................90

b.     The scope and purpose of Clause 28.1 as a risk-allocation clause .................93

c.     The 2007 Nationalization Decree as an act "not of general applicability" under Clause 28.1 ...........................................................................109

i.     First prong: the interpretation of the phrase "not of general applicability" by reference to the DA provisions in the P&H Contracts ............................110

ii.    Second prong: the interpretation of the phrase "not of general applicability" under Venezuelan public law ...............................................................113

(a) The statements and scholarly writings by Venezuelan legal authorities relied upon by the Claimant ...............................................118

▪ Prof. Brewer-Carías' statements at the Hearing .....................118

▪ Prof. Brewer-Carías' 2009 publication ......................................120

▪ Prof. Lares Martínez's 2013 publication ...................................122

▪The Tribunal's conclusions with respect to the statements and scholarly writings at issue ........................................................ 123

(b) The relevant provisions of Venezuelan statutory law .................. 126

▪The OLAP ............................................................................. 126

▪The OLCAJ ........................................................................... 129

(c) The Tribunal's findings with respect to both the relevant Venezuelan public law doctrine and statutory law .................................... 130

iii.  Third prong: the interpretation of the phrase "not of general applicability" as "commonly understood" ..................................................... 134

iv.  Conclusion on the Non-Performance Claim ............................... 137

3.2    Surviving Obligations and Particular Breaches claims ...................... 138

a.    The Surviving Obligations Claim ............................................ 138

b.    The Particular Breaches Claim .............................................. 139

i.    The replacement of the Corocoro Project's management structure ....... 140

ii.   The execution of the CVP-Eni MoU and Conversion Contract .............. 141

iii.  The non-repayment of the loan ............................................ 142

3.3    Damages for the breach of the Corocoro Contracts ......................... 146

C.   *Hecho Ilícito Claim* ............................................................... **150**

1.   **The Claimant's Position** ....................................................... **150**

2.   **The Respondents' Position** ................................................... **150**

3.   **Analysis** ........................................................................ **151**

D.   *Unjust Enrichment Claim* ......................................................... **152**

1.   **The Claimant's Position** ....................................................... **152**

2.   **The Respondents' position** ................................................... **153**

3.   **Analysis** ........................................................................ **154**

3.1    The subsidiarity principle requirement .................................... 154

3.2    The lack of a legal justification or cause requirement .................... 155

IV.   **COSTS** .............................................................................. **157**

A.   **The Parties' Position** ........................................................... **157**

B.   **Relevant provisions on costs** ................................................... **160**

1.   **The ICC Rules** .................................................................. **160**

2.   **Lex Arbitri** ..................................................................... **160**

C.   **Analysis** .......................................................................... **160**

V.   **DECISION** ........................................................................... **164**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **2001 Hydrocarbons Law** | Decree with Force of the Organic Hydrocarbons Law, Official Gazette No. 37,323, 13 November 2001 |
| **2007 Law on Effects of Migration** | Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements, Official Gazette No. 38,785, 8 October 2007 |
| **2007 Nationalization Decree** | Decree Having the Rank, Value and Force of Law of Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements, Decree No. 5,200, Official Gazette No. 38,632, 26 February 2007 |
| **2008 Transfer Decree** | Decree No. 5,811, transferring to PetroSucre the right to develop primary exploration activities detailed therein, Official Gazette No. 38,851, 16 January 2008 |
| **AGIP** | AGIP Venezuela B.V. |
| **Bicameral Commission** | Bicameral Commission of Energy and Mines |
| **Bicameral Commission Report** | Report on Association Agreements for the Exploration at Risk of New Areas and the Production of Hydrocarbons under the Shared Profits System, Bicameral Commission of Energy and Mines, dated June 1995 |
| **Claimant** or **CGP** | ConocoPhillips Gulf of Paria B.V. |
| **Clause 28.1** | Clause 28.1 of the Corocoro AA |
| **COBV** | Conoco Venezuela B.V. |
| **Congressional Approval** | Congressional Authorization for the Execution of Association Agreements for Exploration at Risk of New Areas and the Production of Hydrocarbons under the Profit Sharing System in Eight of the New Areas, dated 26 June 1996. |
| **Congressional Authorization** | Congressional Authorization of the Framework of Conditions for the Exploration at Risk of New Areas and the Production of Hydrocarbons under the Shared Profits System, dated 17 July 1995 |
| **Conoco** | CGP, COBV, CVCA, or Conoco Ltd. |

| | |
|---|---|
| **Conoco Ltd.** | ConocoPhillips Gulf of Paria Ltd. |
| **ConocoPhillips** | ConocoPhillips Company, Conoco Inc, and/or Phillips Petroleum Company. |
| **Contractual Claims** | The Non-Performance Claim, Surviving Obligations Claim, Particular Breaches Claim, its Overall Breach Claim, jointly |
| **Control Committee** | Entity composed of members appointed by both the Investors and CVP to approve certain decisions of national interest to the Venezuelan State as defined in the Corocoro AA and pursuant thereto |
| **Corocoro AA** or **AA** | Association Agreement between CVP and COBV, dated 10 July 1996 |
| **Corocoro CA** or **CA** | Consortium Agreement between CVP and CVCA, AGIP, and OPIC, dated 16 May 2003 |
| **Corocoro Contracts** | The Corocoro AA, the Corocoro Guarantee, and the Corocoro CA, jointly |
| **Corocoro Discovery** or **Discovery** | The oil discovery subsequent to drilling activities between September 1998 and April 1999 in a first exploratory well in block 9 (referred to as Corocoro-1X) |
| **Corocoro Guarantee** or **Guarantee** | Guarantee of Proper Performance between PDVSA and COBV, dated 10 July 1996 |
| **Corocoro Project** or **Project** | Project underlying the Corocoro Contracts |
| **CPF** | Central Processing Facility |
| **CVCA** | Conoco Venezuela C.A. |
| **CVP-Eni Conversion Contract** | Contract for the conversion to an empresa mixta between CVP and Eni, 30 November 2007 |
| **CVP-Eni MoU** | Memorandum of Understanding entered into by CVP and Eni for the creation of an *empresa mixta*, 26 June 2007 |
| **DA** | Discriminatory Action(s) as defined at Section 1.01 of the Petrozuata AA and Article 14.1(b) of the Hamaca AA |
| **Definitive Model AA** | Definitive Model Association Agreement, dated December 1995 |
| **Enabling Law** | Law Authorizing the President of the Republic to Issue Decrees with Rank, Value and Force of Law on the Matters Delegated Herein, Official Gazette No. 38,617, 1 February 2007 |
| **Eni** | Eni Venezuela B.V. (formerly AGIP) |
| **Force Majeure Clause** | Clause 28 of the Corocoro AA |

| **FSO** | Floating Storage and Offloading Unit |
|---|---|
| **GOPWA** | Gulf of Paria West Area |
| **Government** or **Venezuela** | Bolivarian Republic of Venezuela |
| **Hamaca AA** | Association Agreement between Corpoguanipa, S.A., Arco Orinoco Development Inc., Phillips Petroleum Company Venezuela Ltd., and Texaco Orinoco Resources Company, dated 9 July 1997 (as amended) |
| **Hamaca Guarantee** | Guarantee Agreement between Petróleos de Venezuela, S.A., Arco Orinoco Development Inc., Phillips Petroleum Company Venezuela Ltd., and Texaco Orinoco Resources Company, dated 9 July 1997 (as amended) |
| **ICC P&H Arbitration** | ICC Case No. 20549/ASM/JPA (C-20550/ASM) |
| **ICC P&H Arbitration, R-0 (**[Exhibit number or submission reference]**)** | Citation to the ICC P&H Arbitration documents, part of the present proceedings as per the Parties' agreement |
| **ICC P&H Claimants** | ConocoPhillips Petrozuata B.V. and Phillips Petroleum Company Venezuela Limited, collectively |
| **ICC P&H Parties** | The ICC P&H Claimants and the ICC P&H Respondents, jointly |
| **ICC P&H Respondents** | Petróleos de Venezuela, S.A., Corpoguanipa, S.A. and PDVSA Petróleo, S.A., collectively |
| **ICC Rules** | The ICC Rules of Arbitration of 1988 |
| **ICSID Arbitration** or **ICSID Case** | ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V., ConocoPhillips Gulf of Paria B.V. v Bolivarian Republic of Venezuela, ICSID Case No. ARB/07/30 |
| **ICSID Award** | ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/07/30, Award, 8 March 2019 |
| **Ineparia** | Ineparia S.A. |
| **Investors** | The private entities holding interest in the Project at any point in time, jointly. To wit, Conoco, Eni, OPIC, and Ineparia |
| **IPF** | Interim Processing Facility |
| **Management Company** or **Agua Plana** | Compañía Agua Plana, S.A., the company incorporated on 13 August 1996 to act as |

| | |
|---|---|
| | Management Company pursuant to the terms of the Corocoro AA. |
| **Model AA** | Model Association Agreement |
| **Model AA Memorandum** | Memorandum by PDVSA addressing the various comments raised by private companies with respect to the Model AA, dated 23 November 1995 |
| **Non-Performance Claim** | The Claimant's claim according to which the Respondents ceased performing the Corocoro Contracts from 1 May 2007 onwards |
| **OLAP** | Organic Law of Administrative Procedures |
| **OLCAJ** | Organic Law of the Contentious-Administrative Jurisdiction |
| **Operating Agreement** | Contract concluded between CVP, Conoco, and Agua Plana designating Conoco as the Operator of the Project, dated 13 August 1996 |
| **Operator** | Conoco in its capacity of Operator pursuant to both the Corocoro AA and the Operating Agreement |
| **OPIC** | OPIC Karimun Corporation |
| **Overall Breach Claim** | The Non-Performance Claim, the Surviving Obligations Claim, and the Particular Breaches Claim, jointly |
| **P&H Contracts** | The Petrozuata AA, Hamaca AA, Petrozuata Guaranty, and Hamaca Guarantee, jointly. |
| **Paragraph 1** | Paragraph 1 of Article 1 of the 2007 Nationalization Decree |
| **Paragraph 2** | Paragraph 2 of Article 1 of the 2007 Nationalization Decree |
| **Particular Breach Claim** | The Claimant's claim that the Respondents breached certain specific provisions of the Corocoro Contacts in relation to, *inter alia*, the repayment of the loan extended to CVP, the alleged replacement of the Project's management structure, and the conclusion of the CVP-Eni MoU and the CVP-Eni Conversion Contract |
| **PetroSucre** | PetroSucre S.A. |
| **Petrozuata AA** | Association Agreement between Maraven S.A. and Conoco Orinoco Inc., originally dated 10 November 1995, and modified on 18 June 1997 |

| **Petrozuata Guaranty** | Guaranty and Indemnification Agreement between Conoco Orinoco Inc. and Petróleos de Venezuela, S.A., dated 10 November 1995 |
|---|---|
| **Respondent 1** or **CVP** | Corporación Venezolana de Petróleos, S.A. |
| **Respondent 2** or **PDVSA** | Petróleos de Venezuela, S.A. |
| **Transcript, p.** [page number]**, (**[Party, Witness or Expert making the quoted Statement]**)** | Transcript of the Hearing |
| **Transition Committee** | The committee created on 5 March 2007 pursuant to Article 2 of the 2007 Nationalization Decree |
| **VCC** | Venezuelan Civil Code |
| **VCoC** | Venezuelan Commercial Code |
| **WHP** | Wellhead Platform |

# I.     INTRODUCTION

## A.     THE PARTIES AND THE TRIBUNAL

### 1.  *The Claimant*

1.     The Claimant is:

>       CONOCOPHILLIPS GULF OF PARIA B.V. ("CGP")
>       New Babylon Gardens
>       Anna van Buerenplein 41
>       2595 DA Den Haag
>       The Netherlands

2.     The Claimant is represented in this arbitration by:

>       Constantine Partasides QC
>       Lucy Martinez
>       **THREE CROWNS LLP**
>       New Fetter Place
>       8-10 New Fetter Lane
>       London EC4A 1AZ
>       United Kingdom
>       constantine.partasides@threecrownsllp.com
>       lucy.martinez@threecrownsllp.com

>       Jan Paulsson
>       Luke Sobota
>       **THREE CROWNS LLP**
>       2001 Pennsylvania Avenue, Suite 1100
>       Washington, D.C. 20006
>       U.S.A.
>       jan.paulsson@threecrownsllp.com
>       luke.sobota@threecrownsllp.com

>       D. Brian King
>       Elliot Friedman
>       Sam Prevatt
>       Lee Rovinescu
>       Madeline Snider
>       **FRESHFIELDS BRUCKHAUS DERINGER US LLP**
>       601 Lexington Avenue, 31st Floor
>       New York, NY 10022
>       U.S.A.
>       brian.king@freshfields.com
>       elliot.friedman@freshfields.com
>       sam.prevatt@freshfields.com
>       lee.rovinescu@freshfields.com
>       madeline.snider@freshfields.com

>       Janet Langford Carrig, General Counsel
>       Laura M. Robertson, Deputy General Counsel, Litigation and Arbitration

Suzana Blades, Associate General Counsel, Commercial Litigation & Arbitration
Fernando Avila, Senior Counsel, E&P Americas
Alberto Ravell, Senior Legal Counsel
**CONOCOPHILLIPS COMPANY**
600 N. Diary Ashford, ML 1040
Houston, TX 77079
U.S.A.
janet.l.carrig@conocophillips.com
laura.m.robertson@conocophillips.com
suzana.m.blades@conocophillips.com
fernando.a.avila@conocophillips.com
alberto.f.ravell@conocophillips.com

3.   The Claimant's ultimate parent company is ConocoPhillips Company ("ConocoPhillips"),[1] and its predecessors-in-interest are Conoco Venezuela B.V. ("COBV") and Conoco Venezuela C.A. ("CVCA"). COBV executed the Association Agreement and the Guarantee of Proper Performance in 1996,[2] while CVCA executed the Consortium Agreement in 2003.[3] The Association Agreement, the Guarantee of Proper Performance, and the Consortium Agreement, are referred to jointly as the "Corocoro Contracts".

4.   In particular, on 22 December 1999, COBV transferred its interest in the Corocoro Contracts to CVCA, a subsidiary of ConocoPhillips Gulf of Paria Ltd ("Conoco Ltd."). On 15 August 2005, Conoco Ltd. transferred its interest in CVCA to CGP. On 6 September 2012, as part of its liquidation, CVCA transferred its interest in the Corocoro Contracts to CGP. It is not disputed that CGP is party to the Corocoro Contracts.[4] For ease of reference, CGP, COBV, CVCA, and Conoco Ltd are referred to as "Conoco".

### 2.   *The Respondents*

5.   Respondent 1 is:

CORPORACIÓN VENEZOLANA DE PETRÓLEOS, S.A. ("CVP")
Avenida Libertador
Edificio Petróleos de Venezuela
Torre Oeste, Piso 7
Urb. La Campiña
Caracas 1050
Venezuela

6.   Respondent 2 is:

PETRÓLEOS DE VENEZUELA, S.A. ("PDVSA")
Avenida Libertador
Edificio Petróleos de Venezuela

---

[1] The Tribunal notes that ConocoPhillips is the result of the 2002 merger between Conoco Inc. and Phillips Petroleum Company. For ease of reference, the Tribunal shall refer to Conoco Inc. and/or Phillips Petroleum Company as ConocoPhillips.

[2] *Infra*, §§ 27-28.

[3] *Infra*, § 36.

[4] SoC, n. 32; SoD, n. 52.

Torre Este, Piso 9
Urbanización La Campiña
Caracas 1050
Venezuela

7.      PDVSA and CPV are collectively referred to as the "Respondents".

8.      The Respondents are represented in this arbitration by:

George Kahale, III
Benard V. Preziosi, Jr
Arianna Sánchez
Simon Batifort
Irene Petrelli
**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, NY, 10178
U.S.A.
gkahale@curtis.com
bpreziosi@curtis.com
arianna.sanchez@curtis.com
sbatifort@curtis.com
ipetrlli@curtis.com

9.      On 23 March 2018, the Respondents advised that Respondent 2 would be represented

in this arbitration also by the following counsel:

Alfredo De Jesus S.
Alfredo De Jesus O.
Eloisa Falcon Lopez
Marie-Therese Hervella
**DE JESUS & DE JESUS**
20, rue Quentin Bauchart
75008 Paris
France

10.     The Claimant and the Respondents are jointly referred to as the "Parties".

### 3.   *The Tribunal*

11.     The Tribunal is composed of:

**Dr. Laurent Lévy** (the President of the Tribunal)
LEVY KAUFMANN-KOHLER
3-5, rue du Conseil-Général
P.O. Box 552
1211 Geneva 4
Switzerland
Tel.: +41 22 809 62 00
Email: laurent.levy@lk-k.com

**Prof. Laurent Aynès** (arbitrator nominated by the Claimant)
DARROIS VILLEY MAILLOT BROCHIER
69 avenue Victor Hugo
75116 Paris
France
Tel.: +33 145 02 1919
Email: laynes@darroisvilley.com

**Prof. Andrea Giardina** (arbitrator jointly nominated by the Respondents)
Via Arbia 40
00199 Rome
Italy
Tel.:  +39 06 94321773
Email: andrea.giardina@lexinternational.eu

12.     A Secretary to the Tribunal has been appointed by the Tribunal with the consent of the Parties, who have received her CV and her statement of independence. The Secretary is:

**Eva Kalnina**
LÉVY KAUFMANN-KOHLER
3-5, rue du Conseil-Général
P.O. Box 552
1211 Geneva 4
Switzerland
Tel.: +41 22 809 62 00
Email:  eva.kalnina@lk-k.com

**B.**   MAIN FACTS

*1.   Overview*

13.     The below summary gives an overview of the present dispute and its main factual background. It does not include all facts which may be of relevance. Where necessary, the relevant factual aspects will be discussed in the context of the Tribunal's analysis of the issues in dispute.

14.     The present dispute arises from the Respondents' confiscation of the Claimant's interests in a light and medium (also referred to as conventional) crude oil joint venture located in the West of Venezuela's Gulf of Paria (the "Corocoro Project" or "Project"), and from the Respondents' alleged breaches of their contractual undertakings and guarantees in relation to this Project.

### 2. Historical Context

15.    By way of historical background, the discovery of Venezuela's oil reserves and their extraction by foreign oil companies commenced in and around the 1920s. In light of these developments, Venezuela enacted certain measures, such as the 1943 Hydrocarbons Law, with the alleged objective to provide investors a stable legal framework in order to incentivize investments.[5]

16.    A policy shift from the late 1950s resulted in Venezuela gradually reverting the oil assets to its own patrimony. Finally, in 1975 Venezuela enacted the 1975 Nationalization Law, pursuant to which all existing oil concessions in favour of foreign oil companies were cancelled and all activities related to the exploration, exploitation, manufacturing, refining and marketing of oil were "reserved to the State".[6]

17.    The 1975 Nationalization Law also provided for the creation of Petróleos de Venezuela, S.A. ("PDVSA"), a new State-owned and controlled national oil company that would be responsible for the development and management of all oil activities going forward.[7] The only limited concession for private participation in the hydrocarbons industry was made in Article 5 of the 1975 Nationalization Law. This provision allowed for the participation of private entities in the oil industry - "[i]n special cases and if convenient for the public interest" - by association agreements between PDVSA and its subsidiaries on the one hand, and private entities on the other, subject to the associations receiving prior authorization from the Venezuelan Congress.[8] PDVSA was thus responsible for the exploration and development of Venezuela's oil reserves.[9]

### 3. Apertura Petrolera and the Corocoro Contracts

18.    In the 1990s, facing a decline in oil production, foreign oil companies were once again invited to explore and develop Venezuela's oil reserves. This process, promoted by

---

[5] Law Partially Reforming the Hydrocarbons Law, Extraordinary Official Gazette No. 1,149, published on 15 September 1967 ("1943 Hydrocarbons Law"), **C-5**.

[6] Organic Law that Reserves to the State the Industry and the Trade of Hydrocarbons, Extraordinary Official Gazette No. 1,769, published on 29 August 1975 ("1975 Nationalization Law"), **C-6/R-3**, Article 1.

[7] 1975 Nationalization Law**, C-6/R-3,** Article 6.

[8] 1975 Nationalization Law, **C-6/R-3**, Article 5.

[9] Decree No. 1123 Creating The Company Petróleos de Venezuela and Issuing its Incorporation Documents and Bylaws in the Manner Expressed Therein, Official Gazette No. 1770 Special ("PDVSA's 1975 By-Laws"), Title I Clause One and Two, **C-7**.

various governmental constituencies, including the Ministry,[10] and which provided foreign investors with different financial incentives to allay their concerns, became known in Venezuela as the "Oil Opening" (or "*Apertura Petrolera*"). The legal basis of the *Apertura Petrolera* was the above-mentioned Article 5 of the 1975 Nationalization Law.[11]

19.    In this context, in June 1995 the Bicameral Commission of Energy and Mines ("Bicameral Commission") issued a "Report on Association Agreements for the Exploration at Risk of New Areas and the Production of Hydrocarbons under the Shared Profits System" ( "Bicameral Commission Report").[12] In its report the Bicameral Commission "examined the convenience" of executing the foregoing association agreements between private entities and PDVSA's subsidiaries and, pursuant to the 1975 Nationalization Law, proposed to the Venezuelan Congress to authorize their execution.[13] The Bicameral Commission's proposal was subject to the Venezuelan Congress granting its authorization in "stric[t]"[14] observance of the conditions set out in Annex A of the Bicameral Commission Report.[15]

20.    On 17 July 1995, as required by Article 5 of the 1975 Nationalization Law, the Venezuelan Congress "authorize[d]" the "execution of  Association Agreements" between PDVSA's subsidiaries and private entities "for the Exploration at Risk of New Areas and the Production of Hydrocarbons under the Shared Profits System" ("Congressional Authorization").[16] This Congressional Authorization, which considered and observed the Bicameral Commission Report's "careful analysis",[17] set out the framework of conditions for the conclusion of the Association Agreements with respect to ten New Areas, namely, Guanare, Sombrero, San Carlos, Delta Centro, Punta

---

[10] Initially known as the Ministry of Energy and Mines, in 2005, it was renamed the Ministry of Energy and Petroleum. In 2007, it was renamed again as the People's Ministry of Energy and Petroleum. In 2011, the People's Ministry of Energy and Petroleum was renamed again as the People's Power Ministry of Oil and Mining. For ease of reference, all references herein are to the "Ministry".

[11] *Supra,* § 17.

[12] Bicameral Commission Report, **R-9**.

[13] Bicameral Commission Report, **R-9**, p. 33

[14] The Tribunal is aware that the Bicameral Commission Report refers to the term in Spanish "*taxativamente*" which, as pointed out by the Respondent, translates into English as "strictly", or "exhaustively" or "not subject to discussion" (SoD, § 20).

[15] Bicameral Commission Report, **R-9**, pp. 33, 37.

[16] Congressional Authorization, **C-22/R-8**, Articles 1, 2 (First and Second Conditions).

[17] Congressional Authorization, **C-22/R-8**, Whereas VI.

Pescador West, Guarapiche, La Ceiba, Catatumbo, Gulf of Paria East, and the one comprising the present dispute, Gulf of Paria West.[18]

21.    The following are the main conditions of the Congressional Authorizations:

i.   **First Condition**:

The National Executive, exercising its legal powers, through the Ministry of Energy and Mines, shall determine the Geographical Areas described in Annex "B" (hereinafter the "Areas") to be granted to a subsidiary of *Petróleos de Venezuela, S.A.* (hereinafter the "Subsidiary") for the carrying out of exploration and exploitation activities of hydrocarbons fields, transportation via special routes, storage and marketing of the production obtained in the Areas, and all necessary works for the management of these activities, all in accordance with the provisions of the Organic Law that Reserves to the State the Industry and Trade of Hydrocarbons.

ii.   **Second Condition**:

The Subsidiary shall conduct the bidding processes necessary for the selection of the private investment companies with which the Association Agreements shall be entered into for the carrying out of the activities described in the First Condition pursuant to Article 5 of the Organic Law that Reserves to the State the Industry and Trade of Hydrocarbons.

Based on the results of each bidding process, the Subsidiary shall enter into an Association Agreement (hereinafter the "Agreement") with the investment company or companies that succeed in the bidding process (hereinafter the "Investors").

The Investors may bid in all Areas in connection with the activities referred to in the First Condition, but they may only be selected, given the results of the bidding process conducted by the Subsidiary, to enter into an Agreement with a maximum number of five (5) Areas, depending on each investor's classification.

iii.   **Fourth Condition**:

In each Agreement, before commencing the activities under the Agreement, the Parties shall form a committee (hereinafter the "Control Committee") to be composed of an equal number of members appointed by the Investors and the Subsidiaries, and to be presided over by a member appointed by the latter. For the validity of its deliberations and decisions, the presence and consent of the members appointed by the Subsidiary shall be required, with the President having a double vote to resolve ties.

The Parties shall submit fundamental decisions of national interest in connection with the execution of the Agreement to the approval of the Control Committee.

These decisions shall be described in the Agreement and shall include, among others, the approval of the exploration, evaluation and development plans, as well as any other modification to such plans, including the extension of the terms for exploration or exploitation, and the implementation of production reductions in compliance with international obligations of the Republic of Venezuela. For this

---

[18] Order Determining Geographical Areas for Execution of Association Agreements for Exploration at Risk of New Areas and Production of Hydrocarbons under Shared Profits System, 17 January 1996, **C-32**.

purpose, the Control Committee shall be informed of all important matters in the life of the Association and all information regarding accounts and receivables shall be presented to the entities designated by the Control Committee in order to allow them to have oversight and audit such information.

iv. **Seventeenth Condition**:

The Agreement shall be governed by and interpreted under the laws of the Republic of Venezuela.

Matters falling within the power of the Control Committee shall not be subject to arbitration.

Arbitration, conducted in accordance with the procedural rules of the International Chamber of Commerce and in effect at the moment the Agreement is signed, shall be the method used for resolving disputes involving matters that do not fall within the power of the Control Committee and cannot be resolved through agreement of the Parties.

v. **Nineteenth Condition:**

The Agreement, as well as all activities and operations derived therefrom, shall in no case create liability on the part of the Republic of Venezuela nor diminish its sovereign rights, the exercise of which shall in no case give rise to claims by other States nor foreign powers, regardless of the nature or characteristics of such claims.

vi. **Twenty-third Condition**:

For the execution of each Agreement, the Subsidiary shall send its final form to the Ministry of Energy and Mines, with the purpose of submitting it, in a period of eight (8) consecutive days, to the consideration of the National Legislative Houses, so that they may proceed to its subsequent authorization, as a priority.

22.    Contemporaneously, and further to the Congressional Authorization's First and Second Conditions, numerous international private entities, including ConocoPhillips, were invited to participate in a bidding process in order to obtain the right to explore and develop the New Areas.[19] To that effect, PDVSA/CVP and the companies that qualified for the bidding round started discussing the content of a Model Association Agreement ("Model AA").[20]

---

[19] Facsimile from Juan Szabo (PDVSA) to Carlos Bustamante (Phillips) attaching Letter from Luis Giusti (PDVSA) to Investors, 6 July 1995, **C-21**; 1995 Exploration Bidding Round: Technical, Economic and Legal Conferences, Macuto, Registered Attendee List, 17-19 October 1995, **C-24**; PDVSA/CVP Presentation, *Tax, Accounting and Financial Overview*, Macuto, 17-19 October 1995, **C-25**; Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bidding Round, 2 November 1995, **C-26**.;

[20] Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bidding Round, **C-26**; Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching "Modifications to Model Association Agreement", **C-27**.

23.    On 23 November 1995, PDVSA issued a memorandum reflecting its position with respect to the different comments raised by the qualified private entities in relation to the Model AA ("Model AA Memorandum"). In light of the need to "ensure that the [possible] modifications [to the Model AA were] consistent with the legal regime under which 1995 Exploration Bidding Round [was] concluded", the Model AA Memorandum focused on "substantive modifications" to the Model AA prompted by the potential bidders' views.[21]

24.    Significantly, the Model AA Memorandum:

   i.    Recognized the need for the Model AA to "acknowledge the applicability" of Article 1160 of the Venezuelan Civil Code ("VCC") providing for "all contracts to be carried out in good faith", as well as of "international investment treaties to which Venezuela is a party". Regarding Article 1160 of the VCC, the Model AA Memorandum stated that its application would allow the AA parties "to demand a good faith renegotiation of the terms of the contract if as a result of an unforeseen change in circumstances there is a substantial adverse impact on the economic benefits intended to be provided to such party under the contract". With respect to international investment protection via treaties, the Model AA Memorandum clarified that such instruments would protect "investors from the relevant countries against adverse effects from discriminatory changes in Venezuelan law".[22]

   ii.   Stated that the Model AA would "be revised to make it clear that an act of the Venezuelan government that is not of general applicability will not be a defense to a claim against CVP for breach of contract if it fails to perform an obligation under the Association Agreement, even if its failure is attributable to the governmental act".[23]

25.    After the various changes addressed in the Model AA Memorandum were incorporated into the Model AA, in December 1995 PDVSA (on behalf of CVP) issued the definitive version of the Model AA applicable to the "qualified companies […] eligible to submit

---

[21] Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching the Model AA Memorandum,**C-27.**

[22] Model AA Memorandum, **C-27**, § 9.

[23] Model AA Memorandum, **C-27**, § 10.v.

bids for the ten Areas being offered in the bidding round" ("Definitive Model AA").[24] PDVSA clarified that the "[w]inning bidders [would] be required to execute the [Definitive Model AA] without modification, except as to ministerial details […] and corrections of typographical or translation errors".[25]

26.  Against this backdrop, after bidding on several blocks within the New Areas, Conoco prevailed with respect to the Gulf of Paria West area.[26] Subsequently, in June 1996, and pursuant to the Twenty-third Condition of the Congressional Authorization,[27] the Venezuelan Congress "authorize[d] the execution of [an] Association Agreement" between CVP and Conoco for the "Exploration at Risk [and] the Production of Hydrocarbons […]" in the Gulf of Paria West area ("Congressional Approval").[28]

27.  Accordingly, on 10 July 1996, Conoco and CVP entered into an Association Agreement for the "exploration, discovery, evaluation, development and exploitation of commercial hydrocarbon reservoirs within [Gulf of Paria West]" ("Corocoro AA" or "AA").[29] The Corocoro AA granted Conoco (or any of its successors, assignees, or other private entities holding interest in the Project, together the "Investors")[30] the right to explore a number of blocks within the Gulf of Paria West area for a determined duration. The Investors could further obtain exploitation rights for specific blocks in case of an approved commercially viable oil discovery. In that event, CVP would have the option to participate with up to 35% interest in a consortium agreement with the Investors for the exploitation of the oil discovery;[31] a participation that would proportionally dilute the Investors' interest in the Projects.

28.  On the same day, Conoco and PDVSA executed a Guarantee of Proper Performance ("Corocoro Guarantee" or "Guarantee") whereby PDVSA "unconditionally and irrevocably" guaranteed the "due and punctual performance" of "all obligations of CVP"

---

[24] Letter from PDVSA to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching the Definitive Model AA, December 1995, **C-28**, p. 2.

[25] Letter from PDVSA to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching the Definitive Model AA, December 1995, **C-28**, p. 3.

[26] *Supra*, § 20.

[27] *Supra*, § 21.vi.

[28] Congressional Approval, **C-34**, Article 1. Out of the 10 New Areas previously identified (*supra*, § 20), the Congressional Approval also sanctioned the execution of association agreements in seven New Areas additional to Gulf of Paria West. Namely, La Ceiba, Guanare, Gulf of Paria East, Guarapiche, San Carlos, Punta Pescador, and Delta Centro.

[29] Corocoro AA, **C-1**, Clauses 2, 1 (definition of "Area"), and Annex A.

[30] Corocoro AA, **C-1,** Recital 1 and Clause 1 (Definitions of "Investor" and "Participating Investor").

[31] Corocoro AA, **C-1**, Clauses 8.5, 10.1 ss.

under: (i) the Corocoro AA; and (ii) consortium agreements to be concluded between CVP and the Investors pursuant to the AA.[32]

29.    Notably, at the time of the execution of both the AA and the Guarantee, Conoco held a 100% interest in the Project. However, Conoco later assigned portions of its interest to OPIC Karimun Corporation ("OPIC") and Eni Venezuela B.V. ("Eni", formerly AGIP Venezuela B.V.). Indeed, from mid-1998 until 2003,[33] the Project's interests were split as follows: 50% for Conoco, 40% for Eni, and 10% for OPIC.[34]

30.    The Project's exploration and exploitation activities were to be managed and conducted through the following contractually instituted organs:

   i.    **Management Company**: The Management Company was in charge of "direct[ing], coordinat[ing] and supervis[ing] the activities […] object of the [Corocoro AA]" while "ensuring an optimal level of commercial production" by "applying […] the standards established in applicable legislation and, to the extent consistent therewith, the technical and commercial criteria commonly employed by the international oil industry".[35] To that effect, Agua Plana S.A. ("Management Company" or "Agua Plana") was incorporated in August 2016, with the Investors holding a 65% interest and CVP a 35% interest, and its Board of Directors being composed of three appointees representing the Investors and two representing CVP.[36]

   ii.    **Control Committee**: The Control Committee was responsible for "approv[ing]" certain "decisions of national interest to the Venezuelan State related to the performance  of the [Corocoro AA]",[37] and consisted of four principal members, half of which were appointed by the Investors and the remaining two (including the Chair) by CVP.[38]

---

[32] Corocoro Guarantee, **C-2**, Section 3.

[33] *Infra*, § 37.

[34] Farm-out Agreement between Conoco Venezuela B.V. and OPIC Karimun Corporation for the Gulf of Paria West Area, 10 April 1998, **R-15**; Gulf of Paria West Investors' Participation Agreement among Conoco Venezuela B.V., Eni Venezuela B.V. and OPIC Karimun Corporation, 31 March 1998, **R-16,** Article 4.

[35] Corocoro AA, **C-1**, Clause 5.2.

[36] Corocoro AA, **C-1**, Clauses 5.3 and 5.4.

[37] Corocoro AA, **C-1**, Clause 4.2.

[38] Corocoro AA, **C-1**, Clauses 4.5, 4.10.

iii. **One or several Development Committees**: A Development Committee (appointed by the Management Company's Board "at or prior" to the execution of any consortium agreement necessary following an oil discovery), was to "direct, coordinate, and supervise" the "commercial aspects of the activities" object "of the Corocoro AA" in respect of the discovery's development area.[39]

iv. **Operator**: The Operator was responsible for the "day-to-day activities in the exploration, development and operation" of the Project, under the supervision of the Management Company, and in compliance with the decisions of the Control Committee, the Management Company's Board, and each relevant Development Committee.[40] Conoco was designated as Operator from the very outset through the conclusion of an operating agreement between CVP, Conoco, and Agua Plana ("Operating Agreement").[41] As a result, Conoco was entitled "at all times" until its resignation or removal pursuant to the Operating Agreement, to "maintain" an interest in the Project of "at least 30%".[42]

31. Acting within this contractual framework, Conoco commenced exploration of the Gulf of Paria West Area ("GOPWA") and its area of approximately 1,135.81 km2, which was divided into 9 blocks.[43] This initial exploration period took place between the years 1996 and 2000,[44] and required the performance of various activities (including extensive seismic testing) throughout the GOPWA at Conoco's "own cost and risk",[45] and during which OPIC and Eni joined as Investors.[46]

32. Between September 1998 and April 1999, a first exploratory well in block 9 (referred to as Corocoro-1X) was drilled, discovering the Corocoro field ("Corocoro Discovery or Discovery").[47] Pursuant to the Corocoro AA,[48] an Evaluation Plan was submitted in July 1999 and approved by the Management Company in December 2000.[49] Thereafter, a

---

[39] Corocoro AA, **C-1**, Clauses 5.9, 10.7; Corocoro CA, C-3, Section VII.

[40] Corocoro AA, **C-1**, Clause 12.1.

[41] Operating Agreement, **C-36**.

[42] Corocoro AA, **C-1**, Clauses 12.5, 12.3.

[43] Corocoro AA, **C-1**, Annex A.

[44] Corocoro AA, **C-1**, Annex E-1; 2002 Oil Development Plan, **C-54**, p. 9.

[45] Corocoro AA, **C-1**, Clause 6.1 and Annex E-1.

[46] *Supra*, § 29; Corocoro AA, **C-1**, Annex E-1; 2002 Oil Development Plan, **C-54**, p. 9.

[47] 2002 Oil Development Plan, **C-54**, p. 9.

[48] Corocoro AA, **C-1**, Clause 7.2.

[49] 2002 Oil Development Plan, **C-54**, p. 9.

comprehensive appraisal program was conducted between July 2001 and March 2002, where the Investors drilled a series of additional exploratory wells within the Corocoro field.[50] Given the promising results thereof, on 22 October 2002 the Investors issued a declaration of commerciality with respect to the Discovery.[51]

33.     Consequently, on 1 November 2002, the Investors submitted a Development Plan for the Control Committee's approval,[52] which was granted on 8 April 2003.[53] Upon said approval, the Investors gained entitlement to an Operation Period of 20 years (i.e. through 2025)[54] which, subject to the Control Committee's further approval, could be extended, at most, "for an additional term not to exceed the remainder of the 39-year term of the [Corocoro AA]" (i.e. through 2035).[55]

34.     Irrespective of the eventual amendment of some of the Development Plan's specifics (the Parties disagree as to the reasons why the amendment was necessary),[56] it is non-controversial that the Development Plan was broadly divided into two phases.  Phase I focused on the eastern part of the Corocoro field, and envisaged the construction of a Wellhead Platfom ("WPH") for crude extraction, an Interim Processing Facility ("IPF") and a subsequent Central Processing Facility ("CPF") for production purposes, a Floating Storage and Offloading Unit ("FSO") to store the oil produced from either the IPF or the CPF, and the corresponding pipelines (one for water injection and another one for transporting the produced oil to the FSO). In turn, Phase II was to focus on the western part of the Corocoro field and would use the "existing production facilities" of Phase I. Phase II would thus be implemented in "parallel" to Phase I, subject to the viability of further development investments, and be "conditional on the [initial] results of Phase I".[57]

---

[50] 2005 Oil Development Plan Addendum (Revision 3), **C-65**, pp. 10-11; 2008 Development Plan Progress Report, **R-24**, p. 28.

[51] Letter from the Investors to CVP, 22 October 2002, **C-53**.

[52] 2002 Oil Development Plan, **C-54.**

[53] Control Committee Meeting Minute of 8 April 2003, **C-57**, p. 2; 2005 Oil Development Plan Addendum (Revision 3), **C-65**, p. 9.

[54] Corocoro AA, **C-1**, Clause 1 (definition of "Operating Period").

[55] Corocoro AA, **C-1**, Clause 21.2.

[56] 2005 Oil Development Plan Addendum (Revision 3), **C-65**; SoC, § 52; SoD, §§ 60-62.

[57] 2005 Oil Development Plan Addendum (Revision 3), **C-65**, pp. 7-8.

35.     On 10 April 2003 (i.e. two days after the Development Plan's initial approval),[58] CVP exercised its option to acquire a 35% interest in the Discovery,[59] with the purchase price loaned to CVP by the Investors in accordance with the terms of the Corocoro AA.[60]

36.     On 16 May 2003, as required by the Corocoro AA,[61] the Investors and CVP entered into a Consortium Agreement ("Corocoro CA" or "CA") in order to "govern their relationship" during the development of the Project.[62] The Corocoro CA was to "serve as a vehicle for financial investments" with respect to the development area and for the "sharing" of both production and joint revenues from such development area.[63]

37.     As expected, CVP's decision to partake in the exploitation and development stages proportionally reduced the Investors' overall interests in the Project.[64] Indeed, at the time the CA was executed, the interests in relation to the Corocoro Discovery were split as follows: 35% for CVP, 32.5% for Conoco, 25% for Eni, and 6.5% for OPIC.[65] These percentages would vary just slightly for Conoco, Eni and OPIC due to Ineparia S.A. ("Ineparia") joining as an Investor in September 2003.[66]

### 4.     The Nationalization of the Corocoro Project

38.     The Corocoro CA was concluded amidst rising political tension in Venezuela. Shortly after Hugo Chávez's election as President in December of 1998, he immediately expressed his dislike for the *Apertura Petrolera*. Indeed, it became one of President

---

[58] *Supra*, § 33.

[59] Letter from PDVSA (on behalf of CVP) to Conoco, 10 April 2003, **C-58**; *supra*, § 27.

[60] Corocoro AA, C-1, Clauses 8.2, 8.5.

[61] Corocoro AA, **C-1**, Clause 10.1.

[62] Corocoro CA, **C-3**, Whereas III.

[63] Corocoro AA, **C-1**, Clause 10.1.

[64] *Supra*, § 27.

[65] Corocoro CA, **C-3**, Exhibit B-2.

[66] *Supra*, fn. 33. Ineparia's involvement was prompted by Conoco's, Eni's, and OPIC's purchase of a portion of the New Area referred to as Gulf of Paria East (*Supra*, § 20), in which Ineparia held a stake of 16.25%. This transaction, made in order to ensure access to the entire reservoir in which the Corocoro Discovery had been made, resulted in Ineparia holding a 0.585% interest in the Corocoro Project (2005 Oil Development Plan Addendum (Revision 3), **C-65**, p. 123; Corocoro Development Update, 13 October 2006, **C-91**). From then onwards, the interest in the Corocoro Discovery were thus split as follows: 35% for CVP, **32.2075% for Conoco**, 25.766% for Eni, 6.4415% for OPIC, and 0.585% for Ineparia. The Tribunal notes that the Claimant's statement in this respect (SoC, § 20) has not been contested by the Respondents in any of their pleadings.

Chávez's main goals to reform the oil industry by securing its underlying resource for the benefit of the Venezuelan people.

39.     As a first step towards that direction, President Chávez enacted the 2001 Hydrocarbons Law, a piece of legislation that made certain changes to the regime that had previously existed under the 1943 Hydrocarbons Law and the 1975 Nationalization Law.[67] Under the 2001 Hydrocarbons Law, production activities were reserved to the State, and private parties would only be authorized to participate in those activities through *empresas mixtas* (mixed enterprises) in which the State owned more than 50% of the shares.[68] This law provided the substratum on which several further legislative measures were passed in later years, some of which are germane to the present dispute.

40.     Opposition to this and other proposed reforms lead to a political strife, including a failed *coup d'état* against President Chávez in April 2002 and a PDVSA strike in December 2002,[69] which was brought to an end in February 2003 with the removal of over 18,000 PDVSA employees (about 1/3rd of PDVSA's workforce).

41.     Moreover, in 2004, President Chávez appointed Mr. Rafael Ramírez as both the President of PDVSA and Minister of Energy and Mines. To achieve this dual appointment, the Articles of Incorporation and By-laws of PDVSA were amended by a Presidential Decree.[70]

42.     Following his reelection in 2006, on 8 January 2007 President Chávez announced the nationalization of various economic sectors, including oil, and proclaimed that he would be seeking the National Assembly's authority to issue Decree-Laws to that effect.[71]

43.     Shortly thereafter, in February 2007, the National Assembly promulgated the Law Authorizing the President of the Republic to Issue Decrees Having Rank, Value, and Force of Law on the Matters Delegated therein ("Enabling Law"), which vested

---

[67] Decree with Force of the Organic Hydrocarbons Law, Official Gazette No. 37.323, 13 November 2001 ("2001 Hydrocarbons Law"), **C-48.**

[68] 2001 Hydrocarbons Law, **C-48**, Articles 9, 22.

[69] Juan Forero, *Venezuela's Lifeblood Ebbs Even as it Flows*, NEW YORK TIMES, 26 February 2003, **C-56**.

[70] See Partial Amendment of Decree No. 2184 of 10 December 2002, containing the By-laws of Petróleos de Venezuela, S.A., Official Gazette No. 38,081, published on 7 December 2004, **C-61**, Article 2; Reprint of Decree No. 3264 Appointing Rafael Ramírez as President of PDVSA, Official Gazette No. 38,081, published on 7 December 2004, **C-62**.

[71] President Chávez's Speech, 8 January 2007, **R-58**.

President Chávez with the power to legislate by decree for 18 months with respect to 11 different areas, including the energy sector and the oil industry.[72] In particular, the Enabling Law stated:

> The President of the Republic is authorized in Council of Ministers to issue Decrees with Rank, Effect and Force of Law, in accordance with the guidelines, purposes and framework of the matters delegated under this Law, in accordance with the last part of Article 203 and section 8 of Article 236 of the Constitution of the Bolivarian Republic of Venezuela, and therefore: […]

> To issue norms allowing the State to assume directly or through wholly owned companies, the control of the activities performed by the associations operating in the Orinoco Oil Belt, **including the upgraders and the associations for exploration at risk and shared profits**, to regularize and **adjust their activities** within the legal framework that **governs the national oil industry** [(i.e. the 2001 Hydrocarbons Law)], through the contractual form of **mixed enterprises or wholly-owned companies of the State**.[73]

44.   On the basis of the Enabling Law, the Government further adopted a series of measures eventually culminating in the nationalization of the Claimant's investment in the Corocoro Project and the extinguishment of the Corocoro AA. These measures are discussed in more detail *infra*.[74]

45.   On 26 February 2007, the Government enacted Decree No. 5.200, a decree with the rank, value and force of law ("2007 Nationalization Decree").[75] This Decree, which specifically referred to, *inter alia*, the Corocoro Project: (i) declared that all "existing associations between the subsidiaries of [PDVSA] and the private sector operating in the [New Areas]" were also to be "adjusted" to the legal framework governing the Venezuelan oil industry (in accordance with the terms set forth in the 2001 Hydrocarbons Law);[76] and (ii) required their migration to *empresas mixtas* that were at least 60% owned by PDVSA or any other affiliate designated by PDVSA.[77]

46.   The 2007 Nationalization Decree further provided that the nationalization would take place in accordance with the following procedure:

---

[72] Law Authorizing the President of the Republic to Issue Decrees with Rank, Value and Force of Law on the Matters Delegated Herein, Official Gazette No. 38.617, 1 February 2007, **R-59**.

[73] Enabling Law, 1 February 2007, **R-59**, Article 1.11 (emphasis added).

[74] *Infra*, §§ 45-53.

[75] Decree Having the Rank, Value and Force of Law of Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements, Decree No. 5.200, Official Gazette No. 38.632, published on 26 February 2007 ("2007 Nationalization Decree"), **C-103/R-2.**

[76] *Supra*, § 39.

[77] 2007 Nationalization Decree, **C-103/R-2,** Articles 1, 2.

**ARTICLE 4.** The private sector companies that are currently parties to [association agreements], shall be **granted a period of four (4) months** as of the date of publication of this Decree-Law [**i.e. until 26 June 2007**], to agree on the **terms and conditions of their possible participation in the new [***empresas mixtas***]**. […]

**ARTICLE 5.** Once the term established in Article 4 of this Decree-Law has expired, and **if no agreement has been reached** on the incorporation and operation of the [*empresas mixtas*], the Republic, through [**PDVSA**] or any of its subsidiaries designated for that purpose, shall **directly assume the activities carried out by the associations** […] for the purpose of preserving their continuity, in light of their public utility and social interest character.[78]

47.     Moreover, the 2007 Nationalization Decree called for the creation of a "Transitio[n] Commi[ttee]" for each of the concerned association agreements, which would be "incorporated to the current board of directors of the respective association", in order to "guarantee the transfer of control" of the various projects to the (forthcoming) *empresas mixtas*.[79] According to the 2007 Nationalization Decree, this "transfer process" was to be "completed" by 30 April 2007, and the "private sector companies" were required to "cooperate with [PDVSA]" for the purposes of "conduct[ing] a safe and orderly change of operator".[80]

48.     To that effect, on 5 March 2007, PDVSA (on CVP's behalf) informed the investors of the creation of the Transition Committee for the Corocoro Project and of the appointment of Messrs. Alexis Lizardo, Cesar Ramírez and Leonardo Marcano thereto.[81] A few days after, on 13 March 2007, Conoco appointed Messrs. Gustavo Hernández and Patrick Wolfe to act on its behalf.[82]

49.     Pursuant to the deadlines set out in the 2007 Nationalization Decree:[83]

   i.   On 1 May 2007, PDVSA assumed full operational control over the Corocoro Project;[84] and

   ii.  On 26 June 2007 (given Conoco's and OPIC's inability to reach a consensus with PDVSA and CVP with respect to the migration of the Corocoro Project), Eni entered into a Memorandum of Understanding with CVP (namely, PDVSA

---

[78] 2007 Nationalization Decree, **C-103/R-2,** Articles 4, 5 (emphasis added).

[79] 2007 Nationalization Decree, **C-103/R-2,** Article 3.

[80] 2007 Nationalization Decree, **C-103/R-2,** Article 3.

[81] Letter from PDVSA (on behalf of CVP) to Conoco and Eni, 5 March 2007, **C-255**.

[82] Letter from Conoco to PDVSA, 13 March 2007, **C-111**.

[83] *Supra*, §§ 46, 47.

[84] SoC, §§ 9-10; SoD, § 97; Reply, § 18.

Petróleo S.A.), providing for the formation of an *empresa mixta* upon the National Assembly's approval in order to assume the operations of the Corocoro Project ("CVP-Eni MoU").[85] Further, in line with Article 5 of the 2007 Nationalization Decree, CVP and PDVSA henceforth "directly assume[d] the activities carried out" further to the Corocoro AA.[86]

50.    On 8 October 2007, the National Assembly enacted the Law on the Effects of the Process of Migration into Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Exploration at Risk and Profit Sharing Agreements ("2007 Law on Effects of Migration"). The 2007 Law on Effects of Migration purported to "extinguish" the association agreements with respect to which a migration agreement could not be concluded, and to formally transfer the privately held interests in the various projects at issue to the (newly created) *empresas mixtas*, as follows:

> **ARTICLE 1.** The [association agreements subject of the 2007 Nationalization Decree] shall be **extinguished** as of the date of publication in the Official Gazette of the Bolivarian Republic of Venezuela of the Decree that **transfers the right to exercise** <u>primary activities</u> **to the [***empresas mixtas***]** that have been incorporated in accordance to the established in such Law-Decree.
>
> Likewise those agreements in which <u>**none** of the private parties</u> that were part in the corresponding associations have reached an agreement for the migration to [*empresas mixtas*] within the term established in Article 4 of the [2007 Nationalization Decree] will also be **extinguished as of the moment of the publication of this Law** in the Official Gazette of the Bolivarian Republic of Venezuela
>
> **ARTICLE 2**. The **interests, shares,** and **participations** in the associations [subject of the 2007 Nationalization Decree], in the **companies** incorporated to develop the corresponding projects, and in the **assets** used for the development of the activities of such associations, including **rights of property, contractual rights,** and those of **other nature**, that corresponded to the <u>**companies of the private sector with which no agreement for the migration to mixed companies was reached**</u> until the term established in Article 4 of the [2007 Nationalization Decree] expired, **are hereby transferred**, based in the reversion principle, without requiring additional actions or instruments, to the ***new* [*empresas mixtas*]** constituted as result of the migration of the respective associations, except for the established in Article 3 of this Law.
>
> **ARTICLE 3**. In the cases in which <u>**none** of the companies</u> that constituted **the private part** of the Association Agreement would have reached an agreement for the migration to [an *empresa mixta*] within the term established in Article 4 of the [2007 Nationalization Decree], the **interests, shares, participations and rights**, to which Article 2 of this

---

[85] CVP-Eni MoU, **R-100**.

[86] *Supra*, § 46.

> Law makes reference **shall remain property of the subsidiary of [PDVSA] that assumed the activities of the corresponding association** until the National Executive determines the subsidiary that shall assume such activities definitively.[87]

51.   On 29 October 2007, as envisaged in the CVP-Eni MoU and considered in Article 2 of the 2007 Law on Effects of Migration,[88] the National Assembly "approve[d] the creation of an [*empresa mixta*] between [CVP] and Eni […], or their respective affiliates, with an initial shareholding of seventy-four percent (74%) and twenty-six percent (26%), respectively".[89]

52.   To that effect, on 30 November 2007, CVP and Eni concluded a contract concerning the incorporation of PetroSucre S.A. ("PetroSucre"), an *empresa mixta*, whose shareholding would be split pursuant to the National Assembly's approval (i.e. 76% for CVP and 24% for Eni), and whose purpose would be to develop and conduct all primary activities within, essentially, the GOPWA ("CVP-Eni Conversion Contract").[90]

53.   On 16 January 2008, President Chávez issued Decree No. 5.811 ("2008 Transfer Decree"). This decree transferred to PetroSucre the "right to develop primary exploration activities in search of hydrocarbon deposits, extraction in their natural state, collection, transportation and initial storage", within de GOPWA, for a period of 25 years.[91] Consequently, pursuant to Article 1 of the Law on 2007 Effects of Migration, the Corocoro AA was "extinguished".[92]

54.   According to the Claimant, the foregoing facts attract the Respondents' civil liability under Venezuelan law, a contention that the Respondents oppose.[93]

## C.   OVERVIEW OF THE PARTIES' POSITIONS

55.   In this section, the Tribunal provides a brief overview of the Parties' positions and main heads of claims and defenses. As such, it is by no means exhaustive. A detailed

---

[87] 2007 Law on Effect of Migration, **C-152**, Articles 1-3.

[88] *Supra*, §§ 49.ii, 50.

[89] Approval of the incorporation of an *empresa mixta* between CVP and Eni, Official Gazette No. 38,798, **C-153**, Article 1.

[90] CVP-Eni Conversion Contract, **C-267/R-101**, Articles 1-2.

[91] 2008 Transfer Decree, **C-159**, Articles 1-2.

[92] *Supra*, § 50.

[93] *Infra*, Section III.

account of the Parties' positions with respect to each issue in dispute is set out in the analysis' section below.[94]

### 1. The Claimant's Position

56. The Claimant raises both contractual and non-contractual claims in this arbitration.

57. With respect to the Contractual Claims, the Claimant's case is three-fold:

    i. First, the Claimant submits that the Respondents fully failed to perform the Corocoro Contracts from 1 May 2007 onwards. The Tribunal refers to this claim as the "Non-Performance Claim".[95]

    ii. Second, the Claimant submits that the Respondents also committed so-called "positive breaches" of the Corocoro Contracts,[96] which are divided into two main lines of argument:

        a) First, the Claimant argues that the Respondents breached contractual obligations which, in the Claimant's view, were specifically designed to survive the termination of the Corocoro AA. In particular, the Claimant argues that by not performing the Corocoro Contracts and instead carrying on with the development the Corocoro Project through PetroSucre, the Respondents contravened the explicit mandate in the Corocoro AA, which vested upon the Claimant the continuous right (until expiration of the 39-year contractual term of the Corocoro AA) to develop and share the production and revenue of the Corocoro Discovery. The Tribunal refers to this claim as the "Surviving Obligations Claim".[97]

        b) Second, the Claimant alleges that the Respondents failed to pay the loan which was extended to CVP for the acquisition of its 35% interest in the Corocoro Discovery, relieved the Claimant as Operator, unlawfully replaced the management structure governing the Corocoro Project, and executed the CVP-Eni MoU and the CVP-Eni

---

[94] *Infra*, Section III.

[95] *Infra*, §§ 182.i, 184-185.

[96] C-PHB, §§ 16, 18.

[97] *Infra*, §§ 182.ii, 186-194.

Conversion Contract while the Corocoro Contracts were still in force, thereby disclaiming all of their obligations under the Corocoro Contracts. The Tribunal refers to these submissions, cumulatively, as the "Particular Breaches Claim".[98]

iii.  Third, the Claimant submits that, contrary to the Tribunal's findings in ICC Case No. 20549/ASM/JPA (C-20550/ASM) ("ICC P&H Arbitration"), the Respondents in the present case cannot invoke or otherwise rely on the implementation or compliance with the 2007 Nationalization Decree to escape liability for the above breaches. Pursuant to the Tribunal's findings in the ICC P&H Arbitration, the Claimant no longer disputes that the 2007 Nationalization Decree is an extraneous and non-attributable governmental act to the Respondents.[99] Therefore, any breach of the Corocoro Contracts caused by the 2007 Nationalization Decree in principle constitutes a *causa extraña* precluding the Respondents' liability under general Venezuelan contract law. However, the Claimant submits that, through Clause 28.1 of the Corocoro AA, the Respondents assumed the risk for any damages caused to the Investors by state acts "not of general applicability", such as the 2007 Nationalization Decree.[100]

58.  With respect to the non-contractual claims, which are raised in the alternative, the Claimant argues that: (i) the Respondents' conduct constitutes an indemnifiable *hecho ilícito* under Venezuelan law;[101] and (ii) the Respondents have been unjustly enriched by the confiscation of the Claimant's assets and interests in the Corocoro Project.[102]

---

[98]  *Infra*, § 182.iii, 195-200.

[99]  *Infra*, § 229. As pointed out by the Respondents (R-PHB, §§ 2-6), this was not the Claimant's position in the first round of submissions. Rather, in its Statement of Claim the Claimant argued that the Respondents actively participated in procuring the 2007 Nationalization Decree in breach of, *inter alia*, the principle of good faith under Venezuelan law (expressly incorporated in certain provisions of the Corocoro AA). Consequently, the Claimant formerly argued that the 2007 Nationalization Decree could not be considered a *causa extraña* under Venezuelan law and, as such, its implementation could not preclude the Respondents' liability for the breach of the Corocoro Contracts (SoC, §§ 146-219). The Claimant has departed from the foregoing position in light of the Tribunal's decision in the ICC P&H Arbitration to reject such line of argument, and now accepts that the 2007 Nationalization Decree is indeed extraneous and non-attributable to the Respondents (Transcript, pp. 8:8-10:9 (Claimant's Opening Statement); *infra*, § 229). Consequently, and with due regard to procedural economy, the Tribunal need not and will not analyze the Claimant's previous position as set out in the Statement of Claimant. For the same reason, the Tribunal will not address the broader inter-related argument that the Respondents breached the Corocoro Contracts in bad faith by being instrumental in the issuance of the 2007 Nationalization Decree.

[100]  *Infra*, § 201.

[101]  *Infra*, § 385.

[102]  *Infra*, § 392.

### 2. The Respondents' Position

59.  At the outset, the Respondents submit that, to the extent that the present dispute concerns fundamental decisions of the Venezuelan State, it exceeds the scope of both the arbitration agreement in Clause 25.2 of the Corocoro AA and the Congressional Authorization's Fourth Condition.[103] Consequently, they argue that the Claimant's claims are not arbitrable.[104]

60.  Moreover, the Respondents note that the Claimant has waited ten years after the 2007 Nationalization Decree to file its claims, and allege that the Claimant never disclosed that it considered them to be in breach of any contractual obligation or otherwise liable under the *hecho ilícito* and unjust enrichment doctrines. In this regard, the Respondents argue that the Claimant's conduct denotes a "disloyal delay" which warrants the dismissal of the adduced claims on that basis alone.[105]

61.  As to the merits of the Claimant's claims, the Respondents submit that no breach of the Corocoro Contracts can arise as the Claimant ceased to have any rights in the Corocoro Project by virtue of a law of public policy, namely, the 2007 Nationalization Decree.[106] In the alternative, the Respondents argue that, even if the Respondents were considered debtors under the Corocoro Contracts notwithstanding the expropriation of the Claimant's contractual rights and assets in the Corocoro Project, any alleged breach of the Corocoro Contracts would be excused under Clause 28.1 of the Corocoro AA, which precludes liability for any breaches caused by state acts of "general applicability", such as the 2007 Nationalization Decree.[107]

### D. ARBITRATION AGREEMENT

62.  The jurisdiction of the Tribunal is based on the arbitration agreements contained in the Corocoro AA and the Guarantee, and their incorporation by reference in the CA.

63.  Clause 25.2(a) of the Corocoro AA provides as follows:

> Any dispute arising out of or concerning this Agreement regarding matters not within the competence of the Control Committee [(established in Clause IV of the AA)] shall be settled exclusively and finally by arbitration. The arbitration shall be conducted and finally settled by three (3) arbitrators (except as described below)

---

[103]; *Infra*, § 63; *supra*, § 21.iii.

[104] *Infra*, §§ 143 ss.

[105] *Infra*, §§ 169 ss.

[106] *Infra*, §§ 205-208.

[107] *Infra*, § 217.

in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce as in effect on the date of this Agreement (the "ICC Rules"), or such other rules as may be agreed by all of the Parties involved. If CVP is a party to the relevant dispute, CVP shall select an arbitrator and the other party or parties thereto shall collectively select an arbitrator in accordance with the ICC Rules. If CVP is not a party to the relevant dispute, and there are only two such parties, each such party shall select and arbitrator in accordance with the ICC Rules. In either such case, the arbitrators so nominated shall then agree within (30) days on a third arbitrator to serve as Chairman. Notwithstanding the foregoing, disputes submitted to arbitration pursuant to Clause 12.5, 22.9 or 23.4 [relating to the transfer or termination of "Block and Development Areas"] shall be resolved by a single arbitrator. All arbitration proceedings under this Agreement shall be conducted in New York City (United States of America). All arbitrators appointed pursuant to this Agreement shall have the powers of an amiable compositeur. Any decision or award of the tribunal (or the arbitrator) shall be final and binding upon the Parties. Judgment for execution of any award rendered by the arbitral tribunal (or the arbitrator) may be entered by any court of competent jurisdiction without review of the merits of such award. To the extent permitted by law, any rights to appeal from or to cause a review of any such award by any court or tribunal are hereby waived by the Parties.

64.    Section 11 of the Corocoro Guarantee provides as follows:

Any dispute concerning the legal interpretation or construction of this Guarantee shall be settled exclusively and finally by arbitration. The arbitration shall be conducted in accordance with the ICC Rules. The Investors [i.e., Claimant] shall collectively select an arbitrator and the Guarantor [PDVSA] shall select an arbitrator in accordance with the ICC Rules. The arbitrators so nominated shall then agree within 30 days on a third arbitrator to serve as Chairman. The arbitration shall be conducted in New York City (United States of America). Notwithstanding the foregoing, in the event that a dispute involves both the Guarantor [PDVSA] and CVP, arbitration shall be conducted in accordance with Clause 25.2 of the [Association] Agreement, as a single proceeding, and Guarantor and CVP shall jointly have the rights of CVP under such Clause 25.2.

65.    Section X of the Corocoro CA provides as follows:

Any dispute between the Members of the Consortium regarding this Agreement shall be resolved pursuant to the procedures set forth in Article 25.2 of the Partnership [Association] Agreement.

66.    The Respondents' objections to the Tribunal's jurisdiction on the grounds of the alleged non-arbitrability of the Contractual Claims are addressed in Section III.A.1 below.

## E.    PLACE OF ARBITRATION AND LANGUAGE OF THE PROCEEDINGS

67.    Pursuant to Clause 25.2(a) of the Corocoro AA, Section 11 of the Guarantee, and Section X of the CA referring to Clause 25.2 of the AA, the place of arbitration is New York City, New York (U.S.A.).

68.     The ToR provides that all proceedings shall take place in New York unless the Parties agree otherwise, or the Tribunal decides otherwise upon request of one of the Parties or on its own motion by showing of good cause.[108]

69.     On 13 February 2018, the Parties agreed on Washington DC as the "physical venue of the hearing". The Parties have further agreed that the language of the arbitration shall be English.

## F.     APPLICABLE LAW

### 1.    *Applicable substantive law*

70.     Clause 25.1 of the Corocoro AA, Section 8 of the Guarantee, and Section IX of the CA, all provide that each instrument shall be governed by and construed or interpreted in accordance with the laws of Venezuela. The applicable substantive law is thus Venezuelan law.

71.     Moreover, Clause 25.5 of the Corocoro AA provides that, "[w]ithout limiting the generality of Clause 25.1 [governing law], the Parties hereby acknowledge the applicability of Article 1160 of the Venezuelan Civil Code to this Agreement, and that accordingly all obligations hereunder shall be performed in good faith, and in accordance with equity, custom and law. The Parties also acknowledge the applicability of any international treaties relating to the mutual protection of foreign investment to which Venezuela and any country of which an Investor is a national may now be or hereafter become parties".[109]

72.     Notwithstanding the foregoing, Clause 25.2(a) of the Corocoro AA states that "all arbitrators appointed pursuant to this [AA] shall have the powers of an *amiable compositeur*". The Parties dispute the extent to which the Tribunal may rely on its powers to act as *amiable compositeur* to resolve the present dispute. The Tribunal addresses this issue in more detail in Section III.A.2 below.

### 2.    *Applicable procedural rules*

73.     This arbitration is governed by (in the following order of precedence):[110]

---

[108] ToR, § 41.

[109] Corocoro AA, **C-1**, Clause 25.5; ToR, § 43.

[110] ToR, § 44.

a)   The mandatory rules of the law on international arbitration applicable at the place of the arbitration;

b)   The ICC Rules of Arbitration of 1988 ("ICC Rules");

c)   The ToR and the procedural rules issued by the Tribunal, as reflected in Procedural Order No. 1 ("PO1"), and any amendments thereof.

74.   If the provisions therein do not address a specific procedural issue, the applicable procedural issue is to be determined by agreement between the Parties or, in the absence of such agreement, by the Tribunal.[111]

75.   Further, in accordance with Section 10 of PO1, the Tribunal may also seek guidance from, but is not bound by, the IBA Rules on the Taking of Evidence in International Arbitration 2010.

## G.   PROCEDURAL HISTORY

### 1.   Initiation of the Arbitration

76.   On 30 December 2016, the Claimant submitted the Requests for Arbitration ("Request") against the Respondents.

77.   On 1 March 2017, the Respondents submitted their Answer ("Answer").

78.   The co-arbitrators nominated by the Parties were confirmed on 29 March 2017 by the ICC Court:

▪   Laurent Aynès, as co-arbitrator upon the Claimant's joint nomination.

▪   Andrea Giardina, as co-arbitrator upon the Respondents' joint nomination.

79.   On 24 May 2017, the ICC Court confirmed Dr. Laurent Lévy as President of the Tribunal upon the joint nomination of the co-arbitrators.

80.   On 2 June 2017, the President of the Tribunal confirmed to the Parties that the Tribunal was duly constituted, and invited them to indicate their availability for a first procedural session and preference as to its format.

---

[111] ToR, § 45.

81.     On 15 June 2017, the President of the Tribunal circulated for the Parties' comments the draft Terms of Reference ("ToR") and a draft PO1. He also requested them to, if possible, seek a joint Procedural Timetable. The President further informed the Parties of the Tribunal's intention to appoint Ms. Eva Kalnina as the Secretary of the Tribunal and indicated the scope of her duties in this capacity.

82.     On 20 June 2017, the Parties agreed to hold a first procedural meeting by telephone conference and gave their respective availabilities. They also consented to the Tribunal's proposal to appoint Ms. Eva Kalnina as the Secretary of the Tribunal.

83.     On 26 June 2017, the Claimant and the Respondents provided their observations and comments on the draft ToR and PO1.

84.     In their respective communications of 27 and 28 June 2017, the Parties informed the Tribunal that they were not able to agree on a joint Procedural Timetable.

85.     On 5 July 2017, the President of the Tribunal informed the Parties that the first procedural session would take place by telephone on 13 July 2017 at 4:30 pm CET. The President attached to his message the final PO1 and the draft ToR incorporating the Parties' comments.

86.     On 11 July 2017, before the first procedural session, the Claimant provided further comments on the ToR.

87.     On 13 July 2017, the first procedural session took place as announced and the following participated:

- For the Claimant: (i) Mr. Constantine Partasides, Ms. Lucy Martinez, and Mr. Luke Sobota, from Three Crowns; (ii) Mr. Elliot Friedman, from Freshfields Bruckhaus Deringer; and (iii) Mr. Alberto Ravell, from ConocoPhillips Company.

- For the Respondents: George Kahale, III, Benard V. Preziosi, Jr., Arianna Sánchez Galindo, Simon Batifort, and Irene Petrelli, from Curtis, Mallet-Prevost, Colt & Mosle.

- For Worldwide Reporting (providing the agreed transcript): Mr. David Kasdan, Mr. Randy Salzman, and Ms. Kate Peregoy.

88.     On 20 July 2017, the President of the Tribunal sent to the Parties and to the co-arbitrators the finalized ToR and Procedural Timetable, asking them to return nine

copies of the signed signature page to the ICC Secretariat. The President also reminded the Parties of the agreement to make "part of the present proceedings" the entire case file pertaining to the ICC P&H Arbitration.

89.    On 27 July 2017, the ToR were executed by all signatories.

### 2.   *The Written and Pre-Hearing phases*

90.    Through communications of 24 and 25 July 2017, the Parties confirmed their agreement that the Statement of Claim ("SoC") and the Statement of Defense ("SoD") be filed <u>only</u> with the ICC and kept under seal by the ICC until the delivery of the final award in the ICC P&H Arbitration. This agreement, endorsed by the Tribunal, was acknowledged by the ICC Secretariat on 3 August 2017.

91.    On 13 October 2017, the Claimant filed the SoC along with accompanying exhibits, witness statements, expert reports and legal authorities.

92.    On 12 January 2018, the Respondents filed their SoD, along with accompanying exhibits, witness statements, expert reports and legal authorities.

93.    On 2 February 2018, both Parties filed their Requests for Document Production.

94.    On 13 February 2018, the Claimant informed the Tribunal that the Parties had agreed for the hearing to be held in Washington D.C. They also agreed to postpone the date for the objections to requests for document production and the voluntary production of documents to 21 March 2018. Unable to reach an agreement for the adjustment of the rest of the Procedural Timetable, both parties agreed to submit their respective proposals to the Tribunal.

95.    On 9 March 2018, the Tribunal sent the final draft award in the ICC P&H Arbitration to the ICC for scrutiny.

96.    On 12 and 22 March 2018, the Parties agreed to the remainder of the Procedural Timetable.

97.    On 21 March 2018, both Parties filed their Responses to each other's requests for document production.

98.    On 23 March 2018, the Tribunal invited the Parties to hold the Pre-Hearing Telephone Conference ("PHTC") on 1 October 2018 at 4:30pm CET.

99.     On 27 March 2018, the ICC Secretariat acknowledged that Respondent 2 would also be represented by Alfredo De Jesús S., Alfredo De Jesús O., Eloisa Falcón López and Marie-Thérèse Hervella from DE JESÚS & DE JESÚS, in Paris (France).

100.    On 28 March 2018, the Parties confirmed their availability to hold the PHTC on 1 October 2018, at 4:30 CET.

101.    On 19 April 2018, the Tribunal confirmed the scheduled PHTC and informed the Parties that the final award in the ICC P&H Arbitration was likely to be notified on or around 25 April 2018. The ICC would forward the submissions relating to these proceedings as soon as the electronic version of the final award had been received.

102.    On 25 April 2018, Tribunal handed down the final award in the ICC P&H Arbitration.

103.    On the same day: (i) The ICC Secretariat forwarded the SoC and SoD (with accompanying materials) to each member of the Tribunal; and (ii) the Respondents submitted their replies to the Claimant's response to the Respondents' requests for document production. The Claimant also wrote to the Tribunal regarding the early production of a requested document.

104.    On 7 May 2018, the Tribunal issued Procedural Order No. 2 ("PO2"), setting out its decision on the Parties' requests for production of documents.

105.    On 31 May 2018, the Respondents alleged that over half of the documents produced by the Claimant were virtually entirely redacted. According to the Respondents, none of these documents were included in the Claimant's privilege log and the Claimant had not raised any objection to their production. Further, the Respondents claimed that the format of several documents was changed before being produced (from native excel files to PDF). They also questioned the inclusion of certain documents in the Claimant's privilege log.

106.    On 8 June 2018, the Claimant filed its Reply, along with accompanying witness statements, expert reports, exhibits and legal authorities ("Reply").

107.    On 13 June 2018, the Claimant answered the Respondents' allegations of 31 May 2018. The Respondents replied on 15 June 2018, and the Claimant further commented on 20 June 2018.

108.    On 29 June 2018, the Tribunal issued its decision regarding the Parties' outstanding issues on document production.

109.   On 14 September 2018, the Respondents filed their Rejoinder, along with accompanying witness statements, expert reports, exhibits and legal authorities ("Rejoinder").

110.   On 21 September 2018, the Parties exchanged notices identifying the witnesses and experts to be cross-examined in the upcoming evidentiary hearing.

111.   On 2 October 2018, the Claimant submitted additional legal authorities.

112.   On 5 October 2018, the Respondents submitted an updated version of Mr. Jésus Patiño's expert report (both in English and in Spanish).

113.   On 15 October 2018, following a Pre-Hearing Telephone Conference held on 1 October 2018 ("PHTC"), the Tribunal issued Procedural Order No. 3 ("PO3"), which contained its decisions and instructions on various issues relevant to the upcoming hearing, as well as an indicative hearing timetable agreed between the Parties and endorsed by the Tribunal.

### 3.   The Oral phase

114.   The evidentiary hearing was held at the ICSID facilities in Washington D.C. from 29 October 2018 to 2 November 2018 ("Hearing"). In addition to the members of the Tribunal and the Secretary, the following persons attended the Hearing:

    i. For the Claimant:

    - **THREE CROWNS LLP**

        o   Mr. Constantine Partasides QC
        o   Mr. Luke Sobota
        o   Mr. Benjamin Jones
        o   Mr. Mihir Chattopadhyay
        o   Ms. Kelly Renehan

    - **FRESHFIELDS BRUCKHAUS DERINGER**

        o   Mr. Brian King
        o   Mr. Elliot Friedman
        o   Mr. Ricardo Chirios
        o   Mr. Sam Prevatt

- o Mr. Lee Rovinescu
- o Ms. Madeline Snider
- o Mr. Cameron Russell
- o Ms. Katerina Gross
- o Ms. Yesica Crespo
- o Ms. Cassia Cheung

- ▪ **PARTY REPRESENTATIVES**

  - o Ms. Laura Robertson
  - o Ms. Suzana Blades
  - o Mr. Alberto Ravell
  - o Mr. Fernando Avila

- ▪ **TECHNICAL SUPPORT**

  - o Mr. Jamie Johnson (FTI)
  - o Mr. James Haase (Immersion Legal)

ii. For the Respondents:

- ▪ **CURTIS, MALLET-PREVOST, COLT & MOSLE**

  - o Mr. George Kahale, III
  - o Mr. Benard V. Preziosi, Jr
  - o Ms. Arianna Sánchez
  - o Mr. Simon Batifort
  - o Ms. Irene Petrelli
  - o Ms. Matilde Flores

- ▪ **PARTY REPRESENTATIVES**

  - o Ms. Gabriela Villamizar

- ▪ **TECHNICAL SUPPORT**

  - o Mr. Dario Gatti (Quadrant Economics)
  - o Ms. Desiree Okunola (Quadrant Economics)
  - o Mr. Ivan Vazquez (Quadrant Economics)

115. In the course of the Hearing, the Tribunal heard evidence from the following witnesses and experts:

    i. For the Claimant:

- **Mr. Patrick J.M. Wolfe,** Chair of the Management Company's Board of Directors (2005-2007), Drilling and Production Manager (2005-2007), and one of the Claimant's representatives at the Transition Committee.

- **Prof. Allan Brewer-Carías**, the Claimant's Venezuelan law expert.

- **Dr. Richard Strickland,** the Claimant's technical expert in relation to issues concerning production volumes. In particular, he addresses the production forecasts proposed by the Respondents' expert Mr. Patiño.

- **Dr. Manual A. Abdala**, the Claimants' quantum valuation expert.

- **Mr. Pablo D. López Zadicoff**, the Claimants' quantum valuation expert.

    ii. For the Respondents:

- **Mr. Leonardo Marcano**, member of CVP's Technical Subcommittee in charge of evaluating and reviewing technical documents regarding the Project's contracting and drilling activities (2004 - 2006), one of CVP's representatives in the Transition Committee (2007), PetroSucre's Director (January 2008 – June 2009), and PetroSucre's General Manager (July 2009 – August 2015).

- **Mr. Sergio Salomón**, Acting Manager of PetroSucre's Integrated Reservoir Studies.

- **Mr. Rubén Figuera**, first President of PetroSucre (January - December 2008), CVP's General Manager of Offshore Joint Ventures (March 2007 – November 2009), and Internal Director of CVP's Board of Directors (May 2014 – August 2017). He is also the Respondents' fact witness for oil production issues for the purposes of their quantum analysis.

- **Prof. Luis Alberto García Montoya**, the Respondents' Venezuelan law expert.

- **Dr. Daniel Flores**, the Respondents' quantum valuation expert.

▪ **Mr. Jesús Rafael Patiño Murillo**, the Respondents' expert on production volumes.

116. Interpretation services were provided throughout the Hearing by:

    i.  Mr. Charles H. Roberts;

    ii.   Mr. Daniel Gilgio; and

    iii.  Ms. Silva Colla.

117. Mr. David A. Kasdan of Worldwide Reporting provided court reporting services at the Hearing.

### 4. *The Post-Hearing phase*

118. At the end of the Hearing, it was agreed that the Tribunal would submit to the Parties certain questions that they may address in their post-hearing briefs ("PHBs") due by 1 February 2019.

119. The Tribunal submitted these questions on 3 December 2018, and added that it would "welcome a joint valuation model" from the Parties' quantum experts or, "in the alternative", indication from each Party whether or not the opposing Party's valuation model adequately represented its own quantification of the alleged damages at issue.

120. On 3 January 2019, the Parties' quantum experts submitted a joint valuation model.

121. On 30 January 2019, Counsel for the Respondents reported on the sanctions that the United States Government had recently imposed on PDVSA which could have a "possible impact" on the filing of the Respondents' PHB. The Claimant made no comment.

122. On 31 January 2019, further to the Respondents' communication regarding the sanctions against PDVSA, the Tribunal suspended the time limit for the Parties' simultaneous submissions of the PHBs. In doing so, the Tribunal clarified that delays in that respect could have repercussions on the Tribunal's schedule for the deliberations and the timing of the award.

123. The Respondents kept the Tribunal appraised on all developments as to the possible release of their PHB.

124. On 8 February 2019, Counsel for the Respondents received confirmation from the U.S Office of Foreign Assets Control ("OFAC") that their PHB could be filed notwithstanding the sanctions against PDVSA. The Respondents therefore proposed a simultaneous filing of the Parties' PHBs on 11 February 2019.

125. On 10 February 2019, the Respondents filed their PHB ("R-PHB") with the Tribunal Secretary. On 11 February 2019, the Claimant filed its PHB ("C-PHB") with the Tribunal Secretary. On 12 February 2019, the Tribunal Secretary circulated the PHBs to both Parties and the Tribunal.

126. On 18 February 2019, the Tribunal received the hard copies of the Parties' PHBs.

127. On 25 February and 1 March 2019, the Respondents and the Claimant respectively filed their costs declarations.

128. On 21 March 2019, the Claimant submitted a letter regarding the award of 8 March 2019 rendered by the tribunal in the ICSID Arbitration with respect to the claims brought by ConocoPhillips against Venezuela ("ICSID Award"). The Claimant noted that the ICSID Award "awarded damages of US$ 562,140,959 for the unlawful expropriation of the Corocoro Project". According to the Claimant, however: (i) the ICSID Award dealt only with the liability of Venezuela under international law "rather than the liability of PDVSA in connection with the Corocoro Contracts"; (ii) the ICSID Award recorded ConocoPhillips' "undertaking that it does not seek double recovery and that if it obtains payment from the relevant governmental actor it will provide an offset to the PDVSA subsidiaries through an appropriate credit or reimbursement, which is the same undertaking as ConocoPhillips has given in these proceedings"; and (iii) no issue of double recovery, could potentially arise, "until the ICSID claimants obtain payment on the ICSID award". The Claimant therefore submitted that the ICSID Award has "no effect on CVP and PDVSA's liability for their non-performance and positive breaches of the Corocoro Contracts".

129. On 28 March 2019, the Respondents stated having applied for a license from OFAC for them to comment on the Claimant's letter of 21 March 2019. The Respondents also estimated that they would be able to provide said comments by 8 April 2019, if not earlier.

130. On 24 April 2019, the Claimant requested the Tribunal to direct the Respondents to reply to the Claimant's letter of 21 March 2019.

131.    On 26 April 2019, the Tribunal requested the Respondents to provide an update on the progress of obtaining the OFAC license, by 2 May 2019. Moreover, should the license be obtained in the meantime, the Tribunal instructed the Respondents to provide their response to the Claimant's letter of 21 March 2019 within 2 business days of obtaining the OFAC license.

132.    On 7 May 2019, the Tribunal reminded the Respondents of its communication of 26 April 2019 requesting an update on the status of the OFAC license, and invited the Respondents to provide the aforementioned update by 8 May 2019.

133.    The same day, the Respondents confirmed that the requisite OFAC license was still pending and assured the Tribunal that they would provide their comments to the Claimant's letter of 21 March 2019 as soon as the license was obtained.

134.    On 21 May 2019, after receiving clearance from OFAC on 20 May 2019, the Respondents commented on the Claimants' letter of 21 March 2019.

135.    On 29 May 2019, the Tribunal closed the proceedings.

136.    On 30 May 219, the Tribunal submitted the draft award to the ICC for scrutiny.

137.    On 27 June 2019, the ICC Court approved the draft final award pursuant to Article 21 of the ICC Rules.

138.    On 17 July 2019, the ICC Secretariat informed the Tribunal of the ICC Court's decision on costs of the arbitration.

### 5. *Time-limit for rendering the Award*

139.    In accordance with Article 18(1) of the ICC Rules, the time limit for rendering the final award is 6 months from the date of the last signature of the ToR (namely, 27 July 2017). In accordance with Article 18(2) of the ICC Rules, the ICC Court has since then extended this time limit as follows:

- at its session of 18 January 2018, to 31 October 2018 (the ICC Secretariat's letter of 26 January 2018);

- at its session of 18 October 2018, to 31 January 2019 (the ICC Secretariat's letter of 30 October 2018);

- at its session of 24 January 2019, to 31 May 2019 (the ICC Secretariat's letter of 31 January 2019);

- at its session of 16 May 2019, to 28 June 2019 (the ICC Secretariat's letter of 29 May 2019);

- at its session of 20 June 2019, to 31 July 2019 (the ICC Secretariat's letter of 28 June 2019); and

- at its session of 18 July 2019, to 30 August 2019 (the ICC Secretariat's communication of 23 July 2019).

## II.   REQUESTED RELIEF

140.    In its PHB,[112] the Claimant requests the Tribunal to render an award:

(a) Declaring that CVP breached its contractual obligations and the duty of good faith, loyalty, and fair dealing owed to Claimant under the Association Agreement, Consortium Agreement, and Venezuelan law, and that CVP is liable fully to compensate Claimant accordingly;

(b) Declaring that PDVSA is liable under the Guarantee to indemnify Claimant for CVP's breaches of the Association Agreement and Consortium Agreement, and that PDVSA is liable fully to compensate Claimant accordingly;

(c) Declaring that PDVSA breached its contractual obligations and duty of good faith, loyalty, and fair dealing owed to Claimant under the Guarantee and Venezuelan law, and that PDVSA is liable fully to compensate Claimant accordingly;

(d) Declaring, in the alternative to (a)-(c) above, that Respondents' conduct constitutes an *hecho ilícito* under Venezuelan law, and that Respondents are liable fully to compensate Claimant accordingly;

(e) Declaring, in the alternative to (a)-(d) above, that Respondents have been unjustly enriched, and that Respondents are liable fully to compensate Claimant accordingly;

(f) Awarding damages, net of taxes, in an amount quantified at US$1.477 billion (as of 31 May 2018) (US$1.586 billion if updated to 31 December 2018), including pre-award compound interest;

(g) Awarding any other appropriate restitutionary compensation in an amount to be quantified;

(h) Awarding post-award compound interest at a rate of 13.94%, or as to be determined by the Tribunal, to run from the date of Award until the date of full and final payment;

---

[112] C-PHB, § 362.

(i) Requiring Respondents to bear the costs of the arbitration, including Claimant's legal and expert fees and costs, and Claimant's internal costs, together with interest on such fees and costs; and

(j) Granting such additional or other relief as may be justified in law or equity.

141.    The Respondents in turn request that the "Claimant's claims should be rejected in their entirety and all costs of this case should be assessed against Claimant".[113]

## III.    LIABILITY

142.    In this Section of the Award, the Tribunal will assess the Parties' positions on liability. The Parties' arguments, insofar as they are necessary to resolve the relevant issues in dispute, have been reproduced prior to the Tribunal's analysis of each issue. That said, the Tribunal may further develop the Parties' position in the analysis itself. In any event, for reasons of procedural economy, the Tribunal has not provided a summary of each and every submission, argument, or objection raised by the Parties. Instead, it has reproduced only what it views as the most important arguments for its decision. However, even if not expressly reproduced, the Tribunal has considered and examined all of the Parties' arguments.

## A.    PRELIMINARY MATTERS

### 1.    Arbitrability of the Claimant's claims and the Tribunal's Jurisdiction

#### 1.1    The Parties' positions

143.    In their initial pleadings, the Parties succinctly referred to (and incorporated by reference) the respective positions and arguments on arbitrability as developed in the course of the ICC P&H Arbitration.[114] Accordingly, the Respondents argued that, pursuant to Article 151 of the Venezuelan Constitution, the Claimant's claims are non-arbitrable and beyond the Tribunal's jurisdiction because they are "based on the implementation" of sovereign decisions of the Government (i.e. the 2007 Nationalization Decree), adopted in the exercise of Venezuela's *jure imperii*.[115] In turn, the Claimant contended that the Tribunal is not being asked to "evaluate the constitutionality or validity of sovereign powers of the Venezuelan State, nor to opine on the 'implementation of sovereign decisions'", but rather to assess the "Respondents'

---

[113] Rejoinder, § 216; R-PHB, § 225.

[114] SoD, § 125, fn. 244; Reply, § 27.

[115] ICC P&H Arbitration, **R-0** (Respondents' Post Hearing Brief, §§ 337 ss; Statement of Defense, §§ 212, 215).

failure to perform their commercial obligations under the [AA]",[116] and thus this dispute is arbitrable.

144. Following the Parties' first round of pleadings in the present case, the Tribunal dismissed the Respondents' arguments on arbitrability in the ICC P&H Arbitration,[117] finding that:

> [...] the Willful Breach Claims comprise allegations of multiple breaches of the Respondents' obligations under the AAs and the Guarantees (and not merely the implementation of the 2007 Nationalization Decree) and are thus squarely arbitrable. Article 151 of the Venezuelan Constitution does not limit the arbitrability of claims like the one in the case at hand in any way.[118]

145. In view of this, the Claimant submits that the "same result follows as to the claims of contractual breach in [the present] case".[119] On the other hand, the Respondents submit that "there are additional factors in this case, including the text of the arbitration clause itself (and of the Congressional Authorization that authorized it), which warrant a different outcome on the arbitrability issue".[120] The Respondents' argument runs as follows:

   i.   The arbitration agreement in Clause 25.2 of the Corocoro AA is "not as broad" as the ones in the P&H Contracts.[121] Rather, Clause 25.2 limits the Tribunal's jurisdiction to "matters not within the competence of the Control Committee",[122] which is responsible for "approv[ing]" certain "fundamental decisions of national interest to the Venezuelan State related to the performance of the [Corocoro AA]".[123]

   ii.  The Venezuelan Supreme Court declared the validity and constitutionality of the arbitration agreements set out in the Congressional Authorization (to be) incorporated in the Association Agreements for the exploration and exploitation of the New Areas. However, in doing so it also noted that:[124] (i) the Association

---

[116] ICC P&H Arbitration, **R-0** (Claimants' Post Hearing Brief, § 452).

[117] Reply, § 26; Rejoinder, § 22.

[118] ICC P&H Award, **CLA-120**, § 328.

[119] Reply, § 27.

[120] Rejoinder, § 22.

[121] Rejoinder, §§ 23-24.

[122] Corocoro AA, **C-1**, Clause 25.2(a); *Supra*, § 63.

[123] Corocoro AA, **C-1**, Clause 4.2; *supra*, § 30.ii.

[124] Rejoinder, § 27.

Agreements, including the Corocoro AA, would "be governed by and interpreted under the laws of the Republic of Venezuela";[125] (ii) matters within the competence of the Control Committee would not be subject to arbitration;[126] and (iii) it would be the Control Committee which would be "entitled to deal with fundamental decisions of national interest relating to the performance of the Agreement, from which it may be concluded that the matters ultimately dealt with by the Arbitral Tribunal would not be fundamental for the national interest".[127]

iii. The Bicameral Commission clarified that the incorporation of arbitration agreements into the Association Agreements for the New Areas should not "in any way, […] subjugat[e] the sovereign rights of the Republic of Venezuela to such dispute resolution Mechanism".[128] It further stated that "[i]n no case [should] the exercise by the Republic of Venezuela of its inalienable and sovereign rights be submitted to arbitration […]".[129]

iv. The Ministry, PDVSA and CVP reported the following to Congress when seeking authorization to enter into the Corocoro AA pursuant to the Twenty-third Condition of the Congressional Authorization:[130] "The matters under the Control Committee's discretionary powers are not subject to arbitration, and its decisions may only be reviewed by Venezuelan courts in order to determine whether the CVP representative took into account the national interest of the Venezuelan State when casting their vote. On the other hand, disputes over commercial matters that cannot be resolved by agreement between the parties, shall be subject to arbitration in accordance with the rules of the International Chamber of Commerce. This dual dispute resolution mechanism reflects Article 127 of the Constitution, which establishes the principle of jurisdictional immunity of the State, with an exception known as the "commercial exception". Under this exception, the State would not invoke jurisdictional immunity when conducting

---

[125] *Nullity Action for Unconstitutionality Filed by Simón Muñoz Armas et al. Against the Tenth, Seventeenth, Second and Fourth Clauses of Article 2 of the Authorization of the Congress of the Republic Approved on July 4, 1995,* Supreme Court of Justice (*en banc*) (Venezuela), Case No. 812-829, Judgment, 17 August 1999, **RLA-65** ("1999 Supreme Court Decision"), p. 31; *supra*, § 21.iv.

[126] 1999 Supreme Court Decision, **RLA-65**, p. 31.

[127] 1999 Supreme Court Decision, **RLA-65**, p. 31.

[128] Bicameral Commission Report, **R-9**, p. 5; *supra*, § 19.

[129] Bicameral Commission Report, **R-9**, p. 9.

[130] *Supra*, § 26.

activities of a commercial nature, for which international commercial arbitration is the appropriate mechanism to resolve this type of disputes [sic]".[131]

146. In light of the above, the Respondents stress that, while the case of the ICC P&H Claimants was "based on the alleged non-performance of the Association Agreements prior to the expropriation",[132] the Claimant now alleges that "it had continuing rights to production which Respondents are obligated to respect notwithstanding the expropriation".[133] For the Respondents, the Claimant's claims directly implicate Venezuela's exercise of sovereign power and therefore they should be "dismissed on the ground that they are non-arbitrable and beyond the jurisdiction of this Tribunal".[134]

147. In turn, the Claimant notes that the list of items reserved for decision by the Control Committee in Clause 4.2 of the Corocoro AA is exhaustive.[135] In this regard, pointing to the statements by Prof. García Montoya at the Hearing,[136] the Claimant submits that the 2007 Nationalization Decree, its implementation, or the Respondents' breach of their contractual obligations, "were not among the enumerated matters reserved for decision by the Control Committee".[137] For the Claimant, it is "absurd" for the Respondents "to suggest that the Parties had agreed that the Control Committee, on which CVP had the deciding vote, would have jurisdiction over matters related to CVP's breach of its contractual obligations. This would have been tantamount to allowing CVP to sit in judgment of its own alleged breach of the Corocoro AA — a concept that is anathema to due process".[138]

148. According to the Claimant, the Respondents' position that the Control Committee had competence over fundamental decisions of national interest broadly understood (as opposed to the exhaustive list in Clause 4.2 of the Corocoro AA), attempts to find ground in the Fourth Condition of the Congressional Authorization.[139] However, the Claimant argues that the Fourth Condition "only serves to confirm that the list of matters

---

[131] Ministry of Energy and Mines, PDVSA and CVP, Association Agreements for Exploration at Risk of New Areas and Production under the Profit Sharing Agreement, **R-10**, pp. 11-12.

[132] Rejoinder, § 30.

[133] Rejoinder, § 31.

[134] Rejoinder, § 31.

[135] C-PHB, § 27.

[136] Transcript, p. 877:4-6, 878:21-879:1 (García Montoya).

[137] C-PHB, § 26.

[138] C-PHB, § 28.

[139] *Supra*, § 21.iii.

to fall within the jurisdiction of the Control Committee 'shall be described' in the Corocoro AA", which is indeed what Clause 4.2 of the Corocoro AA has done.[140]

149.    In this context, the Claimant notes that the Respondents have "never once" contended that the Corocoro AA was not in conformity with the Fourth Condition (which confirms that there are no issues of national interest not already listed in the Corocoro AA).[141] On the contrary, in November 1995 PDVSA explained to the Investors of the New Areas that "Clause 4.2 of the Agreement will clearly provide that the role of the Control Committee is to 'approve or reject' fundamental decisions of Venezuelan national interest related to the implementation of the Agreement, *and that the list of such decisions is encompassed in Clause 4.2*".[142] The Claimant stresses that the Respondents further confirmed the exhaustive nature of the list in Clause 4.2 of the Corocoro AA, when again explaining to the Investors in December 1995 that the "Control Committee will have jurisdiction over the approval of *specified matters of national interest* related to the performance of the Association Agreement".[143]

### 1.2    Analysis

150.    As a preliminary remark, the Tribunal notes that the Respondents do not challenge or otherwise seek a reconsideration of the reasoning and findings in the ICC P&H Arbitration in relation to arbitrability. Rather, the Respondents submit that there are certain additional factors in the present case that require a different conclusion.[144]

151.    Thus the Tribunal must assess whether the said additional factors in fact warrant a determination that the present dispute is not arbitrable. In the Tribunal's view, they do not. First, similarly to the claimants in the P&H Arbitration, the Claimant "is not

---

[140] C-PHB, § 29.

[141] C-PHB, § 29.

[142] C-PHB, § 30, quoting Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bidding Round, 2 November 1995, **C-26**, p. 3 (emphasis by the Claimant).

[143] C-PHB, § 31, quoting PDVSA & CVP, 1995 Exploration Bidding Round: Final Tender Protocol, December 1995, **C-29**, Article 2.1.1 (emphasis by the Claimant).

[144] R-PHB, § 15-16 ("As stated at the Hearing, Respondents understand the Tribunal's decision that the claims of contract breach in the First Case were arbitrable, considering the manner in which those claims were formulated. They were baseless on the merits, but they were styled as breaches by the State companies of various specific contract obligations and the obligation of good faith in purportedly procuring the 2007 Nationalization. The new claims are not only as baseless as the old on the merits, but they also directly challenge the effect of the Government's sovereign act of nationalization, seeking to hold CVP responsible for its actions after the termination of the partnership with Claimant as if the nationalization had not occurred. Arbitration of such a dispute is beyond the scope of the arbitration clause and manifestly inconsistent with the legislative history of the Corocoro Agreement.").

challenging the 'constitutionality or legality of the sovereign acts adopted by the Venezuelan State'".[145] It is correct that the Claimant does consider the effects of the 2007 Nationalization Decree and its implementation, and submits that certain obligations in the Corocoro Contracts survived the formal extinguishment of the Corocoro AA through the 2008 Transfer Decree (i.e. the Claimant's Surviving Obligations Claim).[146] Nevertheless, as seen *infra*, irrespective of its merit, the basis for such claim is purely contractual.[147] Overall, the Claimant's claims in this arbitration do not seek to override the 2007 Nationalization Decree or any other measure issued pursuant to that Decree.

152. Second, while Clause 25.2(a) of the Corocoro AA makes clear that the Tribunal only has jurisdiction over "matters not within the competence of the Control Committee",[148] Clause 4.2 of the Corocoro AA equally clearly defines the competence of the Control Committee. Clause 4.2 in full reads as follows:[149]

> The fundamental decisions of national interest to the Venezuelan State related to the **performance** of this Agreement shall be submitted for **approval** by the Control Committee. **These decisions shall be the following**:
>
> (a) the approval of any material modification to the Minimum Work Program;
>
> (b) the approval of the extension of the Exploration Period to include Phase II and of any extension of the Operation Period for any Development Area pursuant to Clause 21.2;
>
> (c) the approval of any Evaluation Plan and any material modification thereto;
>
> (d) the approval of any Development Plan and any material modification thereto;
>
> (e) the approval of any unitization agreement for Discovery that extends across national boundaries that does not conform to the requirements of Clause 16.4 and submission of any Development Plan for such Discovery without unitization agreement or the portions thereof necessary to permit orderly development in each case in accordance with Clause 16.6;
>
> (f) the approval of any plan for the implementation of any production curtailments required to permit compliance with Venezuelan international treaty obligations pursuant to Clause XVIII; and

---

[145] SoC, § 138; Brewer-Carías ER; **CER-1**, § 20 ("In my opinion, Claimant's claim is within the broad scope of the Arbitration clauses in the Corocoro Contracts, and does not relate to matters within the competence of the Control Committee. This claim does not challenge the validity of any sovereign act, but instead concerns Respondents' own alleged conduct in breach of contracts with a comercial nature. Therefore, the claims concern commercial, not sovereign, acts, and are properly subject to arbitration.").

[146] *Supra*, § 57.ii.a); *infra*, §§ III.B.1.2.

[147] *Infra*, §§ III.B.1.2.

[148] *Supra*, § 63.

[149] Corocoro AA, **C-1**, Clause 4.2.

(g) the resolution of any deadlock with respect to matter presented to the Management Company Board pursuant to Clause 5.5 that fails to receive Qualified Majority Vote.[150]

153.    For the Tribunal, the wording of Clause 4.2 of the Corocoro AA indicates that the list of the "fundamental decisions of national interest to the Venezuelan State" under the Control Committee's competence is exhaustive. In this regard, disputes regarding the alleged breach of the Corocoro Contracts by the Respondents, as the one at issue, do not fall within such mutually agreed list. In fact, the Respondents have not established that the Claimant's claims in this arbitration fall within the closed list set out in Clause 4.2 of the Corocoro AA.

154.    Indeed, the *chapeau* of Clause 4.2 circumscribes the "fundamental decisions of national interest to the Venezuelan State" to those "relat[ing]" to the "performance" (in the sense of implementation or execution) of the Corocoro AA and its operations.[151] Therefore, for the Corocoro Project to be properly carried out, the Control Committee had to "approve" such contractually defined fundamental decisions. However, while the present dispute does concern the Respondents' alleged non-performance of their obligations under the Corocoro Contracts (i.e. the Claimant's Non-Performance Claim),[152] it does not concern the implementation, execution, or operation of the same.

155.    Third, at the Hearing Prof. García Montoya acknowledged that, pursuant to Clause 4.2 of the Corocoro AA, "there [are] no decision[s] of the Control Committee at issue in this arbitration", which (as seen) under normal circumstances would have otherwise pertained to "issues of technical and commercial operations" of the Corocoro Project.[153] According to Prof. García Montoya, however, the "fundamental decisions" outside the Tribunal's jurisdiction could not be "strictly interpreted" to "only includ[e]" the items in

---

[150] Corocoro AA, **C-1**, Clause 4.2 (emphasis added).

[151] The Tribunal notes that, in its relevant part, the Spanish version of Clause 4.2 of the Corocoro AA reads as follows: "*Las decisiones fundamentales de interés nacional para el Estado Venezolano relacionadas con la **ejecución** del Convenio serán sometidas al Comité de Control para su **aprobación**"* (Corocoro AA, **C-1** (original in Spanish), p. 190 of PDF)(emphasis added). In this regard, the Tribunal further notes that Clause 32.5 of the Corocoro AA states the following: "This Agreement is being **executed** in both the Spanish language and the English language. The Spanish version shall constitute the binding version and the English version **is being executed as matter of reference only**" (emphasis added). Notably, the term "executed" in the English version of Clause 32.5 appears as "*suscrito*" in the Spanish version (Corocoro AA, **C-1** (original in Spanish), p. 262 of PDF), which is best defined as "signed".

[152] *Supra*, § 57.i; *infra*, § III.B.1.1.

[153] Transcript, p. 876:21-877:6 (García Montoya).

Clause 4.2 of the Corocoro AA. Rather, the Fourth Condition in the Congressional Authorization should also be considered, which is broader than Clause 4.2.[154]

156.   More specifically, the Fourth Condition states that the Parties "shall submit fundamental decisions of national interest in connection with the execution of the Agreement to the approval of the Control Committee", which "shall be described in the [Corocoro AA] and shall include, **among others**, the approval of the exploration, evaluation and development plans, as well as any other modification to such plans, including the extension of the terms for exploration or exploitation, and the implementation of production reductions in compliance with international obligations of the Republic of Venezuela".[155] In this regard, it is of little relevance that the phrase "among others" in the Fourth Condition makes it non-exhaustive, and thus in principle broader than Clause 4.2 of the Corocoro AA (as pointed out by Prof. García Montoya), because:

    i.   Like the Corocoro AA, the Fourth Condition is concerned with issues of fundamental national interest related to the "execution" (i.e. the implementation) of the Corocoro AA, while issues concerning the breach of the Corocoro Contracts do not fall within such category.

    ii.   The Fourth Condition does not refer to "fundamental decisions of national interest" in the abstract, but to those that require the "approval" of the Control Committee. What is relevant, therefore, is not whether the content of a particular decision is of fundamental national interest to Venezuela, but whether such decision was assigned to the competence of the Control Committee.

    iii.   A comparison between Clause 4.2 of the Corocoro AA and the Fourth Condition shows that the exhaustive list in Clause 4.2 of the Corocoro AA contains issues of national interest additional to those preliminarily identified in the Fourth Condition. Notably, the Fourth Condition itself mandated for "these [fundamental] decisions" to be "described" in the Corocoro AA. The term "among others" in the Fourth Condition was thus given effect by means of Clause 4.2 of the Corocoro AA. Indeed, the contemporaneous statements by the Respondents in November and December 1995 relied upon by the Claimant

---

[154] Transcript, p. 877:7-882:10 (García Montoya); *supra*, § 21.iii.

[155] Congressional Authorization, **C-22/R-8**, Fourth Condition (emphasis added).

confirm that Clause 4.2 of the Corocoro AA specified all matters of national interest that would fall within the competence of the Control Committee.[156]

iv.  The text of the Corocoro AA was subsequently approved by the Venezuelan Congress.[157] Therefore, to the extent there are any inconsistencies between the Congressional Authorization and the Corocoro AA, it is reasonable to accept that the Corocoro AA controls.[158]

157.  Fourth and lastly, neither the Supreme Court's decision, the Bicameral Commission Report, nor the Ministry's report invoked by the Respondents are at odds with any of the Tribunal's findings on arbitrability up to this point.[159] Venezuela's concern was for matters of national interest to be excluded from arbitration and for them to be decided by the Control Committee. However, as already established, the present dispute does not deal with any of the fundamental decisions of national interest set out in Clause 4.2 of the Corocoro AA assigned to the Control Committee. Moreover, the Claimant's claims do not question either the legality or constitutionality of the 2007 Nationalization Decree and its implementation. Rather, the Claimants seek to hold CVP and PDVSA liable for the alleged contractual breaches of the Corocoro Contracts, which, as stated by the Supreme Court, will be governed by and interpreted under the laws of the Republic of Venezuela. Accordingly, in line with the Bicameral Commission Report, the Parties' dispute does not in "any way, […] subjugat[e] the sovereign rights of the Republic of Venezuela".[160] For the same reason, the Respondents' invocation of the Venezuela's "jurisdictional immunity" referred to in the Ministry's report, is irrelevant.[161]

158.  The Tribunal therefore determines that the present dispute is arbitrable and squarely falls within the Tribunal's jurisdiction under Clause 25.2(a) of the Corocoro AA.

---

[156] C-PHB, § 30, quoting Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bidding Round, 2 November 1995, **C-26**, p. 3 (emphasis by the Claimant); *supra*, § 149.

[157] *Supra*, § 26.

[158] ICC P&H Award, **CLA-120**, § 268.

[159] 1999 Supreme Court Decision, **RLA-65**, p. 31; Bicameral Commission Report, **R-9**, pp. 5, 9; Ministry of Energy and Mines, PDVSA and CVP, Association Agreements for Exploration at Risk of New Areas and Production under the Profit Sharing Agreement, **R-10**, pp. 11-12; *supra*, §§ 145.ii - 145.iv

[160] Bicameral Commission Report, **R-9**, p. 9.

[161] Ministry of Energy and Mines, PDVSA and CVP, Association Agreements for Exploration at Risk of New Areas and Production under the Profit Sharing Agreement, **R-10**, pp. 11-12.

### 2. *Amiable compositeur*

#### 2.1 *The Claimant's position*

159.   Clause 25.2(a) of the Corocoro AA states that "all arbitrators appointed pursuant to this [AA] shall have the powers of an *amiable compositeur*".[162] In this regard, and noting that in "most jurisdictions" the concept of *amiable compositeur* is synonymous with that of *ex aequo et bono*, the Claimant submits that decision-makers acting in such capacity must apply "equity, in the sense of fairness and justice (*aequitas*), over the strict application of the laws (*jus summa*)".[163] Differently stated, save for cases where the issue concerns "compliance with mandatory Venezuelan laws regarding public order (*orden público*) or morals (*buenas costumbres*)",[164] a tribunal acting as *amiable compositeur* should "exercise its equitable powers to reach a fair decision, if the strict application of legal provision would lead to an unfair or unjust result".[165] According to the Claimant, the above is consistent with Venezuelan law (*lex contractus*), New York law (*lex arbitri*), the ICC Rules, and has been confirmed by "leading international arbitration commentators".[166]

160.   In view of this, the Claimant submits that, particularly in long-term contracts as the ones at issue, the "Tribunal is empowered to depart from the strict application of law to the extent necessary to reach a fair, just, and equitable result, in relation to both liability and quantum".[167] In particular:

   i.   Regarding liability, the powers of *amiable compositeur* should lead the Tribunal to a "straightforward application" of the terms of the Corocoro Contracts. In doing so, the Tribunal should hold the Respondents liable for breach of contract (or in the alternative for the existence of an *hecho ilícito* or unjust enrichment).[168]

---

[162] *Supra*, §§ 63, 72

[163] SoC, § 224.

[164] SoC, fn. 471, referring to Francisco Hung Vaillant, Reflections on Arbitration in the Venezuelan System (2001), **CLA-76**, p. 162.

[165] SoC, § 225.

[166] SoC, §§ 223-224.

[167] SoC, § 226.

[168] Reply, § 87(a).

ii.   Regarding quantum, the powers of *amiable compositeur* are "relevant" to determine the compensation that the Respondents should be required to pay to remedy the damages caused, "including interest".[169]

iii.   Regarding both liability and quantum, the powers of *amiable compositeur* allow the Tribunal to construe "any possible doubt arising from the strict application of Venezuelan law" to be resolved in favor of the Claimant, as the non-breaching Party.[170]

161.   Lastly, in response to the Respondent's argument that arbitrators acting as *amiable compositeurs* cannot "override" mandatory rules of Venezuelan law (i.e. 2007 Nationalization Decree and its implementation),[171] the Claimant underlines that it is not asking the Tribunal to "wield its powers of *amiable compositeur* to override" the 2007 Nationalization Decree.[172] Rather, this arbitration concerns the Respondents' breaches of the Corocoro Contracts, which are not excused by the 2007 Nationalization Decree in light of the "plain terms" of the *force majeure* provision in Clause 28.1 of the Corocoro AA.[173]

### 2.2   The Respondents' Position

162.   The Respondents do not dispute that the Tribunal has the powers of an *amiable compositeur* and is therefore empowered to depart from the strict application of law to the extent necessary to reach a fair, just, and equitable result, in relation to both liability and quantum.[174]

163.   That being said, the Respondents contend that *amiable composition* does not authorize the Tribunal to: (i) disregard the Parties' choice of Venezuelan law as the law governing the Corocoro AA;[175] (ii) "invent a claim against these Respondents";[176] (iii) "modify the

---

[169] Reply, § 87(b).

[170] Reply, § 87(c).

[171] *Infra*, § 163-164.

[172] Reply, § 86.

[173] *Infra*, §§ 201-204.

[174] SoD, § 138.

[175] Rejoinder, § 95; SoD, § 138.

[176] SoD, § 138.

terms of the [Corocoro AA]";[177] (iv) "ignore all facts and legal principles";[178] or (v) "override" mandatory rules of public policy.[179]

164.   Regarding the latter point in particular, the Respondents submit that Venezuelan law "unanimously states" that mandatory rules of law and public policy "must be respected by arbitrators acting as *amiable compositeurs*".[180]  In view of this, and considering that "hydrocarbon legislation" (including the 2007 Nationalization Decree) is a matter of public policy,[181] the "amiable compositeur provision accompanying the choice of Venezuelan law in the Corocoro Profit Sharing Agreement does not permit this Tribunal to override mandatory rules of Venezuelan law and therefore does not change the result in this case, which is that there is no basis for this Tribunal to grant compensation to Claimant for Respondents' compliance with mandatory rules of Venezuelan law and implementation of [the 2007 Nationalization Decree]".[182] In short, the concept of *amiable composition* "adds nothing" to the Claimant's case.[183]

### 2.3   Analysis

165.   It is common ground between the Parties that the Tribunal may rely on its amiable *compositeur powers* pursuant to Clause 25.2(a) of the Corocoro AA to the extent necessary to reach a fair and equitable determination in this case. The Parties further agree that, in exercising its *amiable compositeur* powers, the Tribunal may not override or otherwise ignore mandatory rules of public policy under Venezuelan law. Moreover, it is not disputed that "hydrocarbon legislation", which includes the 2007 Nationalization Decree, "is a matter of public policy in Venezuela".[184]

166.   The dispute between the Parties on this point is therefore whether an eventual use by the Tribunal of its *amiable compositeur* powers risks contradicting, departing from or overriding the 2007 Nationalization Decree and its implementation. However, such a query cannot be settled in the abstract. The Tribunal must first determine whether the use of its *amiable compositeur* powers is appropriate in relation to a particular issue in

---

[177] Rejoinder, § 95.

[178] SoD, § 138.

[179] Rejoinder, § 95.

[180] SoC, § 139.

[181] SoD, § 141.

[182] SoD, § 142.

[183] Rejoinder, § 97.

[184] SoD, § 141; García Montoya ERI, RER-1, § 38; Reply, § 86.

dispute. Only then can the Tribunal assess whether its attempt to reach a fair and equitable determination pursuant to its *amiable compositeur* powers runs contrary to the 2007 Nationalization Decree or any other mandatory rule of public policy put forward by the Parties.

167.   Indeed, contrary to the Respondents' allegation that "mandatory rules of public policy [are] at issue" in this case, such as the 2007 Nationalization Decree, this does not make the "concept" of *amiable compositeur* in Clause 25.2(a) of the Corocoro AA outright irrelevant.[185] First, it is the Claimant's position in this arbitration that it "is not asking the Tribunal to wield its powers of *amiable compositeur* to override the Nationalization Decree". Rather, the Claimant seeks for the Tribunal to apply its powers of *amiable compositeur* to *inter alia* "confirm the conclusions that the Tribunal must reach based on the straightforward application of the terms of the Corocoro Contracts and Venezuelan law" that the "Respondents should be held liable for their breach of contract".[186] Second, according to the Claimant, some of the alleged contractual breaches by the Respondents have no basis on the 2007 Nationalization Decree.[187]

168.   Therefore, the Tribunal shall keep in mind its *amiable compositeur* powers and inherent limits when deciding all the relevant issues in dispute, as discussed in further detail below. For the sake of clarity, to the extent that no explicit reference is made to these powers, the Parties must assume that the Tribunal did not find it warranted to exercise its *amiable compositeur* powers.

### 3.   The Claimant's Conduct and the Notification of its Claims

#### 3.1   The Respondents' position

169.   The Respondents point out that, "until this Arbitration was filed, almost ten years after the nationalization, Claimant never gave any indication that it considered that it had any claim against Respondents for breach of contract, *hecho ilícito* or unjust enrichment".[188] For the Respondents, this is the "best evidence" under Venezuelan law

---

[185] R-PHB, § 102.

[186] Reply, § 87(a).

[187] *Infra*, §§ 197, 199.

[188] SoD, § 102.

of what a party considers to be the scope of its protected rights,[189] and is significant in two ways:

    i.   First, the attempt to claim breach of contract or *hecho ilícito* or unjust enrichment so long after the alleged unlawful acts constitutes "disloyal delay under Venezuelan law, or breach of the very duty of good faith Claimant relies on";[190] and

    ii.   Second, the Claimant's conduct demonstrates that it never believed that it had a claim for breach of contract, or *hecho* ilícito, or unjust enrichment against the Respondents.[191]

170.    The Respondents note the Claimant's submission that: (i) the Respondents were aware of their own conduct and that the non-performance of the Corocoro Contracts was evident;[192] and (ii) the Respondents fail to explain why its repeated reservations of rights were insufficient for notification purposes.[193] In response, the Respondents make the following arguments:

    i.   First, they note that what is relevant is not the Respondents' awareness of what they have done pursuant to the 2007 Nationalization Decree, as "obviously they were aware of their actions in complying" with said Decree. Rather, "[w]hat is relevant is awareness that Claimant thought that what Respondents had purportedly done in implementing [the 2007 Nationalization Decree] or doing anything else constituted some sort of breach of contract or *hecho ilícito* or unjust enrichment on the part of Respondents".[194]

    ii.   Second, the Respondents observe that the list of letters referred to by the Claimant concerns the "alleged breaches by the Government" and are "conspicuously silent when it came to breaches by Respondents".[195] In this context, the Respondents refer to the finding in the ICC P&H Award that "complaining about these measures does not automatically indicate that there

---

[189] Rejoinder, § 99

[190] Rejoinder, § 102.

[191] Rejoinder, § 103.

[192] Reply, § 84; *infra*, § 173.

[193] *infra*, § 173.

[194] Rejoinder, § 102.

[195] Rejoinder, § 104.

have also been contractual breaches, much less of the specific provisions that the Claimants ultimately came to rely on".[196]

171.   The Respondents therefore submit that the "Claimant's conduct over an entire decade" is "fundamentally inconsistent" with the "notion" that the Claimant believes having any of the claims brought forward in this arbitration, "which itself precludes the assertion of such claims".[197]

### 3.2   The Claimant's position

172.   The Claimant submits that the Respondents' allegations on this point are "untrue, and in any event irrelevant".[198] First, the Respondents do not point to any provision of the Corocoro Contracts requiring the Claimant to provide a notice of breach.[199]

173.   Second, the Respondents "do not explain why Claimant's repeated reservation of rights would not fulfil the notice requirement they seek to imply".[200] In this context, the Claimant points to a number of communications that, considering the total repudiation of their contractual obligations, "put Respondents on notice that they would face an action for breach of the Corocoro Contracts".[201] Moreover, in light of Clause 28.1 of the Corocoro AA, the Respondents were fully aware that the 2007 Nationalization Decree would not excuse their non-performance. As such, "no further notice that the non-performance of their obligations under the AA would give rise to liability" was necessary.[202] Indeed, "the question of notice is utterly irrelevant because the non-performance was self-evident".[203]

### 3.3   Analysis

174.   The Tribunal first notes that in the ICC P&H Arbitration it was determined that, under Venezuelan law, a claim is only forfeited if it has not been claimed within a

---

[196] ICC P&H Award, **CLA-120**, § 488.

[197] Rejoinder, § 109.

[198] Reply, § 78.

[199] Reply, § 80.

[200] Reply, § 80.

[201] Reply, § 82.

[202] Reply, § 84.

[203] Reply, § 84.

predetermined period of time established by law or by contract.[204] In this regard, the Tribunal further notes that the following is undisputed:[205]

i.   There is no requirement in the Corocoro Contracts compelling the Claimant to notify to the Respondents its contractual claims,[206] which would otherwise result in the Claimant forfeiting such claims. Indeed, nothing in the Corocoro Contracts defines a specific right or claim by the Claimant that is to be forfeited, or a specific conduct the absence of which would result in a forfeiture of the right or claim, or a time-period beginning with a specified start time before forfeiture of a right or claim can occur.

ii.   The Claimant has brought all of its claims in this arbitration (both contractual and non-contractual) within the relevant statute of limitation period.

iii.   The Claimant has not waived any of its rights in relation to the claims it now asserts, despite the fact that the underlying factual circumstances that serve as a basis for such claims occurred considerably prior to the initiation of these proceedings.

175.   The Tribunal's analysis is therefore narrow and only requires determining whether the Respondents have established that, under Venezuelan law, the concept of "disloyal delay" warrants dismissing the Claimant's claims in this arbitration for having been brought nearly 10 years after the fact.

176.   The Tribunal has also noted the Respondents' additional argument that "the conduct of a party is the best evidence of what that party considers to be the scope of its protected rights".[207] The Respondents submit that, in light of the Claimant's "extraordinary and inexplicable delay" in filing its claims, it is "clear evidence […] that the Claimant itself never really thought that it had a claim in the first place".[208] However, the foregoing argument is, in the Respondents' own terms, "an evidentiary point".[209] As such, it cannot be subject to a determination by the Tribunal as it does not entail a claim in and of itself. Indeed, the authorities relied upon by the Respondents on this point do

---

[204] ICC P&H Award, **CLA-120**, § 251.

[205] C-PHB, § 183-184; R-PHB, § 112-116.

[206] *Supra*, § 57.

[207] Rejoinder, § 99.

[208] Transcript, p. 141:16-25 (Respondents' Opening Statement).

[209] R-PHB, § 116.

not indicate that the conduct of a party in submitting a claim may result in the preliminary disposal of that claim. Instead, these authorities confirm that the parties' conduct is relevant to interpret the contract to which they are bound by, be it to determine their intent or to shed some light as to how to best understand ambiguous contractual provisions.[210] Thus, the Tribunal may only take these authorities into account when assessing the credibility of the Claimant's claims in this arbitration.

177.    In view of the above, the Tribunal turns to the crux of the matter: the concept of disloyal delay under Venezuelan law. In this respect, the Tribunal concludes that the Respondents have not established that disloyal delay under Venezuelan law requires the dismissal of the allegedly belated claim. Indeed, the Respondents offer two authorities to substantiate its disloyal delay argument, none of which sufficiently shows that disloyal delay has such a prominent place in Venezuelan law.

178.    First, the Respondents refer to the writings of Venezuelan scholars, Profs. Bello Tabares and Jimenéz Ramos, who list examples of how the principle of good faith can be breached in a judicial proceeding, and address the concept of disloyal delay in this context.[211] However, Profs. Bello Tabares and Jimenéz Ramos do not venture into the alleged effects of a disloyal delay. More significantly, Profs. Bello Tabares and Jimenéz Ramos give content to notion of disloyal delay solely on the basis of German doctrine and case law, qualifying it as a "German institution", and never affirm that it has been incorporated or otherwise adopted by Venezuelan law, courts, or practice.[212]

179.    Second, the Respondents refer to a 2011 judgment rendered by the Superior Court of the State of Bolívar.[213] However, this judgment deals with and focuses on procedural fraud allegations, which are not at issue here. Accordingly, while the judgment quotes Profs. Bello Tabares' and Jimenéz Ramos' above publication (including the list of

---

[210] R-PHB, § 110 and authorities quoted therein.

[211] Humberto Enrique III Bello Tabares and Dorgi Doralys Jiménez Ramos, PROCEDURAL FRAUD AND THE CONDUCT OF THE PARTIES AS EVIDENCE OF THE FRAUD (Livrosca, C.A. 2003), **RLA-116**, pp. 44, 46.

[212] Humberto Enrique III Bello Tabares and Dorgi Doralys Jiménez Ramos, PROCEDURAL FRAUD AND THE CONDUCT OF THE PARTIES AS EVIDENCE OF THE FRAUD (Livrosca, C.A. 2003), **RLA-116**, pp. 44, 46.

[213] *Climaco Antonio Marcano v. Seguros la Previsora*, Superior Court in Civil, Commercial and Transit Matters and for the Protection of Children and Adolescents of the Second Circuit of the Judicial Circumscription of the State of Bolívar (Venezuela), Case No. 09-3322, Judgment dated 18 January 2011, **RLA-117**, pp. 19-20.

examples of possible breaches of the good faith principle), it does so in passing and as part of its *obiter dictum*.[214]

180.   That said, even if the concept of disloyal delay as envisaged under German law were applicable in Venezuela, any delay in the submission of Claimant's claims in this arbitration is not disloyal. As noted by the Claimants, Profs. Bello Tabares and Jimenéz Ramos state that for a delayed claim to be deemed disloyal, a claimant must conduct itself in a manner that leads the respondent "to objectively expect that the right will not be exercised".[215] Yet, the Claimant wrote to the Respondents reserving its rights under the Corocoro Contracts for the expropriation of the Corocoro Project.[216] Moreover, pursuant to the Corocoro Guarantee, PDVSA agreed to "unconditionally and irrevocably" guarantee CVP's performance of all its obligations under the Corocoro AA and the Corocoro CA "notwithstanding […] **any delay** […] by any investor in pursuing any remedies available against CVP".[217] In consideration of the foregoing, the Respondents (and particularly PDVSA) could not have "objectively expected" that the Claimant would not bring forward the claims it has now brought in this arbitration.

181.   For the reasons set out above, the Tribunal finds the Respondents' disloyal delay submission unfounded.

---

[214] *Climaco Antonio Marcano v. Seguros la Previsora*, Superior Court in Civil, Commercial and Transit Matters and for the Protection of Children and Adolescents of the Second Circuit of the Judicial Circumscription of the State of Bolívar (Venezuela), Case No. 09-3322, Judgment dated 18 January 2011, **RLA-117**, pp. 19-20.

[215] Humberto Enrique III Bello Tabares and Dorgi Doralys Jiménez Ramos, PROCEDURAL FRAUD AND THE CONDUCT OF THE PARTIES AS EVIDENCE OF THE FRAUD (Livrosca, C.A. 2003), **RLA-116**, pp. 44, 46; C-PHB, § 186.

[216] Letter from Patrick Wolfe (ConocoPhillips) to GOPW Investor's Committee, 2 February 2007, copying Dr. Mommer, Mr. Kahale (Respondents' counsel), and also CVP representatives, Pedro León and Alexis Lizardo, **C-101**; Letter from Roy Lyons (ConocoPhillips) to Eulogio Del Pino (CVP/PDVSA), 6 March 2007, **C-108**; Letter from Roy Lyons (ConocoPhillips) to Eulogio Del Pino (CVP/PDVSA), 13 March 2007, **C-111**; Letters from Roy Lyons (ConocoPhillips) to Rafael Ramírez (Ministry/PDVSA), Bernard Mommer (Ministry/PDVSA), and Eulogio Del Pino (CVP/PDVSA), 12 April and 9 May 2007, **C-116** and **C-137**; Letter from Roy Lyons (ConocoPhillips) to Eulogio Del Pino (CVP/PDVSA), 6 June 2007, **C-143**; Letter from Patrick Wolfe (ConocoPhillips) to PDVSA Transition Committee Members enclosing *IPF 100-Year Storm Emergency Mooring System*, Corocoro Interim Processing Facility dated 10 April 2007, 12 April 2007, **C-115**; E-mail from Patrick Wolfe (ConocoPhillips) to Alexis Lizardo (PDVSA/CVP) and others enclosing "Weekly Report April 18th.doc," 23 April 2007, **C-121**; E-mail from Patrick Wolfe (ConocoPhillips) to the Transition Committee, 30 April 2007, **C-125**; E-mail from Patrick Wolfe (ConocoPhillips) to Alexis Lizardo (PDVSA) et al., enclosing "Daily Report 01MAY07.pdf," 2 May 2007, **C-133**; E-mail from Patrick Wolfe (ConocoPhillips) to Eulogio Del Pino (CVP/PDVSA), 8 May 2007, **C-136**.

[217] Corocoro Guarantee, **C-2**, Section 4 (emphasis added); C-PHB, § 188.

**B.** **THE ALLEGED BREACH OF THE COROCORO AA, THE COROCORO GUARANTEE AND THE COROCORO CA**

*1.* ***The Claimant's position***

182. The Claimant submits that the Respondents breached the Corocoro Contracts in the following three principal ways.

    i. First, by "completely ceas[ing] to perform the Corocoro Contracts from 1 May 2007 onwards" (the "Non-Performance Claim").[218]

    ii. Second, by "fail[ing] to perform" obligations that, in the Claimant's view, "survived the termination of the [AA]" (the "Surviving Obligations Claim").[219]

    iii. Third, by "breach[ing] numerous specific provisions of the Corocoro Contracts, including by executing a substitute contract with Eni […] prior to the purported termination of the Corocoro AA in January 2008" (the "Particular Breaches Claim").[220]

183. According to the Claimant, the Non-Performance Claim, the Surviving Obligations Claim, and the Particular Breaches Claim, each gives rise to "liability under applicable Venezuelan law".[221] Further, "collectively they evidence a single course of conduct by Respondents to disregard their obligations under the Corocoro Contracts" (the "Overall Breach Claim").[222]

    *1.1   Non-Performance Claim*

184. With respect to the Non-Performance Claim, the Claimant refers to the Tribunal's findings in the ICC P&H Arbitration that:[223]

    i. Being an obligation of result, "performance is an end in itself".[224]

---

[218] Reply, § 28.

[219] Reply, § 28.

[220] Reply, § 28.

[221] Reply, § 29.

[222] Reply, § 29.

[223] Reply, § 31-34.

[224] ICC P&H Award, **CLA-120**, § 426 , referring to the opinion of Prof. García Montoya, namely the Respondent's legal expert in both the ICC P&H Arbitration and in the present proceedings (ICC P&H Arbitration (RER-5, n. 106)).

ii.  "When parties enter into a contract, the least that is expected in terms of the result sought to be achieved, is that the contract will be performed *per se*; and failure to perform or obstructing performance would hinder the achievement of this result".[225]

iii.  "[T]he total non-performance of a contract is a prima facie breach which raises a presumption of liability".[226]

iv.  "[I]t is not disputed that the [P&H Contracts] were not performed on and from the date of the Expropriation on 1 May 2007. Thus, it follows that as from the Expropriation on 1 May 2007, the Respondents have arguably breached their obligation to perform the [P&H Contracts] under Venezuelan law".[227]

185.  In this context, the Claimant submits that, as in the ICC P&H Arbitration, it is "undisputed" in the present case that the "Respondents completely ceased to perform the Corocoro AA from 1 May 2007 onwards".[228] Therefore, the Respondents' conduct constitutes a *prima facie* breach of the Corocoro Contracts.[229]

### *1.2   Surviving Obligations Claim*

186.  Regarding the Surviving Obligations Claim, the Claimant relies on Clause 21.5 of the Corocoro AA which, in conjunction with Clause 10.6 of the Corocoro AA and with due regard to Section VIII of the Corocoro AA, provides for certain rights to survive the termination of the Corocoro Contracts.[230] These provisions read as follows:

i.  Clause 21.5 of the Corocoro AA:

Upon the termination of this Agreement all rights and obligations of the Parties hereunder shall terminate **except for the following rights and obligations which shall survive such termination**:

(a) Claims of Party against another Party for damages arising out of acts or omissions of the other Party relating to such other Party's obligations under this Agreement;

---

[225] ICC P&H Award, **CLA-120**, § 427.

[226] ICC P&H Award, **CLA-120**, §§ 424, 491.vii.

[227] ICC P&H Award, **CLA-120**, §§ 440.

[228] Reply, § 34.

[229] Reply, § 34.

[230] Reply, §§ 40-42.

[…]

(c) The provisions of Clauses […] **8.6,** […], **[19], [20]** (excluding Clause 20.9), [21], [22], [23], [24], [25], **[26]**, and [30] […].[231]

ii.   Clause 10.6 of the Corocoro AA:

Each Consortium and the related Consortium Agreement shall terminate upon the expiration of the Operation Period for the relevant Development Area or upon the earlier termination of this Agreement with respect to such Development Area in respect of all Participating Investors pursuant to Clause XXII **except the obligations of the Parties that survive the termination of this Agreement in accordance with Clause 21.5 which shall also survive the termination of such Consortium and the related Consortium Agreement**.[232]

iii.   Section VIII of the Corocoro CA:

This Consortium Agreement, shall terminat[e] at the conclusion of the Operating Period for the Development Area or sooner, on the date on which the Partnership Agreement for the Development Area and all Participating Investors terminates, pursuant to Article XXII of the Partnership Agreement. Upon termination of the Consortium Agreement, all rights and obligations of the Parties under such shall also be terminated, **with the exception of said rights and obligations specified in Article 21.5 of the Partnership Agreement**.[233]

187.   According to the Claimant, the foregoing provisions guarantee, beyond the termination of the Corocoro Contracts, some of the Claimant's "rights" (and the "Respondents' corresponding obligations") which constitute the "core" of the Parties' "financial bargain",[234] namely, the Claimant's right: (i) to "participate in the development of the Corocoro Project" pursuant to Clause 8.6 of the Corocoro AA;[235] (ii) to a "continued sharing of production on a pro rata basis" pursuant to Clause 19.2 of the Corocoro AA;[236] and (iii) to perceive joint revenues from a discovery pursuant to Clause 20 of the Corocoro AA. [237]

188.   More specifically, the above-mentioned Clauses 8.6, 19.2 and 20 of the Corocoro AA read in their relevant part as follows:

i.   Clause 8.6 of the Corocoro AA:

---

[231] Corocoro AA, **C-1**, Clause 21.5 (emphasis added).

[232] Corocoro AA, **C-1**, Clause 10.6 (emphasis added).

[233] Corocoro CA, **C-3**, Section VIII (emphasis added).

[234] Reply, § 39.

[235] Reply, § 36.

[236] Reply, § 37.

[237] Reply, § 38.

Following the submission of a Development Plan to the Control Committee, except as otherwise provided in Clause 5.8, the applicable Discovery **may only be developed by mutual agreement of CVP and the Investors,** or the relevant Participating Investors, for a period equal to the later of:

(a) ten (10) years from the date of initial submission, and

(b) the end of the Evaluation Period for the Evaluation Area in which such Discovery is located or the Operation Period for the Development Area in which such Discovery is located, as the case may be.[238]

ii.  Clause 19.2 of the Corocoro AA:

Except as provided in Clause 19.3, title to all Production shall vest on pro rata basis among the members of the relevant Consortium in proportion to their respective Participations in the relevant Discovery at the wellhead or other point of extraction. Except as provided in Clause 19.4 each Consortium member shall take its pro rata share of the Production from each Discovery in the related Development Area, corresponding to its Participation in such Discovery, at the Delivery Point specified in the applicable Development Plan.[239]

iii.  Clause 20 of the Corocoro AA:

20.1 The financial relationship among the Parties under this Agreement shall be based upon profit sharing. In particular, the members of each Consortium with Participations in any Discovery or the relevant Investors in the case of Early Production shall be required to pay a profitability bonus for each calendar quarter equal to the relevant PEG Amount for such calendar quarter, to CVP for transfer to the Venezuelan State in accordance with the Conditions as provided in this Clause XX. Profit shares allocable to the Consortium members, or the Investors, shall take the form of Production and Joint Revenues allocated in accordance with Clause XIX and this Clause XX.[240]

[…]

20.5 All Joint Revenues realized in any month shall be allocated among Discoveries in accordance with the Accounting Procedures. As set forth in the Accounting Procedures, such Joint Revenues shall be taken into account in determining the PEG Amounts. All Joint Revenues from a Discovery not allocated to CVP as part of the PEG Amount shall be allocated among the relevant Consortium members in accordance with their respective Participations in such Discovery. If such Discovery is not yet subject to Development Plan, such distribution will be made among the Investors or the relevant Participating Investors in proportions that they agree among themselves.[241]

189.  Based on these provisions and the reference to the same in Clause 21.5 of the Corocoro AA[242] (which is, in turn, referred to in Section VIII of the Corocoro CA),[243] the

---

[238] Corocoro AA, **C-1**, Clause 8.6 (emphasis added).

[239] Corocoro AA, **C-1**, Clause 19.2 (emphasis added).

[240] Corocoro AA, **C-1**, Clause 20.1 (emphasis added).

[241] Corocoro AA, **C-1**, Clause 20.5 (emphasis added).

[242] *Supra*, § 186.i

[243] *Supra*, § 186.iii.

Claimant submits that its "rights to develop the Corocoro [Project] and to share pro rata in its production and revenue survive the termination of the AA (and the CA)".[244]

190.    In this context, the Claimant argues that the Respondents breached such surviving obligations and continue to do so "to this day",[245] in two ways.

191.    First, by not performing the Corocoro Contracts from 1 May 2007 onwards.[246]

192.    Second, by carrying on with the development of the Corocoro Project through PetroSucre. In particular, the Claimant submits that, by "developing the Corocoro Discovery through the formation of an *empresa mixta* with Eni", the Respondents contravened the explicit mandate of Clause 8.6 of the Corocoro AA, according to which the "[Corocoro] Discovery [could] **only** be developed by mutual agreement of CVP and the Investors".[247] Moreover, by impeding the Claimant from receiving its 32.2075% share of the Project's production and revenue,[248] and instead allocating 74% to CVP and 26% to Eni,[249] the Respondents breached the production and revenue sharing provisions in Clauses 19 and 20 of the Corocoro AA.[250]

193.    In support of this argument, the Claimant emphasizes that (i) Clause 19.2 of the Corocoro AA "impose[d] a positive obligation on [CVP] to only take Production in proportion to its 35% interest in the Project";[251] (ii) Clause 20.5 of the Corocoro AA "ma[de] it clear that Respondents could take no more than 35% of the Project's Joint Revenue";[252] (iii) Clause 12.5 of the Corocoro AA envisaged the Claimant's right as Operator to "at all times maintain an Overall Interest of at least 30% in the Association".[253]

---

[244] Reply § 43.

[245] Reply, § 28.

[246] Reply, § 34; *supra*, § 184-185.

[247] *Supra*, § 188.i (emphasis added); Reply, § 44.

[248] *Supra*, fn. 66, §§ 37, 29.

[249] *Supra*, § 51-52.

[250] Reply, §§ 46-51.

[251] Reply, § 48.

[252] Reply, § 49.

[253] SoC, § 149(a); Corocoro AA, **C-1**, Clause 12.5 ("The original Operator or an Affiliate of the original Operator shall at all times maintain an Overall Interest of at least 30% and the Operator in respect of each Discovery shall acquire and maintain the minimum Participation in such Discovery specified in Clause 8.4. In the event that an Operator resigns or is removed in accordance with the Operating Agreement the Operator shall be required to transfer sufficient portion of its Overall Interest and/or its interest in any Discovery to permit the replacement Operator to satisfy the minimum interest condition set forth in the preceding sentence" […]).

194.    Incidentally, the Claimant submits that "[b]y impeding Claimant from receiving its share of production or revenue from the Corocoro Project, Respondents also breached their obligation of good faith under Venezuelan law, pursuant to which it has an implied duty not to 'impede or frustrate the interests [that Claimant] sought to achieve through the contract'".[254] For the Claimant, this constitutes a breach of Clauses 2.1 to 2.4 and 25.5 of the Corocoro AA, which allegedly incorporate the good faith principle under Venezuelan law.

### 1.3   Particular Breaches Claim

195.    With respect to the Particular Breaches Claim, the Claimant's argument is three-fold.

- **Non-repayment of the loan**

196.    First, the Claimant submits that the Respondents have failed to repay the loan extended to CVP for it to acquire its 35% interest in the Corocoro Discovery.[255] According to the Claimant, this constitutes a breach of Clause 8.5 of the Corocoro AA[256] and of Section 8.2 of Annex D of the AA.[257] Moreover, it denotes a breach of the duty to perform the Corocoro AA in good faith and not to "impede or frustrate the interests [that Claimant] sought to achieve through the contract".[258]

- **Replacement of the Corocoro Project's management structure**

197.    Second, the Claimant submits that, by instituting the Transition Committee in March 2007 and materially relieving the Claimant as Operator on 1 May 2007, the Respondents "replaced the existing management structure of the Corocoro Project".[259] Given that this was not mandated by the 2007 Nationalization Decree,[260] the Respondents "breached specific provisions of the [Corocoro] AA providing for

---

[254] Reply, § 50.

[255] *Supra*, § 35-37.

[256] Reply, § 59; Corocoro AA, **C-1**, Clause 8.5 ("No later than five Business Days after the approval of Development Plan, CVP shall notify the relevant Participating Investors of the CVP Participation in the related Discovery, which may not be more than 35% or less than 1%". […] Except as otherwise provided in Clause XI, the relevant Participating Investors shall be deemed to have lent the purchase price to CVP at an interest rate of LIBOR plus 1% per annum, accruing from the date of the relevant Declaration of Commerciality. Principal and interest on such Loan shall be payable by CVP solely to the extent of CVP's deemed net after-tax cash flow from the related Development Area determined in accordance with the Accounting Procedures".)

[257] Reply, § 59.

[258] Reply, § 59.

[259] Reply, § 60.

[260] Reply, § 61.

Claimant's rights of oversight and control of Project activities".[261] In particular, the Respondents prevented the Management Company and "other management organs" (of which the Claimant was part of) "from directing and supervising the Project's activities",[262] in breach of Clauses 5.2[263] and 13.1[264] of the Corocoro AA.[265]

198. Moreover, the Claimant argues that the Respondents failed to comply with their duties as Operator of the Project (despite the Claimant's requests in that respect) and breached the Corocoro Contracts by: (i) not providing a monthly operational report pursuant to Section 3.2 of Annex D of the Corocoro AA;[266] and (ii) not granting to the Claimant prompt and full access to all data, records, and information concerning the Project, pursuant to Clause 26.2 of the Corocoro AA (a provision that, according to the Claimant, also survived the termination of the Corocoro Contracts in accordance with Clause 21.5 of the Corocoro AA).[267]

- ▪ **Execution of the CVP-Eni MoU and Conversion Contract**

199. Third, the Claimant submits that, by executing the MoU (between the Respondents and Eni) and the Conversion Contract (between CVP and Eni), the Respondents "affirmatively disclaimed all of their obligations under the Corocoro Contracts" while the "Corocoro AA was still afoot".[268] Indeed, the Claimant contends that the MoU and the Conversion Contract were entered into on 26 June 2007 and 30 November 2007,

---

[261] Reply, § 60.

[262] Reply, § 61; *supra*, § 30.

[263] Corocoro AA, **C-1**, Clause 5.2 ("The Management Company shall direct, coordinate and supervise the activities that are the object of this Agreement ensuring an optimal level of commercial production and applying to that effect the standards established in applicable legislation and to the extent consistent therewith the technical and commercial criteria commonly employed by the international oil industry. The Management Company shall early out the operations required to accomplish the object of this Agreement through the Operator to the extent set forth herein and in the Operating Agreement.")

[264] Corocoro AA, **C-1**, Clause 13.1 ("All operations and activities relating to the Project shall be carried out by the Operator under the supervision of the Management Company in accordance with: (a) The laws and regulations of the Republic of Venezuela; (b) The specific requirements of this [AA] and the Operating Agreement, and the decisions of the Control Committee, the Management Company Board, and each relevant Development Committee […].")

[265] Reply, § 61.

[266] Reply, § 62; Corocoro AA, **C-1**, Annex D, Section 3.2 ("The Operator shall provide monthly report to the members of the Management Company Board and each Development Committee. […]").

[267] Reply, § 62; *supra*, § 186.i; Corocoro AA, **C-1**, Clause 26.2 ("CVP and all members of the Control Committee and the Management Company Board shall have prompt and full access to all data, records and information used or produced by or for Investors or the Operator in connection with the Project, regardless of whether such data, records and information would otherwise be considered proprietary or confidential, and shall have the right to inspect or cause to be inspected any and all Project-related facilities during regular business hours in manner that will not materially interfere with Project-related activities. […]")

[268] Reply, § 57.

respectively,[269] while the Corocoro AA was purportedly terminated on 16 January 2008 at the earliest (in accordance with the 2007 Law on Effects of Migration and the 2008 Transfer Decree).[270]

200.    In this regard, the Claimant further notes that "nothing in the Nationalization Decree or any other Venezuelan law mandated Respondents to enter into [these contracts] with Eni prior to the termination of the Corocoro AA".[271] According to the Claimant, the Respondents' conduct breached Clauses 2.3,[272] 2.4,[273] and 8.3 of the Corocoro AA,[274] as well as Recital 2 of same.[275] Moreover, the Claimant stresses that, because the CVP-Eni MoU "summarizes the agreement in principle reached between [CVP] and [Eni]",[276] it confirms that "these entities engaged in negotiations regarding the termination of the Corocoro AA before the Respondents assumed the activities of the Project on 26 June 2007".[277] For the Claimant, such engagement in negotiations breached the good faith principle incorporated in Clauses 2.1 to 2.4 and 25.5 of the Corocoro AA.[278]

### 1.4   Impossibility to Invoke Force Majeure

201.    Lastly, the Claimant argues that, unlike in the ICC P&H Arbitration, the Respondents cannot rely on the 2007 Nationalization Decree to escape liability.[279] The Claimant acknowledges that (to the extent the contractual breaches of the P&H Contracts

---

[269] *Supra*, §§ 49.ii, 52.

[270] SoC, §§ 116, 143, 170; *supra*, §§ 50, 53.

[271] Reply, § 57.

[272] Corocoro AA, **C-1**, Clause 2.3 ("The activities contemplated in this Agreement shall be conducted in association by Investors and CVP on the terms and subject to the conditions set forth herein in accordance with the requirements set forth in the Conditions. […]"); Reply, § 58(a).

[273] Corocoro AA, **C-1**, Clause 2.4 ("Considering that the Parties hereto base their relationship under this Agreement on good faith and have as their objective the long-term commercial success of the activities contemplated hereunder the Parties agree that where any consent approval or agreement must be obtained from any Party or its representative pursuant to this Agreement such consent approval or agreement shall not be unreasonably withheld"); Reply, § 58(b).

[274] Corocoro AA, **C-1**, Clause 8.3 ("[…] Once Development Plan is approved with respect to Discovery the relevant Participating Investors shall have all of the rights set forth in this Agreement with respect to such Discovery and shall have the obligation to implement such Development Plan in accordance with the terms set forth in this Agreement"); Reply, § 58(c).

[275] Corocoro AA, **C-1**, Recital 2 ("CVP […] has been granted, based on the Conditions, ten new areas including […] to carry out in association its right to explore for, evaluate, develop and produce hydrocarbons […]"); Reply, § 58(b).

[276] CVP-Eni MoU, **R-100**, p. 1

[277] C-PHB, § 45.

[278] C-PHB, § 45.

[279] Reply, §§ 64-65.

resulted from actions by the respondents in ICC P&H Arbitration pursuant to the 2007 Nationalization Decree), the Tribunal in that case:

   i. held that the 2007 Nationalization Decree was a governmental act "external and not attributable to the [ICC P&H Respondents]", which "consequently preclude[d] their liability for the non-performance" of the [P&H Contracts];[280] and

   ii. determined that, in any event, the ICC P&H Claimants had failed to establish causation between their losses and the ICC P&H Respondents' purported actions.[281]

202.   The Claimant submits, however, that the above findings are "unavailable" to the Respondents in the present case by virtue of Clause 28.1 of the Corocoro AA, which had no equivalent in the P&H Contracts, and through which in the present case the Respondents have assumed the risk of being held liable notwithstanding an event of *force majeure*.[282] More specifically, Clause 28.1 reads as follows:

> Failure of Party to fulfill any obligation incurred under this Agreement shall be excused and shall not be considered default hereunder during the time and to the extent that such non-compliance is caused by an Event of Force Majeure, **except that if the Event of Force Majeure is an <u>act of the Venezuelan State</u> that is <u>not of general applicability</u>, such Event of Force Majeure shall not preclude an action for damages against CVP for the nonperformance of the relevant obligation**.[283]

203.   According to the Claimant, the 2007 Nationalization Decree "squarely" fits the characterization of "an act of the Venezuelan State" which is "not of general applicability".[284] The Claimant observes that Venezuelan law draws a clear distinction between acts of *general* applicability, "which relate to acts of government addressed to an undetermined number of persons", and acts of *particular* applicability, "which are addressed to a specific person or a determinable group of persons".[285] Thus, to the extent that Article 1 of the 2007 Nationalization Decree specifically refers to, *inter alia*, the "Exploration at Risk and Profit Sharing Agreements of Gulf of Paria West",[286] the

---

[280] ICC P&H Award, **C-120**, § 473.

[281] ICC P&H Award, **C-120**, §§ 487, 490

[282] Reply, §§ 64-65.

[283] Corocoro AA, **C-1**, Clause 28.1 (emphasis added).

[284] Reply, § 67.

[285] Reply, § 69.

[286] 2007 Nationalization Decree, **C-103**, Article 1; Reply, § 68.

2007 Nationalization Decree can only be deemed an act of particular applicability.[287] In this context, the Claimant recalls that, in the ICC P&H Arbitration, PDVSA already conceded that the 2007 Nationalization Decree was "'discriminatory, meaning 'not applicable to all enterprises in Venezuela'".[288]

204.    As such, "the plain text" of Clause 28.1 of the Corocoro AA "precludes Respondents from exonerating themselves from the harm resulting from their non-performance [and other breaches] by pointing to the Nationalization Decree".[289] The Respondents must therefore redress all the breaches underlying the Non-Performance Claim, the Surviving Obligations Claim, the Particular Breaches Claim, and the Overall Breach Claim, without any limitation.[290]

### 2.   The Respondents' position

205.    The Respondents submit that the Claimant's entire case on liability (i.e. its Non-Performance Claim, its Surviving Obligations Claim, its Particular Breaches Claim, and its Overall Breach Claim) rests on the incorrect premise that they "breached contractual obligations to Claimant and that Claimant had a continuing right to receive the benefits of contractual performance".[291] The Respondents submit that, after the nationalization of the Claimant's "interests" in the Corocoro Project as of 26 June 2007 by way of the 2007 Nationalization Decree,[292] "there were no substantive obligations to be breached by CVP and no substantive rights to be enforced by Claimant under the Profit Sharing Agreement".[293]

206.    For the Respondents, it is "elementary" that in order for a "debtor to be liable for breach to a creditor, there must be both an obligation that was breached by the debtor and a right of the creditor to demand and receive performance of that obligation".[294] As a consequence of the nationalization, however, "neither the obligation nor the right exists in this case".[295] Put differently, the issue here is not whether the 2007 Nationalization

---

[287] Reply, § 69.

[288] Reply, § 67-68.

[289] Reply, § 70.

[290] Reply, §§ 75-77.

[291] Rejoinder, § 37.

[292] Rejoinder, § 84-85 ss.

[293] Rejoinder, § 46.

[294] Rejoinder, § 41.

[295] Rejoinder, § 41.

Decree and all measures thereafter provide an "excuse" for the non-performance of the Corocoro Contracts, but rather that there was nothing to perform: the Claimant was "no longer the owner of the right in question, namely, the interest in the Project and the [AA]", and therefore no longer held "substantive rights to enforce against" the Respondents.[296]

207.   According to the Respondents, their conclusion is supported by: (i) the writings of Prof. Brewer-Carías, the Claimant's legal expert in this arbitration, who has recognized that the 2007 Nationalization Decree extinguished all covered association agreements and thus expropriated the contractual rights of the corresponding private entities;[297] (ii) multiple other Venezuelan law scholars, who explain that upon said expropriation of contractual rights, liability for the payment of just compensation lies on the State and not on the entity sharing contractual privity;[298] (iii) French as well as Italian law, which are "influential in Venezuela";[299] as well as (iv) "international law generally", which is consistent with Venezuelan law as to the "meaning and effects of the concept of expropriation".[300]

208.   The Respondents thus argue that, following the nationalization of its interests in the Corocoro Project, the Claimant has "the right to receive compensation from the State". However, they emphasize that, consistent with what the Claimant is "in fact" currently "pursuing in the ICSID Arbitration",[301] "it was understood from the outset that international treaties would be the remedy for the adverse consequences of governmental action, including expropriation, and that CVP would not provide any indemnity in this respect".[302]

209.   In addition to the above general observations, the Respondents also provide the following reply to the Claimant's other contractual claims, as summarized below.

---

[296] Rejoinder, § 41.

[297] Rejoinder, § 42.

[298] Rejoinder, § 43.

[299] Rejoinder, § 44.

[300] Rejoinder, § 45.

[301] SoD, § 29; Rejoinder, § 41.

[302] Rejoinder, §§ 58-63; SoD, § 29.

### 2.1 Surviving Obligations Claim

210. Regarding the Surviving Obligations Claim,[303] the Respondents note the Claimant's reliance on Clauses 8.6, 19.2, and 20 of the Corocoro AA,[304] and submit that "a simple reading" of these provisions indicate that they merely "define how the field [was] to be developed and production and revenues [were] to be shared" under the AA.[305] They "do not purport to be a guarantee" by CVP that Claimant's interests "[would] never be nationalized".[306] Rather, they "create an obligation only in the nature of a negative covenant, that is, that neither party may take action that would cause the other party not to be able to receive its pro rata share of production and revenues under the [AA]"; something that the Claimant has failed to establish.[307]

211. Indeed, according to the Respondents,[308] the Claimant's "absolutist interpretation" of the Corocoro AA "overlooks the fact that CVP's contractual obligations [thereunder], including the general obligation not to take action to interfere with the enjoyment of other parties' rights, are all subject to and qualified by the provisions of the [AA] referring to Venezuelan law", which in turn "implement the Seventeenth Condition of the Congressional Authorization",[309] such as Clauses 13.1, 25.1,[310] and 25.4.[311]

212. For the Respondents it is thus "difficult to understand how Claimant can argue that CVP or PDVSA breached any contractual obligation when the agreement Claimant alleges was breached itself requires compliance with and is governed by Venezuelan law, and under Venezuelan law that agreement ceased to exist".[312] This is even more so "in light

---

[303] *Supra*, §§ 186-194.

[304] *Supra*, § 187-189.

[305] Rejoinder, § 39.

[306] Rejoinder, § 39.

[307] Rejoinder, § 39.

[308] Rejoinder, § 47.

[309] *Supra*, § 21.iv.

[310] *Supra*, fn. 264; Corocoro AA, **C-1**, Clause 25.1 ("This Agreement shall be governed by and construed in accordance with the laws of the Republic of Venezuela").

[311] Corocoro AA, C-1, Clause 25.4 ("The approval or disapproval of any matter by the Control Committee or the Management Company Board shall not supersede any applicable Venezuelan law or regulation or exempt any Party from being subject to any such law or regulation").

[312] Rejoinder, § 47.

of the fact" that the 2007 Nationalization Decree is "indisputably a law of public policy in Venezuela".[313]

213. The Respondents thus conclude that the Surviving Obligations Claim is simply not serious. Not only because the "contract provisions in question obviously do not have the meaning Claimant seeks to ascribe to them", but "no provision of the [Corocoro AA] could override mandatory laws of public policy".[314]

### 2.2   Particular Breaches Claim

214. Regarding specifically the first *tranche* of the Particular Breaches Claim (namely, the non-repayment of the loan to acquire the 35% interest in the Corocoro Discovery),[315] the Respondents submit that the repayment of the loan allowing CVP to obtain its initial 35% participation in the Project was conditional. Indeed, Clause 8.5 of the Corocoro AA (upon which the Claimant relies) states that the "principal and interest on such loan shall be payable by CVP **solely to the extent** of CVP's deemed net after-tax cash flow from the related Development Area".[316] In this context, the Respondents stress that "it is undisputed that [said] condition […] was never met" and therefore the Respondents cannot be in breach of the alleged non-repayment.[317] In any event, the Respondents point out, "this is not the basis of any request for relief":[318] the Claimant's case has "nothing to do with [the loan repayment]".[319]

215. As to the second *tranche* of the Particular Breaches Claim (namely, the replacement of the Project's management structure),[320] the Respondents broadly submit that no "damage could arise or has arisen" as a consequence of the "alleged breach" of the "provisions relating to the management and operatorship of the Project".[321] According to the Respondents, "[t]he core of this case is Claimant's attempt to impose responsibility on CVP for the Government's nationalization of the Project, which has

---

[313] Rejoinder, § 48.

[314] Rejoinder, § 49.

[315] *Supra*, § 196.

[316] Corocoro AA, **C-1**, Clause 8.5 (emphasis added).

[317] Rejoinder, fn. 68 (see also SoD, § 123).

[318] SoD, § 123 (Section 8.5).

[319] SoD, § 123 (Section 8.5).

[320] *Supra*, § 197-198.

[321] Rejoinder, fn. 68.

nothing to do with any of these provisions".[322] The Respondents further point out that the Claimant has been unable to "keep its story straight" as to exactly which contractual obligations constitute the basis of its claim, and emphasize the constant variation in the Claimant's position since its Request throughout the proceedings.[323]

216.  Finally, as to the third *tranche* of the Particular Breaches Claim (namely, entering into agreements with Eni prior to the termination of the Corocoro AA in January 2008),[324] the Respondents reject breaching the Corocoro AA by executing the CVP-Eni MoU and the CVP-Eni Conversion Contract.[325] According to the Respondents, the Claimant's position cannot be reconciled with the terms of the 2007 Nationalization Decree and it again "misunderstands the nature of the nationalization process carried out thereunder".[326] The Respondents' argument runs as follows:

i.    First, unlike Conoco, Eni agreed to "migrate to the new mixed company structure" pursuant to the terms of the 2007 Nationalization Decree (i.e. by 26 June 2007). Thus, "everything CVP did", namely, the execution of the CVP-Eni MoU and the CVP-Eni Conversion Contract, was in implementation of, and in strict compliance with, [the 2007 Nationalization Decree]".[327] CVP had no choice but to comply with the 2007 Nationalization Decree and conclude those agreements with Eni.

ii.   Second, Claimant's "contemporaneous letters" (dating from 12 April to 4 July 2007), leave "no doubt" as to its "understanding" of both the "nationalization process" and all that the Respondents' actions to that effect were required by the 2007 Nationalization Decree.[328] This must include the execution of the CVP-Eni MoU and the CVP-Eni Conversion Contract.

iii.  Third, the 2007 Law on Effects of Migration,[329] on which the Claimant now incorrectly relies in an attempt to argue that the Corocoro AA was only

---

[322] Rejoinder, fn. 68, §§; SoD, § 123.

[323] Rejoinder, §§ 32-35.

[324] *Supra*, § 199-200.

[325] Reply, § 57.

[326] Rejoinder, § 80.

[327] Rejoinder, §§ 81-82.

[328] Rejoinder, § 83.

[329] *Supra*, § 50, 53.

extinguished on 16 January 2008,[330] is in any event irrelevant. On the one hand, Conoco's pleadings in both the ICC P&H Arbitration and the ICSID Arbitration denote Conoco's "clear understanding" that its interests in Venezuela were "nationalized", "expropriated", "confiscated", or "complete[ly]" and "final[ly] tak[en]" as of 26 June 2007; not 16 January 2008.[331] On the other hand, as "Conoco has repeatedly recognized in all documents before this Tribunal", the Law on Effects of Migration simply "confirmed" the expropriation that had already taken place by means of the 2007 Nationalization Decree.[332] Its purpose was to "complete" the migration process by "put[ting] an end" to a "provisional regime", whereby the companies that had agreed to migrate by 26 June 2007 (such as Eni) could "continue conducting petroleum operations using the [AA] mechanism [...].[333] As such, the 2007 Law on Effects of Migration purported "to allow time for an orderly migration until the issuance of the decrees transferring the rights to exercise primary activities to the [new] mixed companies",[334] namely, the 2008 Transfer Decree.[335]

iv. Fourth, "since it is undisputed that there was no production at Corocoro during 2007", the Claimant suffered no damage from any action prior to the 2008 Transfer Decree. At the most, the Claimant was "deprived" of having to "pay its share of any cash calls", which could hardly be considered damage.[336]

### 2.3   Force majeure and Clause 28.1 of the Corocoro AA

217.    The Respondents further contest the Claimant's characterization of the content and effects of Clause 28.1 of the Corocoro AA as a provision that prevents the Respondents from relying on the 2007 Nationalization Decree in order to preclude all liability with respect to the alleged breaches of the Corocoro Contracts.[337] According to the Respondents, while contractual parties may "expressly agre[e] to allocate to the State company the burden of providing compensation for [an] expropriation" (an agreement

---

[330] *Supra*, fn. 270.

[331] Rejoinder, § 84.

[332] Rejoinder, fn. 194.

[333] Rejoinder, § 85.

[334] Rejoinder, § 85.

[335] *Supra*, § 53.

[336] Rejoinder, § 86.

[337] *Supra*, §§ 201-204.

that "may […] alter the conclusion that claims for breach of a contract extinguished by an expropriation are not sustainable against the State company party to the contract"),[338] Clause 28.1 of the Corocoro AA is not an example of an agreement to such a "super-indemnity".[339] To the contrary, "risk allocation clauses" such as Clause 28.1 of the Corocoro AA must be "strictly construed".[340]

218.  In particular, the Respondents submit that the Parties understood from the very outset that, contrary to the P&H Contracts, the Corocoro Contracts would "not provide for any indemnity by CVP in favor of the [Investors] in the event that the Government exercised its sovereign rights in a manner that had an adverse impact on the Project or the [Investors] themselves".[341] During the bidding process concerning the New Areas,[342] "[n]early every company […] requested an economic stabilization clause" (ideally containing an "indemnity of the type in the [Petrozuata AA]") to be inserted into the Model AA.[343] However, PDVSA's consultants advised against the insertion of such clauses on the basis that, *inter alia*, there was no specific authorization for such a clause in the Congressional Authorization.[344] Instead, PDVSA was advised to "include a clause in the Association Agreement confirming the applicability of Article 1160 of the Civil Code and the understanding of the Parties that Article 1160 effectively provides for a renegotiation right if economic circumstances substantially change".[345] This consideration was accepted by PDVSA and included in the Model AA Memorandum (transmitted to all potential bidders, including Conoco).[346]

219.  Moreover, the Model AA also referred to international investment treaties as mechanisms to protect investors against changes in Venezuelan law.[347] Notably,

---

[338] Rejoinder, § 55.

[339] Rejoinder, § 78.

[340] Rejoinder, § 78-79.

[341] SoD, § 35.

[342] *Supra*, §§ 22 ss.

[343] Memorandum from Cleary, Gottlieb, Steen and Hamilton to PDVSA of 14 November 1995, **R-99**, p. 13; Rejoinder, § 60; *supra*, § 22.

[344] Memorandum from Cleary, Gottlieb, Steen and Hamilton to PDVSA of 14 November 1995, **R-99**, p. 13; Rejoinder, § 60.

[345] Memorandum from Cleary, Gottlieb, Steen and Hamilton to PDVSA of 14 November 1995, **R-99**, p. 13; Rejoinder, § 60.

[346] *Supra*, § 23.

[347] Rejoinder, §§ 61-62; *Supra*, § 24.i.

Clause 25.5 of the Corocoro AA refers to both Article 1160 of the VCC and to investment treaties:[348]

> Without limiting the generality of Clause 25.1 [stating that the governing law is Venezuelan law,] the Parties hereby acknowledge the applicability of Article 1160 of the Venezuelan Civil Code to this Agreement and that accordingly all obligations hereunder shall be performed in good faith and in accordance with equity, custom and law. The Parties also acknowledge the applicability of any international treaties relating to the mutual protection of foreign investment to which Venezuela and any country of which an Investor is national may now be or hereafter become parties.[349]

220.   In light of the above, the Respondents submit that the Parties clearly understood that international treaties would be the remedy available to the Investors for the adverse consequences of governmental action with respect to the Corocoro Project.[350] What is more, granting now the Claimant an additional remedy which PDVSA explicitly denied during the bidding process would materially change the terms and conditions upon which Conoco entered into the Corocoro Project.[351]   As such, Clause 28.1 of the Corocoro AA cannot be of any assistance to the Claimant and is "irrelevant", given that the "Claimant is alleging breaches of obligations that were extinguished by the nationalization", which in turn left the Claimant with "no interest in the Project to protect or enforce".[352]

221.   In any event, the Respondents argue that the premise for the Claimant's reliance on Clause 28.1 of the Corocoro AA is incorrect: contrary to the Claimant's contention,[353] the 2007 Nationalization Decree is not an act of particular applicability.[354] The fact that Article 1 of the 2007 Nationalization Decree provides for a list of "companies and agreements" is immaterial.[355] Indeed, this list merely "confirms that the [2007 Nationalization Decree] applied to all companies operating outside the legal framework of the 2001 Hydrocarbons Law", which "confirms" its character of "general applicability".[356]

---

[348] Rejoinder fn. 134; Corocoro AA, **C-1**, Clause 25.5.

[349] Corocoro AA, **C-1**, Clause 25.5.

[350] *Supra*, fn. 302.

[351] Rejoinder, § 63.

[352] Rejoinder, § 64.

[353] *Supra*, §§ 202-203.

[354] Rejoinder, § 65.

[355] Rejoinder, § 68.

[356] Rejoinder, § 68; *supra*, § 39.

222.   According to the Respondents, it is "well established under Venezuelan law", which is "consistent with French and Italian law on this point",[357] that "a law has a general character when the same legal regime applies to every person who falls within the factual circumstances of that law, regardless of the greater or lesser number of individuals that are affected. The general character of the law is not lost by the fact that the law establishes a particular, special or exceptional regime to a group of persons whose conduct falls within the conditions established in the law. In fact, even 'special norms' maintain the character of generality".[358]

223.   In this context, the Respondents point out that the 2007 Nationalization Decree was issued as an "act with rank, effect, and force of law", making it a "true legislative act", as opposed to an administrative act.[359] As a consequence, pursuant to, *inter alia*, Prof. Brewer-Carías's writings outside this arbitration, the 2007 Nationalization Decree shares the "same fundamental normat[ive] status as the laws" enacted by the legislator.[360] The Claimant's attempt to distinguish between administrative acts of general and particular applicability for the purposes of Clause 28.1 of the Corocoro AA[361] is therefore similarly "irrelevant in this case", given that the 2007 Nationalization Decree is not an administrative act.[362]

224.   Nevertheless, to the extent that the classification of administrative acts is at all deemed relevant, in the Respondents' view the 2007 Nationalization Decree would still qualify as an act of "general effect" and as a "general act", as opposed to an act of particular effect. Referring once more to the writings of the Claimant's expert, Prof. Brewer-Carías,[363] the Respondents contend that "the classification of administrative acts as acts of general effects or acts of particular effects depends on their normative or non-normative content and the classification of general or individual administrative acts depends on the recipients of the acts".[364] Thus, given that the 2007 Nationalization Decree "creat[ed] rules of conduct that are part of the [Venezuelan] legal system", and

---

[357] Rejoinder, § 70.

[358] Rejoinder, § 69.

[359] Rejoinder, §§ 70-71.

[360] Allan R. Brewer-Carías, Treaties on Administrative Law, Vol. I: Administrative Law and its Fundamental Principles (Editorial Jurídica Venezolana 2013), **RLA-107**.

[361] *Supra*, § 203.

[362] Rejoinder, § 73.

[363] Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings. Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009), **RLA-108**.

[364] Rejoinder, § 73.

was aimed at "a plurality of individuals" (i.e. all the existing associations remaining outside of the legal framework of the 2001 Hydrocarbons Law), its characterization as an act of "general effect" and as a "general act" is unquestionable.[365] Simply put, the 2007 Nationalization Decree could not have been more generally applicable, as its scope covered all possible entities and associations (without any distinction between them) operating outside the *empresas mixtas* regime established through the 2001 Hydrocarbons Law.

225.   In this last respect, the Respondents reject the Claimant's assertion that it is "common ground" between the Parties that the 2007 Nationalization Decree is not of general applicability.[366] First, relying on references to the ICC P&H Arbitration, the Respondents note that "PDVSA and its subsidiaries have always made clear their position that [the 2007 Nationalization Decree] is an act of general applicability".[367] Second, PDVSA's concession in the ICC P&H Arbitration that the 2007 Nationalization Decree constituted a "Discriminatory Action" under terms of the compensation provisions in the P&H Contracts is irrelevant: "the contractually agreed upon definitions of 'Discriminatory Actions' under the Petrozuata and Hamaca Association Agreements have nothing to do with the concept of a law of general applicability under Venezuelan law".[368]

### 2.4   No causation

226.   The Respondents further submit that in any event none of the Claimant's contractual claims "can be sustained because the indispensable element of causation is lacking".[369] Thus, absent causation, there can be no liability under Venezuelan law.[370] The Respondents' argument is three-fold:

   i.   First, since the ICC P&H Arbitration, there has been no disagreement between the Parties and their experts that causation (i.e. the cause-and-effect relation between an alleged breach, as the cause, and the resulting damage, as the

---

[365] Rejoinder, § 74.

[366] *Supra*, fn. 288.

[367] Rejoinder, § 75, fn. 160.

[368] Rejoinder, §§ 75-77.

[369] Rejoinder, §§ 50 ss.

[370] Rejoinder, § 50.

effect) is one of the constituent elements of civil liability under Venezuelan law.[371]

ii. Second, the Tribunal in the ICC P&H Arbitration established that the standard of causation under Venezuelan law is that of "adequate causation".[372] It subsequently held that the adequate, direct or immediate cause of the ICC P&H Claimants' loss was *not* the purported actions by the ICC P&H Respondents, but rather the nationalization of ICC P&H Claimants' interests in the P&H Contracts by the Venezuelan Government.[373]

iii. Third, despite the disagreement between ICC P&H Parties as to the applicable standard to the element of causation, in light of the ICC P&H Award, the Claimant now recognizes that the "test under Venezuelan law is that of 'adequate causation'".[374] However, the Claimant incorrectly assumes that the Respondents' actions are the adequate cause of the Claimant's damage in the present case.[375] The foregoing ignores that, as "in the [ICC P&H Arbitration], the adequate cause of Claimant's loss here is the nationalization" by Venezuela of its interests in the Corocoro Project.[376]

### 3. *Analysis*

227. At the outset, the Tribunal notes that the Claimant's Non-Performance Claim, Surviving Obligations Claim, Particular Breaches Claim, and Overall Breach Claim (the "Contractual Claims"), are largely determined by the characterization and effects of the 2007 Nationalization Decree and its subsequent implementation.

228. Indeed, the Parties' dispute regarding the Non-Performance Claim deals with the issue of whether the Respondents may excuse any failure to perform the Corocoro Contracts on the basis that the 2007 Nationalization Decree itself required such conduct. In turn, although the Claimant submits that each of the Contractual Claims constitutes an individual breach of the Corocoro Contracts,[377] the Surviving Obligations Claim is

---

[371] Rejoinder, § 50.

[372] Rejoinder, §§ 51-52, referring to ICC P&H Award, **C-120**, § 484-485.

[373] Rejoinder, § 54, referring to ICC P&H Award, **C-120**, § 487.

[374] Rejoinder, § 53, referring to Reply, § 75.

[375] Rejoinder, § 53, referring to Reply, § 75.

[376] Rejoinder § 54.

[377] Reply, § 29.

hardly distinguishable from the Non-Performance Claim. As stated by the Claimant itself, the primary basis of the Surviving Obligations Claim is precisely the Respondents' alleged non-performance of the Corocoro Contracts.[378] By that measure, whether or not the Respondents may invoke the 2007 Nationalization Decree to excuse any breach of their obligations that arguably survived the termination of the Corocoro Contracts, is equally determinant. The same goes for the Particular Breaches Claim. This is of relevance given that the Parties disagree on whether the actions under such head of claim were required by, or were the natural result of, the 2007 Nationalization Decree.

229.     In this context, the Tribunal notes that the Claimant now takes "full account" and even invites the Tribunal to "stay faithful" to its determination in the ICC P&H Arbitration that, as a matter of Venezuelan law, the 2007 Nationalization Decree is an external and non-attributable act to the Respondents.[379] Considering that Venezuelan law is also applicable here,[380] it follows that, in principle, the Respondents may rely on the 2007 Nationalization Decree to preclude their liability for any breach of the Corocoro Contracts incurred pursuant to said Decree. However, the Claimant submits that Clause 28.1 of the Corocoro AA prevents the Respondents from invoking the 2007 Nationalization Decree in that manner. Therefore, according to the Claimant, the Respondents must be deemed liable for all of their breaches of the Corocoro Contracts, irrespective of the above characterization of the 2007 Nationalization Decree as an external and non-attributable act.

230.     It is thus apparent to the Tribunal that the success of the Contractual Claims hinges on the Tribunal ultimately making either of the following alternative findings:

i.     First, that the 2007 Nationalization Decree is an act "not of general applicability" in accordance with Clause 28.1 of the Corocoro AA and that, therefore, the Respondents may not avoid liability in the present case for any non-

---

[378] Reply, §§ 43 ("Therefore, Claimant's rights to develop the Corocoro Discovery and to share pro rata in its production and revenue survive the termination of the AA (and the CA). **Respondents' non-performance has denied Claimant its rights under each of these surviving provisions**") (emphasis added).

[379] Transcript, pp. 8-10,12 (Claimant's Opening Statement) ("[A]t the beginning of this week of hearings, let me state as clearly as I can that **we are here not to ask you to reconsider the [ICC P&H Award] you rendered under [the P&H Contracts]**. Absolutely to the contrary: We invite you to stay faithful to your findings in that prior Award; to apply those findings, but to apply them to the different terms of different contracts governing the Corocoro Project [...]. You found that [the 2007 Nationalization Decree is] a separate, unattributable act that PDVSA could rely on to excuse non-performance. [...] **We take full account of that finding**. The resulting question that now arises, as a matter of the contract before you in this case, is whether the Respondents can again rely on an act of Government as an unattributable, external act so as to excuse contractual non-performance. [...] And the outcome of liability is clear [...]."); *supra*, § 57.iii.

[380] *Supra*, § 70.

performance or positive breach of the Corocoro Contracts on the basis that they were acting (or not) in compliance with such Decree (and its subsequent implementation).

ii. Second, that the claimed breaches of the Corocoro Contracts are not the result of the 2007 Nationalization Decree, but instead attributable directly to the actions of CVP or PDVSA.

231. The above two alternative findings are indispensable to the Claimant's case even if the Tribunal were to reject the Respondents' argument that no contractual breach has occurred because, following the expropriation and extinguishment by the 2007 Nationalization Decree of the Corocoro Contracts (and the contractual rights and obligations therein), there were no substantive obligations to be breached and, by consequence, no rights to be claimed or enforced by the Claimant.[381] Indeed, even if the Tribunal were to disagree with the Respondents and conclude that the Claimant may claim compensatory damages for the Respondents' breaches of the Corocoro Contracts (notwithstanding the extinguishment of the same), the Claimant must still establish that the Respondents' alleged contractual liability is not precluded by an external and non-attributable cause or *force majeure*, such as the 2007 Nationalization Decree (and its implementation). The foregoing appears to be clear to the Claimant, particularly with respect to the Particular Breaches Claim.[382]

232. In this context, the Tribunal will first consider the Contractual Claims assuming, *arguendo*, that the Claimant retained the right to seek compensatory damages for the alleged breach of the Corocoro Contracts, despite the extinguishment and expropriation of the latter. If the contractual requirements for the Claimant's Contractual claims are met, the Tribunal will then consider the question of whether the Claimant can at all claim for contractual breach of the Corocoro Contracts after the implementation of the 2007 Nationalization Decree. Such approach is, in the Tribunal's view, both logical and procedurally efficient, particularly considering that the Respondents' expropriation argument (as a defense against the Contractual Claims) in any event requires an analysis interpreting Clause 28.1 of the Corocoro AA.

---

[381] R-PHB, §§ 22-53; *Supra*, §§ 205-209.

[382] C-PHB, fn. 61 ("Even assuming, *arguendo*, that the Tribunal was to conclude that the Nationalization Decree was a law of general applicability (which it is not), Respondents could not rely on the Nationalization Decree as an external, non-attributable cause to excuse their repudiation of the Corocoro Contracts, as nothing in the Nationalization Decree (or any other law) compelled CVP to execute this contract prior to the termination of the Corocoro Contracts.").

233.    Indeed, referring to Clause 28.1 of the Corocoro AA, the Respondents acknowledge that "the one exception" which may (but does not on the facts of the present case) "alter the conclusion that claims for breach of a contract extinguished by an expropriation are not sustainable against the State company party to the contract[,] is the case where the contracting parties have expressly agreed to allocate to the State company the burden of providing compensation for the expropriation".[383] According to the Respondents, "it is evident that Claimant fully understands this point, as it places heavy reliance on Section 28.1 of the Profit Sharing Agreement, the force majeure clause".[384] The Respondents submit, however, that "Section 28.1 does not operate as an indemnity for governmental action" and that, without such an "express indemnity", there can be "no breach of contract arising out of post-nationalization conduct because the debtor-creditor relationship between the parties no longer existed".[385]

234.    The analysis of Clause 28.1 of the Corocoro AA therefore not only appears essential to the Claimant's contractual claims, but also to the Respondents' expropriation defense. Such an analysis, however, necessitates assuming as a first step that the contractual provisions of the Corocoro AA, including Clause 28.1, remain in place (notwithstanding the 2007 Nationalization Decree) and at all allow for a potential cause of action for breach of contract. Otherwise, the assessment of Clause 28.1 of the Corocoro AA as – to use the Respondents' language – the possible "one exception" to the Respondents' defense, would be hindered.

235.    Accordingly, the Tribunal will divide its analysis of the Contractual Claims into three parts. The first part (**3.1**) focuses on the Non-Performance Claim and, in particular, on whether, as a matter of contract, the Claimant may invoke Clause 28.1 of the Corocoro AA in order to hold the Respondents liable for any non-performance or breach prompted by the 2007 Nationalization Decree. The second part (**3.2**) considers the Surviving Obligations and Particular Breaches claims, and whether such alleged breaches and the resulting harm are directly attributable to the Respondents (as opposed to their implementation of the 2007 Nationalization Decree). If either of the previous two queries is answered affirmatively, the third part (**3.3**) will then deal with the issue of whether the Claimant may claim compensatory damages for any breach of

---

[383] Rejoinder, § 55.

[384] Rejoinder, § 55.

[385] R-PHB, § 56, fn. 117 ("As explored at the Hearing, the presence of an **express indemnity** covering expropriation may affect this analysis, depending upon the facts of the case, **but no such provision exists here**") (emphasis added).

the Corocoro Contracts, despite the expropriation of the Corocoro Project and the alleged extinguishment of the Corocoro Contracts.

### 3.1 Non-Performance Claim

236. The Claimant argues that, from 1 May 2007 onwards (i.e. when PDVSA assumed full operation control over Corocoro Project and thus replaced the Claimant as Operator of the Project),[386] the Respondents "completely ceased to perform the Corocoro AA".[387] According to the Claimant, this "total non-performance" constitutes a "*prima facie* breach" of the Corocoro Contracts.[388] In support of its contention, the Claimant refers to the ICC P&H Arbitration, where the Tribunal determined that an outright non-performance occurred with respect to the P&H Contracts (which was deemed a breach of the same). According to the Claimant, such finding is equally apposite in the present case.[389]

237. The Tribunal accepts that, pursuant to Article 1271 of the VCC, Venezuelan law imposes an obligation (of result) on parties to perform their contractual undertakings.[390] However, the Tribunal also considers that the Claimant's reliance on the ICC P&H Award to argue the non-performance by the Respondents of the Corocoro Contracts is problematic. First, the ICC P&H Arbitration concerned two extra heavy crude oil projects in the Orinoco Belt that, unlike the Corocoro Project: (i) involved no previous exploration activities; and (ii) at the time of issuance of the 2007 Nationalization Decree, were already in commercial production.[391]

238. Second, the Claimant has not explained or provided sufficient evidence as to what exactly comprises the Respondents' alleged full non-performance of the Corocoro Project in circumstances where the Corocoro Discovery had not yet reached production. In sum, the Tribunal is of the view that the circumstances that led to the conclusion that the P&H Contracts were not performed from 1 May 2007 onwards, do

---

[386] SoC, §§ 9-10; SoD, § 97; Reply, § 18; *supra*, § 49.i.

[387] Reply, § 34.

[388] SoC, § 144, Reply, § 34.

[389] *Supra*, §§ 184-185.

[390] VCC, CLA-2 Article 1271 ("The debtor shall be ordered to pay damages, both for the non-performance of the obligation as well as for the delay in the performance thereof, unless he proves that the non-performance or delay arises from an external cause not attributable to him, even though there has been no bad faith on his part"); ICC P&H Award, **CLA-120**, § 424.

[391] ICC P&H Award, **CLA-120**, fn. 1244, §§ 21-22.

not necessarily inform or determine the existence of the same or a similar non-performance in the instant case.

239. That said, as pointed out by the Claimant,[392] the Respondents have not contested the Non-Performance Claim on such grounds (i.e. the fact of non-performance in itself). While the Respondents submit that non-performance cannot be at issue in the context of extinguished and thus non-existent contracts,[393] it seems that they have not offered any alternative argument, nor rebutted the Claimant's factual allegation that CVP and PDVSA ceased to perform the Corocoro Contracts since May 2007. As pointed out by the Claimant, the "Respondents' contestation of the [Contractual Claims] arises at a later stage of the analysis, not at the stage of breach. They do not contest their alleged non-performance from the 1st of May 2007".[394]

240. In short, while the Claimant's Non-Performance Claim remains factually uncontested, it nevertheless needs to be determined by the Tribunal. In the ICC P&H Arbitration, the Tribunal recognized that, "when parties enter into a contract, the least that is expected in terms of the result sought to be achieved, is that the contract will be performed *per se*; and failure to perform or obstructing performance would hinder the achievement of this result".[395] The same is applicable here. The Tribunal thus determines that, to the extent that the Respondents have not performed the Corocoro Contracts from 1 May 2007, they have committed a *prima facie* breach of the same as of that date.

241. In this context, the issue turns to whether the Respondents' non-performance was caused by or attributable to the 2007 Nationalization Decree. If so, save for any contractual arrangement to the contrary (which the Claimant argues was precisely the function of Clause 28.1 of the Corocoro AA),[396] the implementation of the 2007 Nationalization Decree in principle precludes the Respondents' liability for their *prima facie* breach of the Corocoro Contracts.

242. In this regard, as repeatedly explained by Prof. García Montoya at the Hearing, the Corocoro Contracts became impossible to perform as from 26 June 2007.[397] Prof.

---

[392] C-PHB, §§ 40-41.

[393] Supra, §§ 205-208.

[394] Transcript, p. 1169:15-18 (Claimant's Closing Statement).

[395] ICC P&H Award, **CLA-120**, § 427.

[396] C-PHB, §§ 60-61 ss; *infra*, § 246.

[397] Transcript, pp. 910:9-19, 914:20-22, 920:16-23 (García Montoya).

Brewer-Carías agreed.[398] For the Tribunal it is thus clear that such permanent impossibility to perform is attributable to and caused by the 2007 Nationalization Decree and the direct assumption by PDVSA of all of the Associations' primary activities.[399] Therefore, recalling that the 2007 Nationalization Decree is extraneous and non-attributable to the Respondents, any failure to perform the Corocoro Contracts by the Respondents from 26 June 2007 onwards is henceforth excused pursuant to the figure of *causa extraña* under Venezuelan contract law.[400]

243.   The question that arises is whether the above conclusion equally applies to the period between 1 May 2007 (i.e. the date from which the Respondents' non-performance commenced)[401] and 26 June 2007—a query that must be answered in the affirmative. Indeed, the Tribunal notes that the Claimant rightly at no point has argued that the Respondents' non-performance is directly attributable to them (as opposed to the 2007 Nationalization Decree). The Claimant does make this argument in relation to its Particular Breaches Claim,[402] but not with respect to its Non-Performance Claim. Accordingly, and considering that the Claimant has not provided any details as to what exactly comprises the Respondents' non-performance (beyond alleging a complete lack of any performance without distinguishing the cause), the Tribunal concludes that any obligation not performed by the Respondents between 1 May 2007 and 26 June 2007 was also rendered impossible to perform by the 2007 Nationalization Decree. This is more so recalling that, pursuant to Article 3 of the Nationalization Decree, PDVSA assumed full operational control of the Corocoro Project from 1 May 2007 onwards.[403]

244.   The Claimant's Non-Performance Claim thus boils down to the interpretation and application of Clause 28.1 of the Corocoro AA ("Clause 28.1"). In particular, the said claim is contingent on the Tribunal determining that Clause 28.1 is a contractual mechanism preventing the Respondents from invoking the 2007 Nationalization Decree in order to escape liability for their non-performance of the Corocoro Contracts.

---

[398] Transcript, p. 839:22-840:10.

[399] *Supra*, §§ 46, 49.ii.

[400] VCC, **CLA-2**, Article 1127.

[401] *Supra*, § 240.

[402] *Supra*, § 197, 199.

[403] 2007 Nationalization Decree, **C-103/R-2**, Article 3; *supra*, § 49.i.

245. Clause 28.1 reads as follows:

> **Failure** of Party to **fulfill any obligation** incurred under this Agreement shall be excused and shall not be considered default hereunder **during** the **time** and to the **extent** that such **non-compliance** is caused by an **Event of Force Majeure**, **except** that if the Event of Force Majeure is an act of the Venezuelan State that is **not of general applicability**, such Event of Force Majeure shall not preclude an action for damages against CVP for the nonperformance of the relevant obligation.[404]

246. In light of the Parties' position with respect to Clause 28.1, the Tribunal considers the following issues to be essential for its decision on the Claimant's Non-Performance Claim:

   i.   Is Clause 28.1 a risk-allocation clause?

   ii.  If so, was Clause 28.1 designed and intended to apply to a risk (i.e. an uncertain future event) that renders performance of the obligations in the Corocoro Contracts impossible or otherwise precludes the continuation of the Corocoro Project, such as the 2007 Nationalization Decree?

   iii. If so, is the 2007 Nationalization Decree an act "not of general applicability" falling under the purview of Clause 28.1?

247. In addressing each of the foregoing essential issues regarding Clause 28.1, the Tribunal need not and will not determine: (i) whether and when the Claimant's rights and interests in the Corocoro Contracts and/or the Project itself were expropriated; or (ii) the effects of such expropriation.

248. As stated above, the Tribunal's current analysis makes the assumption that the provisions of the Corocoro Contracts have effect notwithstanding the expropriation.[405] For this reason, the analysis will focus on whether the Claimant's Contractual Claims and, in the present instance, the Non-Performance Claim, amount to a breach of the Corocoro Contracts attributable to the Respondents. At this stage of the analysis, the qualification of the 2007 Nationalization Decree (or of any subsequent acts adopted by Venezuela thereafter) as expropriatory or not, is irrelevant. In other words, what matters at this juncture is not so much whether the 2007 Nationalization Decree amounts to an expropriation, or which of the Claimant's rights were taken by the Decree. Rather it is whether the Decree's application (i) made it impossible to perform the obligations under the Corocoro Contracts; (ii) brought about the termination or extinguishment of the same; and/or (iii) precluded the continuation of Corocoro Project as a whole. That said,

---

[404] Corocoro AA, **C-1**, Clause 28.1 (emphasis added).

[405] *Supra*, §§ 230-234.

for ease of reference and following the Parties' example as per their submissions, in the following sections the Tribunal occasionally employs the term "expropriation" (without ascribing any specific legal significance to such term) when alluding to an act of government that renders the contractual obligations impossible to perform.

### a. *The characterization of Clause 28.1 as a risk-allocation clause*

249. The Claimant argues that, whereas other association agreements entered into during the *Apertura Petrolera*, such as the P&H Contracts, protected investors from state measures through the "discriminatory action" partial indemnification provisions ("DA"), the Corocoro AA offers "investor protection" in the form of the "contractual allocation of risk" found in Clause 28.1.[406] In particular, the Claimant submits that Clause 28.1 was inserted into the Corocoro AA "*in lieu*" of the "partial indemnity" available under the DA provisions, in order to "make clear" that CVP would be liable for breach of contract even if its failure to perform could be "attributable" to a "governmental act".[407] Thus, according to the Claimant, the assumption of risk in Clause 28.1 offers an even "greater" protection from governmental action than the DA provisions, as the compensation in the latter was limited by a specific formula or cap.[408]

250. The Respondents in turn argue that no "equivalence" exists between the "express indemnities" in the P&H Contracts and Clause 28.1.[409] For the Respondents, the fact that an eventual compensation under Clause 28.1 is not limited by a particular formula "does not transform that provision into an indemnity for expropriation".[410] They submit that the Claimant's attempt to utilize Clause 28.1 as some sort of "super-indemnity" against expropriation "flies in the face" of both its text and the drafting history of the Corocoro AA (which expressly rejected the inclusion of such an indemnity for governmental action).[411]

---

[406] Reply, § 71.

[407] Reply, §§ 71, 73, referring to Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching the Model AA Memorandum, **C-27.**

[408] Reply, § 74.

[409] Rejoinder, § 55.

[410] Rejoinder, § 57; R-PHB, § 56 ("But Section 28.1 does not operate as an indemnity for governmental action. On the contrary, it is a provision that (i) expressly acknowledges that CVP will not have liability for governmental acts interrupting performance during the life of the Corocoro Agreement, the only exception being where the act in question is not an act of general applicability, and (ii) has no relevance to the post-nationalization period").

[411] *Supra*, §§218-220; Rejoinder, § 78; R-PHB, § 56 ("[Even] if the governmental act is not an act of general applicability, that does not mean that CVP will have liability in the event of an expropriation of Claimant's property rights, **as Section 28.1 does not deal with expropriation**") (emphasis added).

251.    The Tribunal considers that the dispute between the Parties with respect to the nature of Clause 28.1 is ultimately immaterial. For the reasons set out below, the characterization of Clause 28.1 as a risk-allocation clause should not be controversial.

252.    To begin with, the Claimant does not argue, and rightly so, that Clause 28.1 provides for an indemnity.[412] Unlike the DA provisions in the P&H Contracts, Clause 28.1 does not contain an established or determinable compensation in case a particularly defined event takes place. Contrary to the general purpose of indemnity clauses (such as the DA provisions), Clause 28.1 does not in itself create liability (in the form of a duty to compensate) due to the occurrence of a pre-determined circumstance. Rather, it excludes liability should either Party fail to "fulfill" its obligations if the "non-compliance is caused" by an "Event of Force Majeure" (as this term is defined in Article 28.2 of the Corocoro AA and thus applicable in the context of the Corocoro Contracts only). Clause 28.1 then lifts such possible exclusion of liability by CVP if the event of force majeure is "an act of the Venezuelan State that is not of general applicability".[413]

253.    This being said, a clause need not necessarily provide for an indemnity for it to be considered a risk-allocation clause. In the Tribunal's view, all that is required is a risk (i.e. an uncertainty of a future event and ensuing damage), an allocation between the contractual parties as to how to deal with such risk, and the identification of who will bear its consequences. For the reasons stated below, these elements are present in Clause 28 of the Corocoro AA.

254.    First, Clause 28.1 recognizes that an Event of Force Majeure may cause a party's failure to fulfill its obligations. At first glance, this seems like a mere restatement of the law. However, Clause 28.2 Corocoro AA provides certain examples that will qualify as a Force Majeure Event even if "foreseeable".[414] Thus the clause creates a "risk", as it covers circumstances that might not otherwise be considered an extraneous cause

---

[412] Transcript, p. 32:3-6 (Claimant's Opening Statement) ("[L]et me be very clear about this—it is not ConocoPhillips' case that Article 28.1 is an indemnity provision, and ConocoPhillips' case does not need it to be an indemnity provision). This is also acknowledged by the Respondents (R-PHB, fn. 117).

[413] Corocoro AA, **C-1**, Clauses 28.1, 28.2.

[414] Corocoro AA, **C-1**, Clause 28.2 ("For the purposes of this Agreement an "Event of Force Majeure" shall mean any event or circumstance, other than lack of finances, beyond the reasonable control of and unforeseeable by the Party obligated to perform the relevant obligation, or which, **if foreseeable** could not be avoided in whole or in part by the exercise of due diligence, including but not limited to [...]") (emphasis added).

(*causa extraña*) for which liability is precluded under general Venezuelan contract law.[415]

255.   Second, Clause 28.1 allocates the assumption of the aforementioned risk to the compliant party. That party may not claim compensation for the other party's failure to perform an obligation (as the failure cannot "be considered a default"), if such "non-compliance" is "caused" by an "Event of Force Majeure" as defined in clause 28.2 of the Corocoro AA, unless: (i) the non-compliant party is CVP; and (ii) the Event of Force Majeure causing CVP's failure to fulfill its obligations under the Corocoro AA is an act "not of general applicability".[416]

256.   In other words, Clause 28.1 allocates the risk of a contractually defined *force majeure* to the compliant party, except if such an Event of Force Majeure is an act "not of general applicability" and the non-compliant party is CVP, in which case the risk is allocated to CVP (in the form of a possible damage claim). It is thus clear to the Tribunal that Clause 28.1 constitutes a risk-allocation clause; its effect is to disregard, in certain instances, the requirement of causation to find liability or the contractual obligation to cover a certain risk. This conclusion was also affirmed by Prof. García Montoya, the Respondents' expert, at the Hearing.[417]

257.   The Tribunal further acknowledges the Respondents' submission that nothing in Clause 28.1 can be construed as an indemnity against the expropriation of the Corocoro Project.[418] However, just as risk-allocation clauses need not provide for an indemnity,[419] their existence is not predicated on the allocation of a specific risk, such as the possible expropriation of the contract or its termination. Contractual parties are free to select the risk to assume and to establish the terms of how to allocate the said

---

[415] Henri Mazeaud, Jean Mazeaud, Léon Mazeaud and François Chabas, CIVIL LAW: OBLIGATIONS, VOL. II (1960), **CLA-123**, pp. 46-47; ICC P&H Award, **CLA-120**, § 455; ICC P&H Arbitration, **R-0** (Claimants' Post Hearing Brief, § 355; Respondents' Rejoinder § 265; García Montoya ER II, **RER-5**, § 99). On this point, the Tribunal notes that the Claimant has been clear in that its understanding of *force majeure* is rooted, not on the definition thereof under Venezuelan law, but exclusively on Clause 28 of the Corocoro AA. *See* Transcript, p. 37:16-22 (Claimant's Opening Statement)("PRESIDENT LÉVY: Just a question in passing: You refer to the notion of the concept of "force majeure". Just a question: Your definition of "force majeure" is only resulting from Article 28.2 of the Association Agreement, or not?" MR. PARTASIDES: So our definition of "force majeure" is that which appears in Article 28 […]").

[416] Corocoro AA, **C-1**, Clause 28.1.

[417] Transcript, p. 903:8-13 (García Montoya) ("Here, we are **not calling into question the existence of an "assumption of risk" clause**. I cannot say that there is not. I think there is one. Otherwise it would have answered for everything, there is an "assumption of risk" clause, so we do not doubt its existence, we don't presume it's non-existence.") (emphasis added).

[418] *Supra*, § 250.

[419] *Supra*, § 253.

risk. The exception to this general rule would be mandatory rules of law requiring a particular formulation for a clause to be considered a risk-allocation provision, or limiting party autonomy with respect to a particular risk.[420] That said, neither Party has alluded to any such overriding rule of Venezuelan law that might be applicable to this case.

258. The Respondents' complaint that Clause 28.1 does not provide for an indemnity against expropriation is thus inapposite to assess whether Clause 28.1 is a risk-allocation provision or not. The same goes for the Claimant's contention that, *inter alia*, Clause 28.1 was introduced into the Corocoro AA as some sort of unrestricted equivalent to the DA provisions.[421] These types of arguments address not the existence of a risk-allocation clause, but possibly its characterization and definitely its scope and purpose; an issue to which the Tribunal turns next.

### b.  *The scope and purpose of Clause 28.1 as a risk-allocation clause*

259. The Respondents have provided numerous authorities stating that risk-allocation clauses must be "strictly construed".[422] The Tribunal agrees and notes that, as stressed by the Respondents, the Claimant has made no assertion or provided any authority to the contrary.[423] Therefore, should "doubts arise in relation to [the] scope" of Clause 28.1, the Tribunal shall "restrict [its] interpretation in every way possible".[424] The text of Clause 28 of the Corocoro AA reads in full as follows:[425]

### XXVIII
### FORCE MAJEURE

28.1 **Failure** of Party to **fulfill any obligation** incurred under this Agreement shall be excused and shall not be considered default hereunder during the time and to the extent that such **non-compliance** is caused by an **Event of Force**

---

[420] Ángel Cristobal Montes, THE BREACH OF OBLIGATIONS (Editorial Tecnos 1989), **RLA-109**, pp. 191-192; Jorge Giorgi, THE THEORY OF OBLIGATIONS IN MODERN LAW, VOL. II (Editorial Reus 1928), **RLA-111**, p. 43.

[421] *Supra*, § 249.

[422] Rejoinder, § 78, referring to Ángel Cristobal Montes, THE BREACH OF OBLIGATIONS (Editorial Tecnos 1989), **RLA-109**, p. 192; Aída Kemelmajer De Carlucci, THE PENALTY CLAUSE (Ediciones Depalma 1981), **RLA-110**, pp. 182-183; Jorge Giorgi, THE THEORY OF OBLIGATIONS IN MODERN LAW, VOL. II (Editorial Reus 1928), **RLA-111**, p. 43-44; H. G. Beale (ed.), CHITTY ON CONTRACTS, VOL. I: GENERAL PRINCIPLES (13th ed., Thomson Reuters 2008), **RLA-112**, pp. 1513-1514; *W.J. Tatem Limited v. Gamboa*, King's Bench Division, Judgment dated May 30, 1938, 1 K.B. 132 (1939), **RLA-113**, p. 138. Moreover, *see* R-PHB, § 76; Transcript, pp. 852-853, 900-903 (García Montoya).

[423] Transcript, p. 1270:14-22 (Respondents' Closing Statement) ("I don't think you need to get to this, but as long as we're on it, to the extent that there is any doubt as to the scope and meaning of this risk-allocation clause, we have shown you that, under Venezuelan law, you have to interpret it as restrictively as possible, even its existence should be ruled out, if it's not crystal clear that it's a law of general application. Once again, this is one of those issues where we showed you lots of authority. **They showed you zero.**") (emphasis added)

[424] Jorge Giorgi, THE THEORY OF OBLIGATIONS IN MODERN LAW, VOL. II (Editorial Reus 1928), **RLA-111**, p. 43; Ángel Cristobal Montes, THE BREACH OF OBLIGATIONS (Editorial Tecnos 1989), **RLA-109**, p. 192.

[425] Corocoro AA, **C-1**, Clause 28 (emphasis added).

**Majeure, except** that if the Event of Force Majeure is an act of the Venezuelan State that is **not of general applicability**, such Event of Force Majeure shall not preclude an action for damages against CVP for the nonperformance of the relevant obligation.

28.2 **For the purposes of this Agreement**, an "Event of Force Majeure" shall mean any event or circumstance, other than lack of finances, beyond the reasonable control of and unforeseeable by the Party obligated to perform the relevant obligation, or which, **if foreseeable**, could not be avoided in whole or in part by the exercise of due diligence, including but not limited to strikes, boycotts, stoppages, lockouts and other labor or employment difficulties, fires, earthquakes, tremor, landslides, avalanches, floods, hurricanes, tornadoes, storms, other natural phenomena or calamities, explosions, epidemics, wars (declared or undeclared), hostilities, guerrilla activities, terrorist acts, riots, insurrections, civil disturbance, acts of sabotage, blockades, embargoes, **or acts of state or any governmental body.**

28.3 If **any Party** cannot comply with any obligation stipulated herein because of an Event of Force Majeure, such Party shall **notify** the other Parties in writing as promptly as possible giving the reason for non-compliance, particulars of the Event of Force Majeure and the obligation or condition affected. **Except as provided in Clause 28.1**, any **obligation** of a Party shall be **temporarily suspended** during the period in which such Party is unable to perform by reason of an Event of Force Majeure, **but only to the extent of such inability to perform**. The obligations of the Parties to perform as provided by this Agreement through facilities not affected by the Event of Force Majeure shall continue. The Party affected by the Event of Force Majeure shall promptly notify the other Parties as soon as such event has been removed and no longer prevents it from complying with its obligation, and shall thereafter resume compliance with the Agreement.

28.4 The Party which has given notice of an Event of Force Majeure shall endeavour to mitigate the effects of such Event of Force Majeure on the performance of its obligations. **Where an Event of Force Majeure continues for more than sixty (60) days**, the Parties shall meet to review the situation and its implications for operations and **to discuss the appropriate course of action in the circumstances**.

28.5 **Subject to the thirty-nine year limit** on the term of the Agreement specified in Clause 21.1, if an Event of Force Majeure occurs that **substantially impedes** exploration, **evaluation, development or exploitation** activities, the relevant Exploration Period, the Evaluation Period **or** the Operation Period will be extended **by an amount of time equal to the period during which such event is in effect**. In each case, such extension will be only with respect to any affected Blocks or Development Areas. If either Phase of the Exploration Period is extended pursuant to this Clause 28.5, CVP shall not be entitled to draw on any letter of credit, guarantee or financial undertaking delivered by an Investor pursuant to Clause 6.9 until the end of such Phase as extended hereby, but only if such Investor provides a replacement of or amendment to such letter of credit, guarantee or financial undertaking, in form and substance satisfactory to CVP, ensuring that CVP's rights at the end of the extended Phase will be the same as the rights it would have enjoyed at the end of the original Phase had no such extension occurred.

28.6 The Investors, or the relevant Participating Investors, may at their option, by notice to CVP, **suspend either Phase of the Exploration Period, any Evaluation Period or any Operation Period** if:

> (a) operations in all or any portion of the Area (or the relevant Evaluation Area or Development Area) are substantially

impeded for a period of at least sixty (60) days due to the absence of a permit required under Venezuelan law for such operations; and

(b) the Investors, or such Participating Investors, have taken and are continuing to take reasonable measures to obtain such permit in accordance with relevant laws and regulations (including without limitation submitting all documents and information to relevant governmental authorities that are reasonably capable of submission at the relevant time).

During the suspension, all operations in the (in the case of an Exploration Period), the relevant Evaluation (in the case of an Evaluation Period) or the relevant Development Area (in the case of an Operation Period) must be **discontinued, except that activities necessary or useful to obtain the relevant permit may continue**. Any such suspension will be lifted either (i) at the option of the Investors, or the relevant Participating Investors, or (ii) if the Investors fail to continue to take reasonable measures to obtain the relevant permit, at CVP' s request. The relevant time period will recommence upon the lifting of the suspension. **Time lapsed during the suspension will not count against the relevant time-period**. The suspension will not under any circumstances extend the overall **39-year limit** on the duration of the Agreement.

260. From the above it is evident that the Parties' agreement on contractually defined Force Majeure Events (possibly affecting the Corocoro Project) extends considerably beyond Clause 28.1. It is Clause 28 of the Corocoro AA *in toto*, as opposed to Clause 28.1 in isolation, which deals with the notion of *force majeure*. In this context, the Tribunal observes that while the Parties have exchanged detailed submissions on Clause 28.1 and the phrase act "not of general applicability" therein,[426] comparatively little attention has been paid to how Clauses 28.3 to 28.6 of the Corocoro AA might inform the interpretation of the scope of Clause 28.1.

261. Having reviewed the Parties' submissions on the interaction between Clause 28.1 and the remaining provisions of Clause 28 of the Corocoro AA (together the "Force Majeure Clause"), the Tribunal notes that, according to the Respondents, the Force Majeure Clause "assumes the continuation of the contract".[427] In particular, the Respondents refer to some clauses of the AA that evidence that the Parties did not contemplate events of permanent effects and stress how: (i) Section 28.3 deals with a "temporary suspension" of the contract's obligations during the period of the Event of Force Majeure; (ii) Section 28.4 deals with the "mitigation" of the effects of the Force Majeure Event and the need to discuss the "implications for operations" and the "appropriate course of action" in case the Event of Force Majeure continues for more than 60 days; (iii) Section 28.5 deals with the possible extension of periods under the contract equal

---

[426] Analyzed further below. See *infra*, §§ 296-299 ss.

[427] R-PHB, fn. 115.

to the period of the Force Majeure Event; and (iv) Section 28.6 addresses possible suspension by the "private parties" if a required permit for petroleum operations is missing, to allow time for such "private parties" to request and diligently pursue such permit.[428]

262. In view of the terms of Clauses 28.3 to 28.6, the Respondents submit that, "on its face", the Force Majeure Clause "only concerns" the issue of whether a Party may invoke an Event of Force Majeure to "excuse" non-performance of an "existing contract".[429] For the Respondents, it follows that the Force Majeure Clause, including Section 28.1, cannot survive the termination of the Corocoro Agreement, as it "makes no sense to talk about the concept of *force majeure* with respect to performance after termination of the agreement, just as it makes no sense to talk about continuing performance after such termination".[430] Likewise, Section 28.1 cannot be deemed a risk-allocation provision somehow protecting the Claimant against expropriatory acts, as "[n]othing in Section 28 contemplates the extinction of the agreement by operation of a law of public policy".[431]

263. The Claimant acknowledges that Clauses 28.3 to 28.6 of the Corocoro AA concern a "temporary suspension" of activities and/or the steps to be taken by a Party whose performance has been inhibited by a contractually defined Event of Force Majeure.[432] Nonetheless, the Claimant submits that these "specific provisions" do not limit the definition of an Event of Force Majeure in Clause 28.2 of the Corocoro AA, which "plainly encompasses an expropriation" by referring to "acts of state or any governmental body", as acknowledged by the Respondents and their expert.[433] Thus, considering that the applicability of Clause 28.1 is contingent on the definition of Clause 28.2, and that, "as here", the expropriation was "effectuated" by an act "not of general applicability",[434] the Force Majeure Clause overall contemplates and as such allocates the risk of the expropriation of the Corocoro Contracts to the Respondents.[435] *A*

---

[428] R-PHB, fn. 115.

[429] Transcript, p. 123:5-7 (Respondents' Opening Statement).

[430] R-PHB, fn. 115.

[431] R-PHB, fn. 115.

[432] C-PHB, § 59.

[433] C-PHB, §§ 59, 57-58; referring to Rejoinder, fn. 136; Transcript, pp. 1002:25-1003:12 (García Montoya).

[434] C-PHB, § 57, referring to Corocoro AA, **C-1**, Clause 28.1 (emphasis added).

[435] C-PHB, § 57.

*contrario*, the Claimant contends that the Force Majeure Clause "plainly does not exclude" a scenario in which the Corocoro Project has been "expropriated".[436]

264.   For the reasons set out below, the Tribunal finds the Respondents' position on the present issue more convincing.

265.   First, the Claimant misrepresents the Respondents' position when stating that the Respondents and their expert concede that an expropriation is an event covered by the Force Majeure Clause. The Respondents do "agree that a governmental act of general applicability is a *force majeure*" under Clause 28.1, but only "to the extent that" Clause 28.1 "applies".[437] However, they submit that, "after the expropriation of Claimant's interests in the Corocoro Agreement", the "Claimant no longer had any rights to enforce against CVP under that Agreement", rendering the Clause 28.1 issue "moot".[438] In other words, according to the Respondents, Clause 28.1 "deals with the effects of force majeure during the life of the contract, not thereafter".[439] In this last respect (i.e. the applicability of Clause 28.1 during the "life of the contract"), the Respondents stated the following at the Hearing:

> As I was trying to make clear, we firmly believe that [Clause] 28.1 is irrelevant, that this Contract was expropriated, the Contract rights were expropriated and transferred. The Investor has no further rights in the Contract, and 28.1 is irrelevant. **[Clause 28.1] might be relevant during the course of performance of the Contract if the Government were to say, for example, Conoco, this month you should reduce your production by 50 percent because I want to comply with an OPEC cut or something, and I would rather take it from you rather than from this company or pro rata across all. I target you. That, in my view, is what this clause was really about. It has nothing to do with a nationalization**.[440]

266.   The Respondents' primary submission is therefore that Clause 28.1 "is irrelevant to this case, since Claimant is alleging breaches of obligations that were extinguished by the nationalization and since Claimant had no interest in the Project to protect or enforce once its interests were taken by act of the State".[441] In the alternative (i.e. "If the Tribunal were to consider this a case of breach"), the Respondents argue being "excused" by the Force Majeure Clause, as the 2007 Nationalization Decree would then be an act of

---

[436] C-PHB, § 57.

[437] R-PHB, fn. 119.

[438] R-PHB, fn. 119.

[439] R-PHB, fn. 119.

[440] Transcript, p. 1276:10-22 (Respondents' Closing Statement)(emphasis added).

[441] Rejoinder, § 64.

"general applicability" pursuant to Clause 28.1. It is only in this second and alternative context that professor García Montoya stated at the Hearing that the 2007 Nationalization Decree would be "contemplated" by Clause 28.1.[442] Thus, contrary to what the Claimant attempts to portray, Prof. García Montoya did not make a blanket statement suggesting that the Force Majeure Clause "plainly encompasses an [event of] expropriation".[443]

267.    Second, the Claimant's argument that the "temporary suspension" of the Parties' obligations under the Corocoro AA pursuant to Clauses 28.3 to 28.6 of the Corocoro AA in no way limits the definition of a "Force Majeure Event" set out in Clause 28.2 of the same,[444] is unpersuasive. The Claimant is right that, so long as an "act of state or any governmental body" is "beyond" the non-compliant party's "reasonable control" and "unforeseeable" to it (or if foreseeable then unavoidable), then such an act is deemed an "Event of Force Majeure" under Clause 28.2 of the Corocoro AA.[445] Formally speaking, an expropriation would meet the foregoing criteria. The fact remains, however, that Clause 28.2 of the Corocoro AA is merely descriptive. It only defines the circumstances that, on their face, are considered an "Event of Force Majeure" for "the purposes of [the Corocoro AA]".[446] It has no bearing on the effects of the defined "Event of Force Majeure", on how, for how long, and to what extent its occurrence may impact the Corocoro Project or the compliance with the Corocoro Contracts, or on how the parties to the Corocoro AA allocate that risk. Alone, Clause 28.2 of the Corocoro AA has no effect. Rather, by defining what an "Event of Force Majeure" is, its function is to serve as a reference-point to the Force Majeure Clause in full. Indeed, Clauses 28.1 and 28.3 to 28.6 all develop the notion of "Event of Force Majeure".

268.    Accordingly, just as any other provision of the Force Majeure Clause, Clause 28.2 of the Corocoro AA cannot be interpreted in isolation. A harmonious interpretation of the Force Majeure Clause as a whole indicates that its text is incompatible with and thus cannot cover an "act of state" (such as an expropriation) that frustrates the performance of the entirety of the Corocoro Contracts and precludes the continuation of the Corocoro Project.

---

[442] Transcript, pp. 1002-1003 (García Montoya).

[443] C-PHB, § 59.

[444] *Supra*, fn. 433.

[445] Corocoro AA, **C-1**, Clause 28.2.

[446] Corocoro AA, **C-1**, Clause 28.2.

269.   As already established, Clause 28.1 states that, generally, the failure to perform an obligation under the Corocoro AA "shall not be considered a default" if "caused by an Event of Force Majeure". Therefore, save for when the "Event of Force Majeure" is an "act of the Venezuelan State that is not of general applicability", the main rule is that damages may not be claimed from the non-compliant party. However, that is only the case "during the time and to the extent" that the "Event of Force Majeure" precludes compliance. Notably, Clause 28.1 itself does not give content to either the terms "time" and "extent" therein, whereas the remaining provisions of the Force Majeure Clause do (notwithstanding the fact that, in principle, these terms would become moot in case of a full expropriation of the Corocoro Project).

270.   Thus, with respect to the "time" factor, Clause 28.3 states that the "obligations" of the non-compliant party shall be "temporarily suspended".[447] This is now common ground between the Parties.[448] Regarding the "extent" factor, Clause 28.3 goes on to clarify that "the obligations of the Parties to perform [...] through facilities not affected by the Event of Force Majeure shall continue". Again, both of these provisions become superfluous or, at least, without effect, should the "Event of Force Majeure" be one of the full expropriation of the Corocoro Project.

271.   Similarly, as noted by the Respondents,[449] Clause 28.4 imposes a duty on the non-compliant party to mitigate the effects of an "Event of Force Majeure". In addition, going to the issue of "time", Clause 28.4 requires the parties to confer, review the situation and "implications for operations", and discuss the "appropriate course of action", in case the "Event of Force Majeure" lasts for over 60 days. Importantly, both the mitigation and conferring obligations are required irrespective of whether the "Event of Force Majeure" is an act of "general applicability" or not. Regardless, both of these obligations become irrelevant when faced with an expropriation. Indeed, there is nothing to mitigate or operate and no course of action left once the performance of all aspects of the Corocoro AA has been rendered impossible.

---

[447] The Tribunal notes that Clause 28.3 rightly states that the temporary suspension of the parties' obligations is applicable "except as provided in Clause 28.1". Otherwise, the possibility to claim for damages against CVP in case the relevant "Force Majeure Event" is an act "not of general applicability" could be put at risk. However, considering Clauses 28.4 and 28.5 (infra, §§ 271-272), by no means can the carve-out in Clause 28.3 be construed as stating that a "Force Majeure Event" comprised of an act "not of general applicability" may be of unlimited duration and extent.

[448] C-PHB, § 59; R-PHB, fn. 115.

[449] Supra, § 261.

272.   On both the issues of "time" and "extent", Clauses 28.5 and 28.6 state that, subject to the 39-year term of the Corocoro AA,[450] an "Exploration, "Evaluation" or "Operation Period" shall be "extended" or might be "suspended", in case an "Event of Force Majeure" occurs that "substantially impedes" exploration, evaluation, development or exploitation respectively, "by an amount of time equal to the period during which such event is in effect", and "only with respect to" the "affected" Block or Area "or any portion of" the same. This is significant for two related reasons:

   i.   On the one hand, Clauses 28.5 and 28.6 indicate that, while the parties envisaged a mechanism to account for "Events of Force Majeure" that could "substantially impede" the Project's exploration, evaluation or production activities, they remained silent on events that could entirely preclude such activities altogether, in all present and conceivable future Blocks or Areas of any kind.

   ii.   On the other hand, by providing for an extension of time or a suspension of the relevant exploration, evaluation or production "Period", Clauses 28.5 and 28.6 suggest that the Force Majeure Clause is "confined in its application to events which are capable of resolution within that particular time-frame".[451] Accordingly, "an event which renders further performance 'unthinkable'", as would be the case of an outright expropriation, "may therefore not fall within its scope".[452]

273.   In short, strictly construed, none of the provisions of the Force Majeure Clause can be given effect when faced with an event, such as the 2007 Nationalization Decree, rendering the performance of all obligations in the Corocoro Contracts impossible and barring the continuation of the Corocoro Project. The Tribunal thus finds that the text of the Force Majeure Clause (including Clauses 28.1 and 28.2 therein) is inapposite in the event of an expropriation. As stated by the Respondents, the Force Majeure Clause "has nothing to do with a nationalization".[453]

---

[450] Corocoro AA, **C-1**, Clause 21.2.

[451] H. G. Beale (ed.), CHITTY ON CONTRACTS, VOL. I: GENERAL PRINCIPLES (13th ed., Thomson Reuters 2008), **RLA-112**, p. 1514.

[452] H. G. Beale (ed.), CHITTY ON CONTRACTS, VOL. I: GENERAL PRINCIPLES (13th ed., Thomson Reuters 2008), **RLA-112**, p. 1514.

[453] Transcript, p. 1276:22 (Respondents' Closing Statement).

274.   The Claimant's argument that the Force Majeure Clause "plainly does not exclude" the expropriation of the Corocoro Project changes nothing,[454] particularly considering that this provision warrants strict construction. For events as drastic as an impossibility to perform an entire contract, the lack of an exclusion is insufficient. Certainly, "[t]he more catastrophic the event, the less likely [it] is that a clause will be held to cover the event which has occurred, unless particularly clear words are used".[455] As seen above, however, the Force Majeure Clause contains no such clear language and, to the contrary, its provisions appear at odds with the notion of expropriation.

275.   In addition, although not determinative, the Tribunal also notes that the Force Majeure Clause stands in stark contrast with the DA provisions in the P&H Contracts. Indeed, unlike the Corocoro AA, the Hamaca AA expressly protected against the "expropriation" of a party's "interest" or "assets".[456] Similarly, the Petrozuata AA was designed to "specifically address precisely how the assets and interest of Conoco [would] be valued and reimbursed in the event of nationalization".[457] Accordingly, the DA provisions of the Petrozuata AA were carefully drafted to that effect.

276.   That the text of the Force Majeure Clause appears inoperative *vis-à-vis* the expropriation of the Corocoro Project is also underscored by the fact that this Clause is not among the provisions that, according to Clause 21.5 of the Corocoro AA, would survive the termination of the Corocoro AA in normal circumstances. For ease of reference, Clause 21.5, where relevant, reads as follows:

> Upon the termination of this Agreement all rights and obligations of the Parties hereunder shall terminate **except for the following rights and obligations which shall survive such termination**:
>
> (a) Claims of Party against another Party for damages arising out of acts or omissions of the other Party relating to such other Party's obligations under this Agreement; […]
>
> (c) The provisions of Clauses 7.9, 8.6, 8. 7, XIX, XX (excluding Clause 20.9), XXI, XXII, XXIII, XXIV, XXV, XXVI and XXX.[458]

---

[454] *Supra*, fn. 436.

[455] H. G. Beale (ed.), CHITTY ON CONTRACTS, VOL. I: GENERAL PRINCIPLES (13th ed., Thomson Reuters 2008), **RLA-112**, p. 1514.

[456] Hamaca AA, R-92, A. 14.1(b)(1).

[457] Letter from David C. Griffith, Manager of International Business Development, Refining and Research Engineering, Conoco Inc., to Aliro Rojas, Maraven, 17 September 1992, attaching Comments on Conditions to Strategic Associations, **R-97**, p. 5 (of PDF).

[458] Corocoro AA, **C-1**, Clause 21.5 (emphasis added).

277. The Claimant concedes that the Force Majeure Clause is not "specifically listed" among the contractual provisions that survive the termination of the Corocoro AA pursuant to Clause 21.5 of the same.[459] However, it argues that the survival of the Force Majeure Clause, and of Clause 28.1 in particular, "necessarily stems from Clause 21.5(a), which provides that claims for damages arising out of a Party's acts or omissions would survive the termination of the Corocoro AA".[460]

278. According to the Claimant, "if a claim for non-performance of the Corocoro AA can be sustained after its termination, then Clause 28.1—which addresses whether a defense to a claim can be asserted—must necessarily survive as well".[461] Otherwise, the outcome would be "bizarre" and "perverse" in that the "risk" that the Force Majeure Clause was "designed to prevent would itself defeat the protection".[462] The Claimant therefore submits that, "in preserving the [surviving] claim", the Tribunal "must evaluate that claim by reference to [Clause] 28.1".[463] For the Claimant, its reading is in "both Parties' interest" as, if Clause 28.1 "does not exist" after termination, the Respondents "would themselves have no right to claim *force majeure* in respect of" a surviving damages claim.[464]

279. The Tribunal cannot accept the Claimant's arguments for the following three main reasons. First, Clause 25.1 of the Corocoro AA is precise and clear. It both carefully includes and excludes the exact provisions that the parties to the Corocoro AA expressly intended to survive its termination in normal circumstances, especially at the time the Corocoro AA would reach its agreed term. In this regard, the absence of Clause 28.1 and, for that matter, of Clause 28 in totality, from Clause 25.1 is significant. Indeed, as noted by the Tribunal at the Hearing, such absence may simply indicate that Clause 25.1 only sought to cover some damages claims other than those possibly attributable to or stemming from an "Event of Force Majeure".[465] Put simply, Clause 25.1 of the Corocoro AA provides for an exhaustive list of continuing obligations and the Claimant has not provided specific reasons to extend such list, which would be

---

[459] C-PHB, § 138.

[460] C-PHB, § 138.

[461] C-PHB, § 138.

[462] Transcript, p. 1203:17-23 (Claimant's Closing Statement).

[463] Transcript, p. 1205:15-16 (Claimant's Closing Statement).

[464] Transcript, p. 1205:17-24 (Claimant's Closing Statement); C-PHB, § 138.

[465] Transcript, pp. 1200:21-1202:9, 1204:17-1205:8

necessary in the present circumstances where a strict contractual interpretation is required.

280.   Second, that the Force Majeure Clause does not survive the termination of the Corocoro AA by no means precludes a party from raising a *force majeure* defense pursuant to Venezuelan law (as opposed to pursuant to the definition of an Event of Force Majeure in the Corocoro AA) against a surviving claim. A breaching party may be prevented from invoking the way in which a *force majeure* event has been regulated in a specific contractual provision (here, the Force Majeure Clause and the definition of an Event of Force Majeure therein) but, as confirmed by Prof. Brewer-Carías at the Hearing,[466] not from relying on *force majeure* in general under Venezuelan law. Indeed, that a particular event is not covered by the Force Majeure Clause (e.g., because the event at issue is incompatible with the text of the Force Majeure Clause and the contractual definition of an Event of Force Majeure) does not prevent a party from invoking general Venezuelan contract law and arguing that a particular event constitutes *force majeure.*

281.   Third, most importantly, the Claimant's argument about the potentially "bizarre" and "perverse" outcome (i.e. that Clause 28.1 must survive the termination of the Corocoro AA because otherwise it would mean that the Parties agreed to a "risk-allocation mechanism that doesn't work when the risk [it was designed for] occurs")[467] is circular. The allegedly questionable outcome only arises if one first assumes that Clause 28.1 was designed to account for an Event of Force Majeure, such as the 2007 Nationalization Decree, that could bring about the impossibility to perform all obligations in the Corocoro AA, its termination and/or prevent the continuation of the Corocoro Project as a whole. However, as seen above, the text of the Force Majeure Clause does not support that conclusion and, as expanded below, neither does the drafting history of the Corocoro AA.[468]

---

[466] Transcript, p. 805:22-24 (Brewer-Carías).

[467] Transcript, p. 1200:13-14 (Claimant's Closing Statement); *supra*, fn 462.

[468] The Tribunal notes that, relying on the writings of Prof. Mélich-Orsini, the Claimant argues that "Venezuelan law is clear that a risk-allocation provision cannot be vitiated by the termination of the contract" (C-PHB, § 139, referring to José Mélich-Orsini, GENERAL DOCTRINE OF CONTRACTS (4th ed., 2006), **CLA-22 (bis)**, p. 808, n. 48). However, as pointed out by the Respondents (R-PHB, fn. 81), Prof. Mélich-Orsini makes that assertion only with respect to risk-allocation clauses that were "precisely […] directed to regulate the consequences of the annihilation of the contract". Therefore, to the extent that the text of the Force Majeure Clause appears incompatible with an event that entirely precludes the performance of the Corocoro AA, least can it be deemed a provision that was precisely directed to account for events that could prompt the termination or annihilation of the same.

282.  Indeed, the Tribunal agrees with the Respondents' line of argument[469] that various elements in the Corocoro AA's drafting history belie the characterization of the Force Majeure Clause as argued by the Claimant in this arbitration.

283.  First, it is undisputed that, unlike the Congressional Authorizations germane to both the Petrozuata and Hamaca AAs,[470] nothing in the Corocoro Congressional Authorization allowed for the inclusion in the Corocoro AA of provisions that could enable CVP (and by extension PDVSA) to compensate the private Investors for the harm directly resulting from and attributable to state and governmental measures.[471]

284.  Second, while during the negotiation of the Model AA "[n]early every company" requested the addition of a "stabilization clause" (particularly an indemnity) akin (although not necessarily identical) to the DA provisions in the Petrozuata AA,[472] such request was deemed both "[un]authorized" and "[in]appropriate".[473] Consequently, it was rejected on the basis that, *inter alia*:

    i.   As seen, it fell outside the scope of the Corocoro Congressional Authorization.[474]

    ii.  It would be "inconsistent" with the objective of eliminating the "PDVSA pays" policy that until that moment had been relied upon "as the general solution to all problems in Venezuela, particularly given that the Association Agreements

---

[469] *Supra*, § 217-220.

[470] ICC P&H Arbitration, **R-0** (Petrozuata Congressional Authorization, **C-25**, Sixteenth Condition)(" Provisions shall be included in the Association Agreement that enable Maraven to compensate the other parties, on equitable terms, for significant adverse economic consequences directly resulting from decisions made by national, state or municipal administrative agencies or any changes in the law that, because of their content or purpose, result in an unjust discriminatory treatment[…].")"; ICC P&H Arbitration, **R-0** (Hamaca Congressional Authorization, **R-11**, Twenty-First Condition)(" The Association Agreement will include provisions that allow for the compensation of the Participants, through amendments to the provisions of the Association Agreement or through the payment of damages, in the event that the Net Cash Flow of a Participant of the Association's activities is substantially and adversely affected as a direct, necessary and demonstrable consequence of discriminatory and unjust measures, without prejudice to the option for Corpoven, according to the provisions of the Association Agreement, to purchase such participation of the Affected Party on equitable conditions, if the effect of such amendments or the payment of such damages results in a change of conditions unacceptable for Corpoven").

[471] Congressional Authorization, **C-22/R-8**.

[472] Memorandum from Cleary, Gottlieb, Steen and Hamilton to PDVSA of 14 November 1995, **R-99**, p. 13; *supra*, §§ 22-23.

[473] Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching "Modifications to Model Assocation Agreement", **C-27**, p. III.

[474] Memorandum from Cleary, Gottlieb, Steen and Hamilton to PDVSA of 14 November 1995, **R-99**, p. 13; *supra*, § 283.

[for the New Areas would] be precedents for contracts in future transactions involving private capital".[475]

285.   Third, *in lieu* of a stabilization clause,[476] PDVSA proposed the incorporation of provisions "specifically acknowledg[ing]" the applicability of Article 1160 of the VCC and certain international treaties in order to "provide protection to Investors against significant adverse economic effects of changes in circumstances occurring after the execution of the Agreement".[477] In particular, the Model AA Memorandum stated the following:

   i.   "Article 1160 of the Venezuelan Civil Code provides that all contracts must be carried out in good faith and in accordance with general principles of equity. Under established doctrine, the application of Article 1160 gives a party to a contract a right to demand a good faith renegotiation of the terms of the contract if as a result of an unforeseen change in circumstances there is a substantial adverse impact on the economic benefits intended to be provided to such party under the contract".[478]

   ii.   "Several international investment protection treaties to which Venezuela is a party protect investors from the relevant countries against adverse effects from discriminatory changes in Venezuelan law".[479]

   iii.   "Although Article 1160 and Venezuela's international treaties apply to the Agreement automatically by virtue of the fact that the Agreement is governed by Venezuelan law, PDVSA intends to include a specific acknowledgment of this fact in the Agreement to affirm its commitment to assuring Investors of their entitlement to the economic benefits contemplated in the Agreement".[480]

286.   Notably, Clause 25.5 of the Corocoro AA refers to both Article 1160 of the VCC and to international investment treaties, as follows:

---

[475] Memorandum from Cleary, Gottlieb, Steen and Hamilton to PDVSA of 14 November 1995, **R-99**, p. 13.

[476] Letter from Juan Szabo (PDVSA) to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching "Modifications to Model Assocation Agreement", **C-27**, p. III.

[477] Model AA Memorandum, **C-27**, § 9.

[478] Model AA Memorandum, **C-27**, § 9(a).

[479] Model AA Memorandum, **C-27**, § 9(b).

[480] Model AA Memorandum, **C-27**, § 9(c).

> Without limiting the generality of Clause 25.1 the Parties hereby acknowledge the applicability of Article 1160 of the Venezuelan Civil Code to this Agreement and that accordingly all obligations hereunder shall be performed in good faith and in accordance with equity custom and law. The Parties also acknowledge the applicability of any international treaties relating to the mutual protection of foreign investment to which Venezuela and any country of which an Investor is national may now be or hereafter become parties.[481]

287.    It follows that the "trade-off" for the non-inclusion of a (so-called) stabilization clause (be it in the form of an indemnity or otherwise) seems to have been effectively incorporated in Clause 25.5 of the Corocoro AA, and not in the Force Majeure Clause. In this regard, as argued by the Respondents, the Force Majeure Clause (including Clause 28.1) can hardly be construed as a provision that was "intended" to "establish a compensation mechanism for nationalization".[482]

288.    The Claimant argues that, to the extent that it has "never" argued that Clause 28.1 is either an "indemnity" or a "stabilization" clause (such as the DA provisions in the P&H Contracts), the Respondents' reliance on PDVSA's rejection of a request to introduce an "indemnity" or "stabilization" clause in the association agreements for the New Areas is "misplaced".[483] According to the Claimant, this is so because "Clause 28.1 provides that if there is a contractual breach by CVP which is caused by an act of the Venezuelan State that is not of general applicability, that breach will not be excused on the grounds of compliance with law or lack of causation".[484] In contrast, the Claimant submits, "the partial indemnity found in the DA Provisions was detached from any finding of liability for breach by PDVSA or the respective PDVSA subsidiary".[485] For the Claimant, the "allocation of risk under the Petrozuata and Hamaca AAs was thus precisely the opposite of the Corocoro AA, which contains no partial indemnity but does render CVP and PDVSA liable for the full consequences of their non-performance caused by a discriminatory act of the Venezuelan state".[486]

289.    The Tribunal finds it difficult to follow the Claimant's above argument. The issue is not whether Clause 28.1 is an indemnity or a stabilization clause. It is not. As already established by the Tribunal, Clause 28.1 is a risk-allocation clause.[487] The issue is thus whether the drafting history of the Corocoro AA supports the Claimant's ultimate

---

[481] Corocoro AA, **C-1**, Clause 25.5.

[482] R-PHB, § 82.

[483] C-PHB, §§ 67-68.

[484] C-PHB, § 68.

[485] C-PHB, § 68.

[486] C-PHB, § 55.

[487] *Supra*, § 256.

position that Clause 28.1 can be construed as a provision somehow protecting Conoco (as the DA provisions did with respect to the private parties of the P&H Contracts) against the risk of expropriation or nationalization of the Corocoro Project. For the Tribunal, the answer to this question is that it does not.

290.   In fact, if the Tribunal were to follow the Claimant's rationale, it would have to conclude that Clause 28.1 (or the Force Majeure Clause in general) protects against state measures that render the Corocoro Contracts (and more broadly the Corocoro Project) impossible to perform, despite the fact that a request for the inclusion of provisions that ultimately offer the same albeit more limited protection (i.e. the capped DA provisions in the P&H Contracts) was rejected during the negotiation of the Definitive Model AA that later became the Corocoro AA.[488] The Tribunal cannot accept such a proposition, as doing so "would be upsetting the terms and conditions upon which the successful bidders [of the New Areas] entered into those projects, bestowing upon them a windfall".[489]

291.   Overall, the Tribunal finds it telling that the Claimant has generally eschewed the drafting history of the Corocoro AA and, in particular, that of Clause 28.1. While the Claimant insists that the Respondents have offered "no positive interpretation" of how Clause 28.1 was to operate (which, as seen above, is inaccurate),[490] the Claimant itself has provided little if any explanation as to how Clause 28.1 came about or why it was introduced.

292.   The Claimant refers to the Model AA Memorandum. That document states that the Force Majeure Clause existing at the time would be "revised to make clear that an act of the Venezuelan government that is not of general applicability will not be a defense to a claim against CVP for breach of contract if it fails to perform an obligation under the Association Agreement, even if its failure is attributable to the governmental act".[491] According to the Claimant, the revision of the Force Majeure Clause (which would eventually become Clause 28.1) was necessary to address the specific request of potential private foreign investors during the negotiation of the Definitive Model AA.[492] However, the Claimant has provided no context to such request, why it was needed, or

---

[488] *Supra*, §§ 25-27.

[489] Rejoinder, § 63.

[490] C-PHB, § 66; Transcript, pp. 1171:25-1173:5; *Supra*, § 265.

[491] Model AA Memorandum, **C-27**, § 10(v).

[492] SoC, § 40; Reply, § 4; C-PHB, § 54.

what it sought to address. Indeed, but for the above reference to the Model AA Memorandum, the Claimant provides no additional input as to how Clause 28.1 came about.

293.     In light of all of the above, the Tribunal confirms that the definition of an Event of Force Majeure as per the text for the Force Majeure Clause, including Clause 28.1, is incompatible with an event, such as the 2007 Nationalization Decree, that renders all obligations in the Corocoro AA impossible to perform.[493] The drafting history of the Corocoro AA and the text of the Force Majeure Clause show that there was no intention to include a provision in the Corocoro AA having the same material effect as the DA provisions in the Petrozuata and Hamaca AAs or even a greater effect than the latter. In fact, the evidence suggests that such possibility was knowingly excluded. Therefore, the Tribunal determines that the Claimant cannot rely on Clause 28.1 to seek redress for any non-performance caused by or attributable to the 2007 Nationalization Decree.

294.     For the avoidance of doubt, the foregoing determination does not negate that the 2007 Nationalization Decree is a *causa extraña* under general Venezuelan law, which is in any event common ground between the Parties, as they do not dispute that the Decree is extraneous and non-attributable to the Respondents.[494] Rather, the Tribunal's conclusion is that the Force Majeure Clause was not intended to apply to an alleged Event of Force Majeure (as defined in the Corocoro AA) that precluded the continuation of the Corocoro Project *in toto,* such as the 2007 Nationalization Decree. Accordingly, the allocation of risk mechanism in Clause 28.1 with respect to "Event[s] of Force Majeure" for "act[s] of the Venezuelan State that [are] not of general applicability" becomes inoperable.

295.     In view of the above, the Tribunal must dismiss the Claimant's Non-Performance Claim in its entirety. Nevertheless, for the sake of completeness, and considering the amount of effort expended by the Parties in addressing this argument, the Tribunal assesses below whether the 2007 Nationalization Decree can be considered an act "not of general applicability" under Clause 28.1, assuming *arguendo* that the latter applies or is otherwise operative.

---

[493] *Supra*, § 273.

[494] *Supra*, § 229. For the avoidance of doubt, the Tribunal is aware that the Claimant does not accept that all of the Respondents' alleged breaches of the Corocoro Contracts were mandated or otherwise attributable to the 2007 Nationalization Decree and its implementation (*supra*, §§ 197, 200). However, the Claimant's position in this respect has no bearing on the characterization of the 2007 Nationalization Decree as a *causa extraña*, and more precisely, as constituting *force majeure* under general Venezuelan law.

c. *The 2007 Nationalization Decree as an act "not of general applicability" under Clause 28.1*

296. Assuming *arguendo* that Clause 28.1 was designed to protect the private investors of the Corocoro Project against acts rendering it impossible to perform and precluding the continuation of the Corocoro Project as a whole, such as the 2007 Nationalization Decree, the Tribunal would need to determine whether the Claimant's Non-Performance Claim meets the requirements of Clause 28.1. In this regard, the Tribunal recalls that:

    i. The Respondents have failed to perform the Corocoro AA from 1 May 2007 onwards;[495]

    ii. Such non-performance was caused by or attributable to the 2007 Nationalization Decree;[496] and

    iii. The 2007 Nationalization Decree is an extraneous "act of state" non-attributable to CVP (as also agreed by the Claimant),[497] beyond CVP's reasonable control and, at the very least, unavoidable. Therefore, it can be considered an "Event of Force Majeure" in accordance with Clause 28.2 of the Corocoro AA.

297. Under the Tribunal's above assumption (i.e. that Clause 28.1 applies to events making the Corocoro Contracts impossible to perform), the success of the Claimant's Non-Performance Claim would thus hinge on the Tribunal finding that the 2007 Nationalization Decree is an act "not of general applicability". Otherwise, pursuant to the terms of Clause 28.1, CVP would be "excused" for its non-performance of the Corocoro AA.

298. The Parties' dispute on whether the 2007 Nationalization Decree is an act of general applicability has three main prongs. The first one deals with the question of whether the characterization of the 2007 Nationalization Decree as a "Discriminatory Action" pursuant to the DA provisions in the P&H Contracts predetermines the issue of whether the 2007 Nationalization Decree is an act "not of general applicability" under the Corocoro AA.[498] The second one focuses on the interpretation of the phrase "not of

---

[495] *Supra*, § 240.

[496] *Supra*, §§ 241-243.

[497] *Supra*, § 229.

[498] *Infra*, §§ 300-308.

general applicability" in Clause 28.1 by reference to Venezuelan public law.[499] The third one deals with the question, put forward by the Respondents, of whether the phrase "not of general applicability" in Clause 28.1 is best interpreted as "commonly understood", and whether such alleged common understanding may lead to the conclusion that an act is "not of general applicability" only if it is discriminatory.[500]

299.    The Tribunal addresses each of these three prongs in turn.

### i. First prong: the interpretation of the phrase "not of general applicability" by reference to the DA provisions in the P&H Contracts

300.    The Tribunal acknowledges that the DA provisions in both the Petrozuata and Hamaca AAs employed the phrase "generally applicable", which appears repeatedly in the definition of a compensable "Discriminatory Action" under each AA.[501] In the ICC P&H Arbitration there was no dispute about the 2007 Nationalization Decree being a "Discriminatory Action".[502] However, contrary to the Claimant's submissions, the phrase "generally applicable" in the P&H Contracts cannot inform the interpretation of the phrase "not of general applicability" in Clause 28.1 of the Corocoro AA. The Tribunal develops its view below.

301.    First, as indicated by the Respondents,[503] the DA provisions were carefully drafted in order to secure an indemnity against certain types of state measures, in consideration of the specificities surrounding the P&H Contracts. Unlike the Corocoro Congressional Authorization,[504] the Petrozuata and Hamaca Congressional Authorizations specifically allowed the inclusion in the P&H Contracts of provisions that could enable Maraven and Corpoven (and by extension PDVSA) to indemnify private investors for the harm resulting from and attributable to state and governmental measures (i.e. the DA provisions).[505] A similar protection was requested yet rejected during the negotiation of

---

[499] *Infra*, §§ 309 ss.

[500] Transcript, p. 1270:3-12 (Respondents' Closing Statement); *infra*, § 341 ss.

[501] ICC P&H Arbitration, R-0 (Petrozuata AA, **C-1**, Sections 1.01(a)(1), 1.01(a)(2); Hamaca AA, **C-3**, Articles 14.1(b), 14.1(b)(1), 14.1(b)(3)).

[502] ICC P&H Award, **CLA-120**, §§ 94.2, 113, 294(vii).

[503] R-PHB, § 72, fn. 151.

[504] Congressional Authorization, **C-22/R-8**.

[505] ICC P&H Arbitration, **R-0** (Petrozuata Congressional Authorization, **C-25**, Sixteenth Condition)(" Provisions shall be included in the Association Agreement that enable Maraven to compensate the other parties, on equitable terms, for significant adverse economic consequences directly resulting from decisions made by national, state or municipal administrative agencies or any changes in the law that, because of their content or purpose, result in an unjust discriminatory treatment[…].″); ICC P&H Arbitration, **R-0** (Hamaca Congressional Authorization, **R-11**, Twenty-First Condition)(" The Association Agreement will include provisions that allow for the compensation of the

the Corocoro AA.[506] The Tribunal therefore finds it inapposite simply to refer to the DA provisions in order to guide the interpretation of the Corocoro AA. The P&H Contracts and the Corocoro AA are distinct agreements and must be interpreted as such.

302. Notably, the Claimant has offered no rule of interpretation to the contrary. Rather, it has limited itself to arguing that it is "not credible" that the "the term 'generally applicable' under the Petrozuata and Hamaca AAs meant something different from the same term and concept in the Corocoro AA".[507] Yet, the phrase "generally applicable" in the P&H Contracts is evidently not the same as the phrase "not of general applicability" in the Corocoro AA. On the one hand, the wording of the DA provisions in the P&H Contracts and Clause 28.1 is literally different. On the other hand, the phrase "not of general applicability" in Clause 28.1 stands alone, is the subject of its sentence, and has no further context. In turn, the phrase "generally applicable" or "not generally applicable" in the DA provisions was always followed by the word "to" and a corresponding comparator (which is lacking in Clause 28.1), such as "entities […] in the hydrocarbon industry in Venezuela", giving it context and a clear meaning.[508] Moreover, not only the P&H Contracts were drafted by different parties to govern projects that are not comparable to the Corocoro Project, but the DA provisions sought to serve a specific purpose (i.e. act as indemnities against state actions) which, as seen, is not the same of Clause 28.1 of the Force Majeure Clause in general.[509] Therefore, any textual similarities between the P&H Contracts and the Corocoro Contracts do not have any import on the interpretation of the latter.

---

Participants, through amendments to the provisions of the Association Agreement or through the payment of damages, in the event that the Net Cash Flow of a Participant of the Association's activities is substantially and adversely affected as a direct, necessary and demonstrable consequence of discriminatory and unjust measures, without prejudice to the option for Corpoven, according to the provisions of the Association Agreement, to purchase such participation of the Affected Party on equitable conditions, if the effect of such amendments or the payment of such damages results in a change of conditions unacceptable for Corpoven").

[506] Letter from PDVSA to Companies that have Qualified to Participate in the 1995 Exploration Bid Round attaching "Modifications to Model Assocation Agreement", **C-27**, p. III; Memorandum from Cleary, Gottlieb, Steen and Hamilton to PDVSA of 14 November 1995, **R-99**, p. 13; *supra*, §§ 22-23;

[507] C-PHB, § 103.

[508] ICC P&H Arbitration, **R-0** (Petrozuata AA, **C-1**, Sections 1.01(a)(1), 1.01(a)(2))("[…] generally applicable **to most enterprises in Venezuela**"); ICC P&H Arbitration, **R-0** (Hamaca AA, **C-3**, Article 14.1(b))("[…] not generally applicable **to entities […] in the hydrocarbon industry in Venezuela**"); ICC P&H Arbitration, **R-0** (Hamaca AA, **C-3**, Article14.1(b)(1)) ("not generally applicable **to corporations and other legal entities that are taxable in the same manner as corporations in Venezuela**"); ICC P&H Arbitration, **R-0** (Hamaca AA, **C-3**, Article 14.1(b)(3)) ("generally applicable to corporations and other legal entities that are taxable in the same manner as corporations in Venezuela").

[509] *Supra*, § 252-258, 288-289.

303.  Second, as correctly noted by the Respondents, "the contractually agreed upon definitions of 'Discriminatory Action' under the Petrozuata and Hamaca Association Agreements have nothing to do with the concept of […] general applicability under Venezuelan law",[510] as understood by the Claimant (i.e. as further seen in the context of the second prong below, an act with undetermined and indeterminable addressees).[511]

304.  Indeed, the DA provisions in the P&H Contracts categorized several public measures as "Discriminatory Actions" despite such measures being applicable to indeterminate and indeterminable addressees (note, for example, the prospective income tax increase implemented in Venezuela in 2006 applicable only to, *inter alia*, enterprises operating within the Venezuelan extra heavy crude oil industry). The Claimant concedes that measures such as these, of interest to "anyone who […] participat[es] in [certain] activities [and even] in certain areas", would be of general applicability.[512] This concession establishes common ground with the Respondents, who reject the premise that the notion of general applicability requires a measure involving "all enterprises in Venezuela".[513] However, as confirmed by the tribunal in the ICC P&H Award,[514] the text of the DA provisions deemed the aforementioned income tax increase a "Discriminatory Action" precisely as it was not "generally applicable" to Venezuelan enterprises.[515]

305.  There is thus a palpable disconnect between the phrase "generally applicable" in the DA provisions of the P&H Contracts, on the one hand, and how the Claimant itself understands the notion of general applicability under Venezuelan public administrative law, on the other. This disconnect is underscored by the Claimant's following statement at the Hearing:

> It's clear on the face of the Decree that this is not of general applicability, and I hope you recall that this very same legal team acting for PdVSA in the Petrozuata and Hamaca Arbitrations has already conceded that the Nationalization Decree was not of general applicability because they, themselves, told you last time that it was a Discriminatory Action. And, of course, it could not possibly be at the same

---

[510] Rejoinder, § 77.

[511] *Infra*, §§ 309-310.

[512] Transcript, pp. 1183:25-1184:1(Claimant's Closing Statement); *See generally*, Transcript, p. 1179-1184 (Claimant's Closing Statement).

[513] R-PHB, § 73.

[514] ICC P&H Award, **CLA-120**, §§ 183-193.

[515] ICC P&H Arbitration, **R-0** (Petrozuata AA, **C-1**, Section 1.01(a)(1)); ICC P&H Arbitration, **R-0** (Hamaca AA, **C-3**, Article 14.1(b)(1)).

time both a Discriminatory Action and an act of general applicability because the two are opposites. **An act of general applicability does not discriminate**.[516]

306. The Claimant's foregoing statement is incorrect. The fact that an act on its face is applicable to an indeterminate or indeterminable number of addressees does not shield the same from being discriminatory. More significantly, perhaps, an act with determinable or determined addressees need not be discriminatory either. A State might have perfectly legitimate, reasonable, proportional, and thus valid reasons for its acts to have an effect on a determinable number or types of individuals, or even only one individual. The number (or the determinability) of addressees of a state measure does not itself prejudge the issue of whether that measure is or is not discriminatory.

307. In short, as appropriately formulated by the Respondents, "there was no magic to the particular defined term 'Discriminatory Action' in the P&H Contracts. The same result would have been reached if the defined term had been "Indemnifiable Action" or any other term which could have been used for the purposes of the [DA provisions]".[517]

308. Consequently, the Tribunal finds that the phrase "generally applicable" in the DA provisions, and the fact that the 2007 Nationalization Decree was considered a "Discriminatory Action", does not give any content to the phrase "not of general applicability" in Clause 28.1.

### ii. Second prong: the interpretation of the phrase "not of general applicability" under Venezuelan public law

309. The Claimant submits that the contractual expression of "act […] not of general applicability" in Clause 28.1 "tracks Venezuelan law, which recognizes a clear distinction between acts of 'general applicability' […], which relate to acts of government addressed to an undetermined number of persons, and acts of 'particular applicability' […], which are addressed to a specific person or a determinable group of persons".[518] In this regard, the Claimant argues that the 2007 Nationalization Decree did not "target" an undetermined number of addressees, but rather a determinable and determinate number of companies.[519] In particular, the Claimant stresses the following:

---

[516] Transcript, p. 35:9-19 (Claimant's Opening Statement)      (emphasis added).

[517] R-PHB, fn. 154.

[518] Reply, § 69.

[519] C-PHB, § 80.

     i.    The 2007 Nationalization Decree "targeted" the "Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements [in the New Areas]";[520] and

     ii.   Article 1 of the 2007 Nationalization Decree "reinforces its targeting nature by specifically naming the only projects to which it applies, including the 'Profit Sharing Agreement […] of Gulf of Paria West,' i.e., the Corocoro Project".[521]

310.    The Claimant therefore submits that the application of the public law "standard" of general applicability "necessitates the conclusion" that the 2007 Nationalization Decree is "not of general applicability".[522] The Claimant also argues that, because the 2007 Nationalization Decree had determinable and even determinate addressees, it must be deemed an act of "particular applicability".[523] Consequently, the Claimant contends that, by virtue of Clause 28.1 (which applies in benefit of the Respondents only in relation to acts of general applicability), the Respondents are precluded "from exonerating themselves from the harm resulting from their non-performance [and other breaches of the Corocoro AA] by pointing to the Nationalization Decree".[524]

311.    The Respondent opposes the Claimant's position on the basis of the following main arguments.

     i.    The concept of an act of "general applicability" is "clear" under the applicable Venezuelan law, and it "does not require that the act in question apply to all circumstances".[525] Instead, it suffices for the act to be applicable to "a type of contract" for it to be deemed of "general application".[526]

---

[520] C-PHB, § 81(a), referring to 2007 Nationalization Decree, **C-103/R-2**, Title ("Decree with Rank, Value and Force of Law of Migration to Mixed Companies of the Association Agreements of the Orinoco Oil Belt, as well as the Risk and Profit Sharing Exploration Agreements").

[521] C-PHB, § 81(b), referring to 2007 Nationalization Decree, **C-103/R-2**, Article 1, paragraph 2 ("[…] As a result of the foregoing, all activities carried out by the strategic associations of the Orinoco Oil Belt, composed of Petrozuata, S.A., Sincrudos de Oriente, S.A., Sincor, S.A., Petrolera Cerro Negro, S.A. and Petrolera Hamaca, C.A., the Exploration at Risk and Profit Sharing Agreements of the **Gulf of Paria West**, Gulf of Paria East and La Ceiba, as well as the companies and consortia created in execution of the same; the company Orifuels Sinovensa, S.A., as well as the subsidiaries of these companies that carry out commercial activities in the Orinoco Oil Belt, and through the entire production chain, shall be transferred to the new mixed companies") (emphasis added).

[522] C-PHB, § 81.

[523] C-PHB, § 93.

[524] Reply, § 70.

[525] R-PHB, § 57.

[526] R-PHB, § 57.

ii. As stated by Venezuelan scholar Roberto De Ruggiero, the "universal character" of a state measure persists "even when the norm intends to govern the conduct of specific, more limited groups within a broader overall category and has been enacted for a specific class of persons".[527] Furthermore, a "law has a general character when the same legal regime applies to every person who falls within the factual circumstances of that law, regardless of the greater or lesser number of individuals that are affected. The general character of the law is not lost by the fact that the law establishes a particular, special or exceptional regime to a group of persons whose conducts falls within the conditions established in the law".[528] The above also holds true under French[529] and Italian law,[530] "both of which are influential in Venezuela".[531]

iii. Therefore, to the extent that the 2007 Nationalization Decree applied to a "type of contract" (i.e. all the existing associations remaining outside of the legal framework of the 2001 Hydrocarbons Law), its general applicability cannot be called into question.[532] The fact that the 2007 Nationalization Decree went ahead and listed all the projects it affected is irrelevant, as that does not "change the fact that, […] following the authorization of the Enabling law",[533] the 2007 Nationalization Decree "was addressed to a type of contract and covered all contracts falling within its parameters".[534]

---

[527] R-PHB, § 57, referring to Roberto De Ruggiero, CIVIL LAW INSTITUTIONS, VOL. I (Editorial Reus), **RLA-96**, p. 30.

[528] Rejoinder, § 69; see also, José Rafael Hernández Gordils, INTRODUCTION TO LAW (Legis Editores, C.A. 2014), **RLA-97**, p. 153; Javier González Reinoza, *The New Conception of the Law in the 1999 Venezuelan Constitution*, in REVISTA DE FILOSOFÍA PRÁCTICA DE LA UNIVERSIDAD DE LOS ANDES (Universidad de Los Andes June 2004), **RLA-98**, p. 15; Luis María Olaso J. and Jesús María Casal, COURSE ON INTRODUCTION TO LAW: INTRODUCTION TO GENERAL LEGAL THEORY, VOL. II (4th ed., 4th rpt., Universidad Católica Andrés Bello 2008), **RLA-99**, pp. 29, 132-133.

[529] Philippe Malinvaud, INTRODUCTION TO THE STUDY OF LAW (16th ed., LexisNexis 2016), **RLA-103**, §§ **38-39**; Jean-Louis Bergel, GENERAL THEORY OF LAW (5th ed., Dalloz 2012), **RLA-102, § 36.**

[530] Vincenzo Roppo, PRIVATE LAW INSTITUTIONS (4th ed., Monduzzi Editore 2001), **RLA-101, § 7**; Francesco Galgano, PRIVATE LAW (12th ed., Cedam 2004), **RLA-100, p. 11**.

[531] R-PHB, § 57.

[532] R-PHB, § 71.

[533] *Supra*, §§ 42-45.

[534] R-PHB, § 71.

312.    According to the Claimant, the Respondents' above arguments incorrectly conflate the notion of a state measure's character, effect or nature, with the "separate and distinct" issue of the addressees of that same state measure.[535]

313.    The Claimant insists that the general or particular "applicability" of a state act relates "specifically to the addressees" of the act.[536] Meanwhile, the effect, nature or character of an act concerns the normative or non-normative content of said act. In particular, the Claimant argues that acts of general effects, nature or character "are those of normative content, *i.e.*, they create norms that are part of the Legal System"; in contrast, acts of particular effects, nature or character "are those that contain a non-normative decision, whether it applies to an individual or to many individuals".[537]

314.    In this context, the Claimant underlines that, as Clause 28.1 refers to acts "not of general applicability" (as opposed to "acts not of general character, effects or nature"), the Respondents' arguments (which mistakenly focus on the normative content of the 2007 Nationalization Decree) deal with an issue "irrelevant to the inquiry posed by Clause 28.1".[538] In other words, the normative or non-normative content of the 2007 Nationalization Decree is irrelevant for the present purposes.

315.    Conversely, the Claimant argues that it is the "applicability" of the 2007 Nationalization Decree (i.e., whether its addressees "are, on the one hand, determined or determinable, or on the other hand, undetermined and indeterminable")[539] that will define whether the Decree was an "act of general applicability" pursuant to Clause 28.1. According to the Claimant, only "in the latter case" (i.e. with undetermined and indeterminable addressees) could the 2007 Nationalization Decree ("whether normative or not"), be of "general applicability".[540] The Claimant contends, however, that the 2007 Nationalization Decree has determinable and determined addressees and therefore the Respondents are liable for their breach of the Corocoro Contracts.

---

[535] C-PHB, § 84, 86.

[536] C-PHB, § 77; *supra*, § 309.

[537] C-PHB, fn. 116, referring to Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings. Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009), **RLA-108**, pp. 143-144.

[538] C-PHB, § 97; *see also*, C-PHB, § 87 ("Respondents have repeatedly characterized Decree-Law 5.200 as being of 'general effects,' 'general nature,' or 'general character.' Indeed, as Claimant observed at the Hearing, Respondents 'use[d] every word after the word 'general' except the word 'applicability.'' This is not a matter of semantics; each of the terms invoked by Respondents pertains to the normative content of a law, rather than its addressees").

[539] C-PHB, § 85.

[540] C-PHB, § 85.

316. Having considered the Parties' positions, the Tribunal begins its analysis by noting that it agrees with the Claimant that the Respondents' arguments (at *supra* § 311), and supporting legal authorities only deal with the character, effect, and nature of state measures (i.e. their normative content), and do not refer, in this context, to their "applicability". The Tribunal further observes that while the Respondents rightly establish that the scope of a state measure (no matter how narrow) has no bearing on its normative content, the Respondents do not tackle the issue of whether the addressees of a state measure are determinable or indeterminable. However, the Parties agree that the 2007 Nationalization Decree is a normative act "because it contains norms that integrated the legal order",[541] and thus the Tribunal does not need to consider the Respondents' additional arguments and supporting authorities on this point.

317. It follows that, in order to address the Parties' disagreement regarding the classification of the 2007 Nationalization Decree under Venezuelan law in view of the term "not of general applicability" in Clause 28.1, the Tribunal must determine whether this term "tracks Venezuelan law", as argued by the Claimant.[542] Such an inquiry requires the Tribunal to establish the content of Venezuelan law, and to assess (i) whether it is correct that, under Venezuelan law, an act of general applicability may only have indeterminate and indeterminable addressees, and, if so, (ii) whether the 2007 Nationalization Decree fulfills such alleged criteria.

318. The Tribunal's analysis will be divided into three parts. The Tribunal will first analyze the statements and scholarly writings of Venezuelan legal authorities relied upon by the Claimant in support of its case: considering that the Respondents do not focus on whether the addressees of the 2007 Nationalization Decree are determinable or undeterminable, the Tribunal's analysis will concentrate on the Claimant's submissions **(a)**. The Tribunal will then analyze the relevant provisions of Venezuelan administrative law which, according to Prof. Brewer-Carías' testimony at the Hearing, best represent the practical application or significance of identifying whether an act has undeterminable or determinable addressees **(b)**.[543] Finally, the Tribunal will outline its

---

[541] C-PHB, § 93, ("As Professor Brewer-Carías explained at the Hearing, Decree-Law 5.200 "is an act of normative character because it contains norms that integrated the legal order [...].""); R-PHB, § 65 ("At the Hearing, he seemed not to appreciate that, as he declared that Decree-Law 5.200 did have normative content, which is obviously correct"); Rejoinder, fn. 152 ("This case does not involve a law of "non-normative, particular and specific content").

[542] Reply, § 69; *supra*, § 309.

[543] Transcript, pp. 738:21-739:2.

findings in light of its review of the relevant Venezuelan administrative law doctrine and statutes in the record **(c)**.

> (a) _The statements and scholarly writings by Venezuelan legal authorities relied upon by the Claimant_

319.   The Claimant refers to three authorities in support of its contention that the 2007 Nationalization Decree is an act "not of general applicability" because it has determinable and determinate addressees: (i) Prof-Brewer-Carías's statements at the Hearing; (ii) a 2009 publication by Prof. Brewer-Carías on administrative law (henceforth the "2009 publication");[544] and (iii) a 2013 publication by Venezuelan scholar, Prof. Eloy Lares Martínez, also on administrative law (henceforth the "2013 publication"). [545] The Tribunal analyzes these authorities below.

> ▪ **_Prof. Brewer-Carías' statements at the Hearing_**

320.   At the Hearing, Prof. Brewer-Carías stated the following:

> I mentioned, according to Venezuelan law, there are two ways of classification of State acts, according to their **contents**, **normative** or non-**normative**, or according to the **addressees undeterminate** [sic]--**undeterminable** on the one side or **determinate** and **determinable** on the other side.[546]
>
> […]
>
> Q. Let me see if I can summarize--and please correct me if I've summarized incorrectly: **One way** of characterizing or classifying Venezuelan law is by reference to its content. Does it contain normative principles or does it not contain **normative** principles? Is that right?
>
> A. That's right.
>
> Q. Is there a second way of characterizing classifying law as a matter of Venezuelan law?
>
> A. The second way through the determination of the **addressees**, those to whom the law applies, and then it can be said that norms can be applied to an **undeterminate** [sic] and **undeterminable** [sic] number of people.  That is the normal way of issuing a law—Civil Code, for instance—or laws that are normative but intended to be applied only to a specific group of persons or subject, in which case it will be of a **non-general applicability**, it would be of **particular applicability**.[547]

---

[544] C-PHB, fn. 116; Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings. Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009), **RLA-108**.

[545] Reply, fn. 127; C-PHB, § 78; Eloy Lares Martínez, Manual of Administrative Law (14th ed., 2013), **CLA-115**.

[546] Transcript, p. 726:11-16 (Brewer-Carías) (emphasis added).

[547] Transcript, p. 729:11-730:4 (Brewer-Carías) (emphasis added).

[…] So, there are two ways of classifying acts, different ways. According to the **normative** or **non-normative content**. And when it's referred to act of **normative content**, it is used in the **common writing**, the **same as saying** this is an act of general **character** or general **effect** because they're **normative**. Other stage, **addressees**, the act addresses to **undeterminate** [sic] or **indeterminate** number of people, that will be **general applicability** or **determinate** and **determinable** number of people **particular applicability**.[548]

[…]

Q. Let me ask my question to you: Is that the same thing, an act of normative content having **general effect**, is that the same thing or is it different from that act of being of **general applicability**?

A. Different. Nothing to do. […] The State acts, as I mentioned, can be classified according to two criteria: **Content/normative or non-normative**; or **addressees/recipients**, **general applicability** and **particular applicability**. There are two classifications in two stages. **You cannot mix it**.[549]

[…]

Q. So, a **normative** law can be of **non-general applicability** as well; is that right?

A. Yes.[550]

[…]

[The 2007 Nationalization Decree] is an act of normative character because it contains norms that integrated the legal order, and that is why it was published, and it is of particular applicability directed to the Group of persons.[551]

321.  Prof. Brewer-Carías' statements at the Hearing support the Claimant's submissions in this arbitration. Indeed, further to the Claimant's position as summarized above,[552] at the Hearing Prof. Brewer-Carías affirmed that under Venezuelan law:

   i.  State acts can be classified according to two different categories, namely, their normative content (i.e. their "character"/"effects") and their addressees (i.e. their "applicability").

   ii.  The two categories are distinct and therefore should not be mixed, although that does not prevent an act from being simultaneously normative and of particular applicability.

   iii.  Acts are normative if they integrate norms into the legal system.

---

[548] Transcript, p. 820:16-821:1 (Brewer-Carías) (emphasis added).

[549] Transcript, p. 819:8-20 (Brewer-Carías) (emphasis added).

[550] Transcript, p. 730:5-7 (Brewer-Carías) (emphasis added).

[551] Transcript, p. 742:24-743:3 (Brewer-Carías) (emphasis added).

[552] *Supra*, §§ 309-310, 312.

iv.  Acts are of general applicability if they have indeterminate and indeterminable addressees, and of particular applicability if they have determinable or determinate addressees.

v.  Most importantly, the 2007 Nationalization Decree is normative (as it integrates norms into the legal system) and of particular applicability (as it has determinable and determinate addressees).

322.  Having considered Prof. Brewer-Carías's position at the Hearing as to whether the term "not of general applicability" in Clause 28.1 "tracks Venezuelan law",[553] it seems to the Tribunal that, were it to rely on this position, it should also assess Prof. Brewer-Carias' statements outside this arbitration, namely, his other writings upon which the Claimant relies (i.e. the 2009 publication).[554] The foregoing becomes particularly relevant in view of the Respondents' submission that Prof. Brewer-Carías' position at the Hearing contradicts his 2009 publication.[555]

▪ *Prof. Brewer-Carías' 2009 publication*

323.  In his 2009 publication, Prof. Brewer-Carías opined as follows:

A. *Administrative acts according to their effects*

The classification of administrative acts according to their effects is made by the Law under two angles. **First**, according to the **normative or non-normative content** of the acts and, **second**, according to the **recipients of the acts**.

a. *Administrative acts of general effects and administrative acts of particular effects.*

First, according to the **normative** or **non-normative** character of administrative acts, these are classified in acts of **general effects** and acts of **particular effects**. It can be said that the Organic Law of Administrative Proceedings establishes a first form of classification of the administrative acts according to their effects, in the sense that it classifies the administrative acts in **normative acts** (**of general effects**) and **non-normative administrative acts** (of **particular effects**). […] The former ones [the administrative acts of **general effects**] are those of **normative content**, *i.e.*, they **create norms** that are part of the Legal System; in contrast, the latter ones, the administrative acts of **particular effects**, are those that contain a **non-normative decision**, whether it applies to an **individual or to many individuals**. It can be said that the Organic Law of Administrative Procedures **identifies** the administrative acts of **general effects**, with those that it qualifies in Article 13 as "acts or administrative dispositions of **general character**", and the administrative acts of **particular effects** with which the same norm qualifies as administrative acts of "**particular character**".

---

[553] Reply, § 69; *supra*, § 309.

[554] Supra, § 319.

[555] R-PHB, §§ 63-68.

[…]

### *b. General Administrative acts and individual administrative acts*

Additionally, in relation to the classification of the acts according to their effects, the Organic Law of Administrative Proceedings also allows to classify them according **to their effects**, **in relation to the <u>recipients</u> of the acts**. Thus, it can be said that the Organic Law adopts the classification of the administrative acts according to their **recipients**, by distinguishing **general administrative acts from individual administrative acts**. <u>General administrative</u> acts are those aimed at a **plurality of individuals, formed either by an <u>indeterminate</u> or by a <u>determined number of persons</u>**; in contrast, **individual administrative** acts are those aimed at a <u>**single individual**</u>. [There is a distinction] between the act of **general effects** or of **normative content**, and the **general act**, which although may **not have a normative content**, is of interest to an <u>indeterminate</u> number of persons. In these cases, the **act** is **general** because it is of interest to an <u>indeterminate</u> number of people and not because it necessarily has a normative content. Of course, the **non-normative general act** may have for addressees a <u>**determinate**</u> number of persons.

The individual act, on the contrary, is the act destined to only one subject of law, which is, in addition, an act of **particular <u>effects</u>**, in accordance with the prior classification [in part a].[556]

324.   Two conclusions follow from the above excerpt:

i.   Unlike at the Hearing, Prof. Brewer-Carías does not expressly mention the concept or term "applicability" (general or particular) in his 2009 publication. This is significant as this is his (only) other writing on this topic before the Tribunal. Consequently, such a disparity is difficult to reconcile with the Claimant's submission that the term "general applicability" in Clause 28.1 "tracks Venezuelan law", which allegedly "recognizes a clear distinction" between acts of "general applicability" and acts of "particular applicability".[557]

ii.   Similarly, it is also apparent from the 2009 publication that an act with determinable or determinate addressees is not an act of particular "applicability" (as defined by the Claimant).[558] Rather, the 2009 publication coins as a "general act" or "general administrative act" – both categories concerning the act's addressees/recipients – precisely those acts with "either" "indeterminate" or multiple "determined" addressees.

---

[556] Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings, Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009), **RLA-108**, pp. 143-145 (additional translated excerpts by the Tribunal) (emphasis and underline added).

[557] Reply, § 69; *supra*, § 309.

[558] *Supra*, § 310.

▪ *Prof. Lares Martínez's 2013 publication*

325. In view of the above differences between Prof. Brewer-Carías' statements at the Hearing and in his 2009 publication, the Tribunal's analysis will turn to the third and last legal authority relied upon by the Claimant to support its characterization of the 2007 Nationalization Decree as an act "not of general applicability", namely, Prof. Lares Martínez's 2013 publication.[559] In particular, the Tribunal must assess whether the 2013 publication further undermines or rather supports the Claimant's argument that an act of general applicability must concern an undetermined number of addressees. In his 2013 publication, Prof. Lares Martínez stated as follows:

> Pursuant to the scope of their effects, administrative acts may be **general** or **individual** […]. General administrative acts can be subdivided as follows: **general administrative acts of <u>normative content</u>**, namely, regulations, and **non-normative general administrative acts**, within which we can find, by way of example, the setting of a date for the initiation of a public bid, […] the order for a massive vaccination campaign of all the population, and other determinations that, although addressed to an **indeterminate** number of persons, do not create abstract norms.
>
> The **doctrine** generally identifies the expressions **general acts** and acts of **general <u>effects</u>**; and also identifies the expressions **individual acts** and acts of **individual** or **particular <u>effects</u>**. As we have explained above, **general acts** or acts of **general <u>effects</u>** are those addressed to an **<u>undetermined</u>** number of persons; while **individual acts**, namely, **acts** of **particular** or **individual <u>effects</u>**, are those that may refer to **one** or **different persons**, but **all of them <u>determined</u>**. Thus, for example, the settlement of successor tax, which establishes the tax to be paid by the different heirs of the *de cujus*, is an **individual act**, or what is the same, an administrative act of **individual <u>effects</u>**.[560]

326. The following three main points follow from Prof. Lares Martínez's analysis:

    i.  There is again no explicit mention of the term "applicability" (general or particular), which further undercuts the Claimant's position as noted above with respect to Prof. Brewer-Carías's 2009 publication.[561]

    ii. Prof. Lares Martínez does not focus at all on the notion of an act's addressees/recipients. Rather, he focuses on the allegedly "separate and distinct" issue of an act's effect (i.e. its normative content).

---

[559] Supra, § 319.

[560] Eloy Lares Martínez, Manual of Administrative Law (14th ed., 2013), **CLA-115**, pp. 188-189 (additional translated excerpts by the Tribunal)(emphasis and underline added).

[561] *Supra*, § 324.i.

iii.  The normative content of an act (i.e. its effect) appears intrinsically linked to the determinability of the act's addressees, contrary to Prof. Brewer-Carías' position at the Hearing.[562] Indeed, Prof. Lares Martínez suggests that while non-normative acts (i.e. acts of particular or individual effects) may be directed to either an indeterminate or determinate number of addressees, normative acts (i.e. acts of general effects) must be addressed to an indeterminate and perhaps even undeterminable number of addressees. Notably, in his 2009 publication Prof. Brewer-Carías seems to agree with Prof. Lares Martínez on this point, as he recognizes that, while a "general act" can be addressed to either an indeterminate or determinate number of recipients,[563] only "non-normative general acts […] may have for addressees a determinate number of persons".[564] Moreover, similar to Prof. Lares Martínez,[565] Prof. Brewer-Carías' 2009 publication stresses that the "individual act" (i.e. an act with only one addressee) is, in addition, an act of particular or individual effect (i.e. a non-normative act).[566]

▪  **_The Tribunal's conclusions with respect to the statements and scholarly writings at issue_**

327.  In an attempt to reconcile the writings of Profs. Brewer-Carías and Lares Martínez (and to the extent possible, also Prof. Brewer-Carías's statements at the Hearing), the Tribunal concludes the following. Under Venezuelan administrative law doctrine, normative acts are of general effect/character and, as such, are directed to an indeterminate and indeterminable number of addressees (i.e. a general act). Non-normative acts are of particular effect/character and their addressees may thus be either one person (i.e. an individual act), or an indeterminate/indeterminable, determinable or determinate plurality of persons (i.e. also a general act).

328.  The above leads to the following three further conclusions:

---

[562] _Supra_, fn. 549 ("The State acts, as I mentioned, can be classified according to two criterias: **Content/normative or non-normative**; or **addressees/recipients**, **general applicability** and **particular applicability**. There are two classifications in two stages. **You cannot mix it**"); _supra_, § 321.ii.

[563] _Supra_, fn. 556; Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings, Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009),**RLA-108**, p. 145.

[564] _Supra_, fn. 556; Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings, Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009),**RLA-108**, p. 145.

[565] _Supra_, fn. 560; Eloy Lares Martínez, Manual of Administrative Law (14th ed., 2013), **CLA-115**, p. 189.

[566] _Supra_, fn. 556; Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings, Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009),**RLA-108**, pp. 143-144.

i.  As far as Venezuelan administrative law doctrine is concerned, the term "applicability" in Clause 28.1 does not clearly track Venezuelan law. Indeed, contrary to the Claimant's and its expert's position in the present case that Venezuelan law draws a clear distinction between acts of general and particular "applicability" depending on the determinability of the act's addressees,[567] the term "applicability" (general or particular) does not appear in either Prof. Brewer-Carías' 2009 publication or Prof. Lares Martínez's 2013 publication.

ii. Contrary to the Claimant's and its expert's position in the present case that the normative content of an act does not determine its addressees, there appears to be a correlation between the normative content of state measures and their addressees. The doctrinal authorities on record appear unanimous in that normative acts, by definition, must have indeterminable and indeterminate addressees (i.e. what the Claimant deems "general applicability"). As noted above,[568] the Parties agree that the 2007 Nationalization Decree is of normative content (i.e. of general effect/character). Therefore, the "general applicability" of the 2007 Nationalization Decree should not be called into question, as also correctly observed by the Respondents.[569]

It is correct that (i) the first paragraph of Article 1 of the 2007 Nationalization Decree addresses the "existing associations" between PDVSA's subsidiaries concerning, *inter alia*, the New Areas, requiring them to adjust to the legal framework set out in the 2001 Hydrocarbons Law,[570] and thus to transform into *empresas mixtas* ("Paragraph 1");[571] and that (ii) the second paragraph of Article 1 goes on to list various specific associations, including the Corocoro Project ("Paragraph 2").[572] By referring to "existing associations", Paragraph 1

---

[567] *Supra*, § 309-310, 313, 321.

[568] *Supra*, fn. 541.

[569] R-PHB, fn. 142.

[570] *Supra*, § 39.

[571] 2007 Nationalization Decree, **C-103/R-2**, Article 1, paragraph 1 ("The existing associations between the subsidiaries of Petróleos de Venezuela, S.A. and the private sector operating in the Orinoco Oil Belt, as well as those referred to as Exploration at Risk and Profit Sharing Agreements, must be adjusted to the legal framework governing the national petroleum industry, and must be transformed into mixed companies in accordance with the terms set forth in the Organic Hydrocarbons Law").

[572] 2007 Nationalization Decree, **C-103/R-2**, Article 1, paragraph 2 ("[…] As a result of the foregoing, all activities carried out by the strategic associations of the Orinoco Oil Belt, composed of Petrozuata, S.A., Sincrudos de Oriente, S.A., Sincor, S.A., Petrolera Cerro Negro, S.A. and Petrolera Hamaca, C.A., the Exploration at Risk and Profit Sharing Agreements of the **Gulf of Paria West**, Gulf of Paria East and La Ceiba, as well as the companies and consortia created in execution of the same; the company Orifuels Sinovensa, S.A., as well as the subsidiaries

arguably makes the Decree's possible addressees immutable and thus determinable, while Paragraph 2 makes the addressees determinate. However, the 2007 Nationalization Decree could only be fully carried out once the "private sector companies" in the "associations" (including Conoco and any other Investor) exercised their option to migrate (or not) to an *empresas mixtas* model by 26 June 2007.[573] Hence, at the time of its issuance in February 2007,[574] the Nationalization Decree's ultimate addressees, namely, the private companies unable to agree to the terms and conditions of their possible participation in the new *empresas mixtas*, were not determinable. Consequently, the 2007 Nationalization Decree must be considered an act of "general applicability" (as defined by the Claimant), which is only buttressed by the fact that the Decree is of normative content.

iii. Even if the 2007 Nationalization Decree were considered an act with determinable and/or determined addressees, *quod non*, it cannot be equated to an act of "particular" applicability or otherwise a "particular" or, to use the words of Prof. Brewer-Carías, an "individual" act.[575] An act with multiple determinate addressees may also constitute a "general act".[576] The Claimant's argument that the 2007 Nationalization Decree is an act "not of general applicability" under Clause 28.1 is incorrectly premised on the idea that, under Venezuelan public law, an act of general applicability may only be addressed to an undetermined and undeterminable number of recipients. However, as clearly distinguished by Prof. Brewer-Carías in his 2009 publication, "general acts" may concern an indeterminate, determinable, or determinate plurality of addressees, while "individual acts" may only have one addressee.[577] The 2007 Nationalization Decree is not an "individual act" as it has more than one addressee, and thus falls within Prof. Brewer-Carías' definition of a "general act"; a doctrinal classification that comes from the Claimant's own legal expert and is relevant to resolve the Claimant's Contractual Claims. Therefore, and recalling that the

---

of these companies that carry out commercial activities in the Orinoco Oil Belt, and through the entire production chain, shall be transferred to the new mixed companies") (emphasis added)

[573] *Supra*, § 46.

[574] *Supra*, § 45.

[575] *Supra*, §§ 323.

[576] *Supra*, § 324.ii.

[577] *Supra*, fn. 556; Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings, Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009), **RLA-108**, p. 145.

notion of a "general act" according to Prof. Brewer-Carías pertains to the discussion of an act's addressees,[578] the 2007 Nationalization Decree can be deemed an act of "general applicability" under Clause 28.1.[579]

## (b) *The relevant provisions of Venezuelan statutory law*

329. The Tribunal now turns to its analysis of Venezuelan positive administrative law, which, as seen below, supports the Tribunal's above effort to reconcile the doctrinal authorities on the record and the resulting conclusions.[580] In particular, the Tribunal notes the publication/notification of administrative acts and the standing for challenging the same in court. These are two aspects that, as stated by Prof. Brewer-Carías at the Hearing, best represent the practical application or significance of identifying whether an act has undeterminable or determinable addressees.[581]

### ▪ *The OLAP*

330. Regarding publication and notification, Articles 72 and 73 of the Organic Law of Administrative Procedures ("OLAP") state the following:[582]

> **Article 72.—**Administrative acts of a general character or which are in the interest of an undetermined number of persons, shall be published in the OFFICIAL GAZETTE corresponding to the entity or agency that made the decision.
>
> [...].
>
> Administrative acts of particular character shall also be published when so required by Law.

---

[578] *Supra*, § 324.ii.

[579] The Tribunal acknowledges that Prof. Lares Martínez's 2013 publication does not strictly follow the same structure as Prof. Brewer-Carías's 2009 publication. Within the acts of "particular or individual effects" (i.e. non-normative acts), Prof. Lares Martínez includes those acts that "may refer to one or different persons, but all of them determined" (*supra*, fn. 560). He then illustrates such acts of particular effects or individual effects with an example of what he deems an "individual act" albeit having more than one addressee (*supra*, fn. 560). In other words, Prof. Lares Martínez does not seem to distinguish between acts that have one determined addressee (what Prof. Brewer Martínez coins "individual acts") and those that have determinable or determinate yet multiple addressees (i.e. what Prof. Brewer Martínez coins "general acts"). However, as seen above, the opinions of Prof. Lares Martínez and Prof. Brewer-Carías are reconcilable (*supra*, § 327). Accordingly, Prof. Brewer-Carías's category of "general acts" can be maintained (despite Prof. Lares Martínez's silence in that respect) with the consequence that the 2007 Nationalization Decree is a "general act" and thus of "general applicability" under Clause 28.1. To the extent that the opinions of Prof. Lares Martínez and Prof. Brewer-Carías were irreconcilable, that simply suggests that the categorization of an administrative act in terms of its addressees is controversial. This in turn indicates that the term "not of general applicability" in Clause 28.1 does not clearly track Venezuelan law as argued by the Claimant (*supra*, §§ 309, 317). Moreover, considering that Clause 28.1 must be "strictly construed" (*supra*, § 259), Prof. Brewer-Carías's categorization in his 2009 publication must prevail.

[580] *Supra*, § 328.

[581] Transcript, pp. 738:21-739:2.

[582] OLAP, **CLA-95**, Articles 72-73 (additional translation by the Tribunal).

> **Article 73.—** The interested persons will be notified of any administrative act of a particular character that affects their subjective rights or their legitimate, personal and direct interests. [...]

331. Article 72 of the OLAP indicates that acts of "general character" (i.e. normative acts) must be published in order to have effects. This publication requirement is not only reasonable but also necessary, if acts of general character are always to have indeterminate addressees. Otherwise, individuals potentially falling within the scope of the norm could not be expected to behave in accordance with its requirements.

332. The second phrase of the first paragraph of Article 72 of the OLAP refers to acts that, while of "particular character" (i.e. non-normative), may be of interest to an "undetermined number of persons". Prof. Brewer-Carías refers to these acts as "general acts",[583] while Prof. Lares Martínez labels them "non-normative general administrative acts".[584] Regardless of the exact characterization, to the extent that they might be of interest to an indeterminate portion of the population, their publication is just as warranted as in the case of acts of general character. Indeed, their notification to each individual potential addressee would be impossible.

333. Lastly, Article 72 of the OLAP provides for the mandatory publication of acts of particular character, but only when specifically required by law. Given that the second phrase of Article 72 already deals with the acts of particular character with an indeterminate number of addressees, the requirement to publish acts of particular character only if required by law must necessarily concern those acts that have a determinable or determined number of recipients. Prof. Brewer-Carías also refers to these sort of acts as "general acts", while Prof. Lares Martínez provides no special doctrinal category for them.[585] Again, regardless of their exact characterization, the occasional publication of acts of particular character with determinable or determined addressees is reasonable and consistent with the general rule of notification pursuant to Article 73 of the OLAP. Notably, the notification requirement in Article 73 of the OLAP does not seem to be superseded by a publication in the relevant official gazette, either pursuant to Article 72 of the OLAP or voluntarily.

---

[583] *Supra*, fn. 556; Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings, Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009), **RLA-108**, p. 145.

[584] *Supra*, fn. 560; Eloy Lares Martínez, Manual of Administrative Law (14th ed., 2013), **CLA-115**, p. 188.

[585] *Supra*, fn. 556; Allan R. Brewer-Carías, Administrative Law and the Organic Law of Administrative Proceedings, Administrative Proceedings Principles. (Editorial Jurídica Venezolana 2009), **RLA-108**, p. 145.

334.   Consistent with the Tribunal's conclusions after its review of the scholarly statements and writings of Profs. Brewer-Carías and Lares Martínez (at *supra*, §§ 327-328), Articles 72 and 73 of the OLAP confirm the following:

   i.   Just like the doctrine on the record, namely Prof. Brewer-Carías's 2009 publication and Prof. Lares Martínez's 2013 publication, the OLAP makes no mention of the term "applicability" referring either to an act's addressees or otherwise.

   ii.   There is a relation between the normative content of a state measure and its addressees. On the one hand, acts of particular character (i.e. non-normative acts) may be directed towards undetermined, determinable and determinate addressees. Accordingly, they must be communicated via notification or publication, depending on the circumstances. On the other hand, acts of general character (i.e. normative acts) must always be communicated via publication, which is sensible as potentially every person falling under its scope may be or become an addressee of such type of act (i.e. indeterminable addressees). The OLAP thus contradicts the Claimant's submission that an act of general character, such as the 2007 Nationalization Decree, may have determinable or determinate addressees (i.e. what the Claimant defines as an act of particular applicability). Conversely, the OLAP endorses the Tribunal's earlier conclusion that the normative content of the 2007 Nationalization Decree precludes questioning its general applicability.[586]

   iii.   The terms "general" or "particular" are used solely in relation to an act's normative content (i.e. its character). Therefore, even assuming that the 2007 Nationalization Decree is an act with determinable or determined addressees, *quod non*,[587] the OLAP does not support the Claimant's contention that an act with determinable or determined addressees is necessarily an act of "particular applicability". Rather, as seen, the 2007 Nationalization Decree can be considered a "general act" even if deemed to have determinable and determinate addressees and, as such, an act of general applicability.[588]

---

[586] Supra, § 328.ii.

[587] OLAP, **CLA-95**, Articles 72-73 (additional translation by the Tribunal).

[588] *Supra*, § 328.iii.

▪ *The OLCAJ*

335.    The Tribunal now turns to the second practical application or significance of identifying whether an act has determinable or undeterminable addressees according to Prof. Brewer-Carías, namely, the issue of standing and challenging state acts before the Venezuelan courts.[589] In this respect, the Organic Law of the Contentious-Administrative Jurisdiction ("OLCAJ") provides the following:

> i.    Only individuals/entities with an "actual legal interest" have standing to act before the administrative courts.[590]

> ii.    The statute of limitations (i.e. *caducidad*) to request the annulment of an act of "particular effects" (i.e. non-normative) is of 180 continuous days from its notification, while the request for annulment of acts of "general effects" (i.e normative) may be made at any time.[591]

336.    The OLCAJ further confirms the Tribunal's conclusions up to this point. In short, if an act of general effect (i.e. normative act) could have determinable or determined addressees (as the Claimant argues is the case of the 2007 Nationalization Decree), a seemingly incongruous situation arises. In particular, the recipients of the normative act in question could seek its annulment at any time, while the recipients of an identical act of particular effects would have to do so within 180 days of the act's notification, despite both acts potentially affecting the addressees' "subjective rights" and "interests" in the same manner.[592]

337.    Moreover, the rules on standing and challenge in the OLCAJ focus exclusively on the normative or non-normative content of state acts. Indeed, the OLCAJ appears silent in relation to the addressees of state acts and again makes no reference to the term "applicability". Therefore, to the extent that the Claimant and its expert maintain, in the Tribunal's view incorrectly, that a normative act (i.e. of general effect) can have either indeterminable or determined addressees,[593] the above provisions of the OLCAJ would

---

[589] *Supra*, § 329.

[590] OLCAJ, **CLA-111**, Article 29 (translation by the Tribunal).

[591] OLCAJ, **CLA-111**, Article 32 (translation by the Tribunal).

[592] OLAP, **CLA-95**, Article 73 (additional translation by the Tribunal); *supra*, § 330.

[593] *Supra*, fn. 550-551; C-PHB, § 93, ("As Professor Brewer-Carías explained at the Hearing, Decree-Law 5.200 'is an act of normative character because it contains norms that integrated the legal order, and that is why it was published' but 'it is of particular applicability', because it is 'directed to the [g]roup of persons'").

be of no significance to identify whether an act has determinable or undeterminable addressees.[594]

(c) *The Tribunal's findings with respect to both the relevant Venezuelan public law doctrine and statutory law*

338.   In light of the preceding review of the relevant Venezuelan public law doctrine and statutes on the record, the Tribunal finds that the Claimant has failed to establish that the phrase "act […] not of general applicability" in Clause 28.1 "tracks Venezuelan law", as argued by the Claimant.[595] Contrary to the Claimant's submission that Venezuelan law recognizes a "clear distinction" between acts of "general applicability" and "particular applicability",[596] the Tribunal finds that the phrase "not of general applicability" in Clause 28.1 does not enshrine the typical characterization of state measures inherent to Venezuelan law. It follows that the Claimant has not demonstrated that the 2007 Nationalization Decree, a normative act, is an "act […] not of general applicability". The Tribunal's conclusion is based on the following main cumulative reasons:

i.   As repeatedly noted above, the term "applicability" is never used either in Venezuelan administrative law or in the specialized doctrine in reference to an act's effect/character or addressees. More pertinently, Venezuelan law barely refers to an act's addressees at all. Indeed, for all practical purposes, namely, publication of state acts (in accordance with the OLAP) and standing and challenge of the same before the Venezuelan courts (in accordance with the OLCAJ),[597] Venezuelan administrative law focuses firstly on the distinction between acts of general effects/character (i.e. normative) and acts of particular effect (i.e. non-normative). Consequently, Venezuelan administrative law does not shed much light on the correct interpretation of the term "applicability" in Clause 28.1 to start with.

ii.   Venezuelan statutory administrative law on the record does not use the terms "general" or "particular" with respect to an act's addressees. Article 72 of the OLAP does draw a distinction between acts of normative content and thus of

---

[594] *Supra*, § 329 ss.

[595] Reply, § 69; *supra*, §§ 309, 317.

[596] Reply, § 69; *supra*, § 309.

[597] *Supra*, § 335.

general character/effect, and acts that, while non-normative, may nonetheless be of interest to an "undetermined number of persons".[598] However, Article 72 of the OLAP does not qualify the latter as being general or otherwise. Therefore, and again assuming that the 2007 Nationalization Decree has multiple determinable and determined addressees, *quod non*,[599] nothing in positive Venezuelan public law precludes these sort of acts from being of "general" applicability under Clause 28.1.

iii. Conversely, Venezuelan statutory administrative law distinguishes between administrative acts of "general" and "particular" effects (i.e. their normative or non-normative content). However, the normative content of an act is an issue that the Claimant describes as "irrelevant".[600] More importantly, the 2007 Nationalization Decree is not an administrative act, but a decree with rank, effect and force of law (i.e. a Decree-Law) and, as such, a true "legislative act".[601]

According to the Claimant, the "legislative nature [or] form" of the 2007 Nationalization Decree "is irrelevant to determine its **scope** of applicability".[602] Yet, the scope of a state measure, be it a law or an administrative act, does not dictate whether that state measure has undeterminable, determinable, or determined addressees either.[603] In any event, the significance of the 2007 Nationalization Decree being a legislative act is that the distinction between "general" or "particular" acts appears germane to administrative acts only and not legislative acts, as rightly noted by the Respondents.[604]

---

[598] *Supra*, § 332.

[599] OLAP, **CLA-95**, Articles 72-73 (additional translation by the Tribunal).

[600] *Supra*, fn. 538.

[601] Allan R. Brewer-Carías, TREATISE ON ADMINISTRATIVE LAW, VOL. I: ADMINISTRATIVE LAW AND ITS FUNDAMENTAL PRINCIPLES (Editorial Jurídica Venezolana 2013), **RLA-107** p. 249; Antonio Moles Caubet, DOGMATIC OF DECREE-LAWS (Publicaciones del Colegio de Abogados del Distrito Federal 1974), **RLA-106,** pp. 26-27.

[602] C-PHB, §§ 94-96 (emphasis added).

[603] C-PHB, § 94, referring to Javier González Reinoza, *The New Conception of the Law in the 1999 Venezuelan Constitution*, in REVISTA DE FILOSOFÍA PRÁCTICA DE LA UNIVERSIDAD DE LOS ANDES (Universidad de Los Andes June 2004), **RLA-98,** p. 15; María Eugenia Soto Hernandez & Fabiola del Valle Tavares Duarte, *Functions of the State in the Constitution of the Bolivarian Republic of Venezuela of 1999*, in Fernando Parra Aranguren (ed.), PUBLIC LAW STUDIES BOOK TRIBUTE TO HUMBERTO J. LA ROCHE RINCÓN (2001), **CLA-127**, p. 418.

[604] Rejoinder, § 71.

For instance, the OLCAJ and the Organic Law of the Supreme Tribunal of Justice ("OLSTJ") refer to actions against annulment of "administrative acts of **general** or **particular** effects" issued by the President.[605] However, the OLCAJ does not address Decree-Laws and the OLSTJ does not qualify them with the terms "general" or "particular", be it in relation to their normative content or addressees. Rather, the OLSTJ simply refers to actions against "acts with rank of law" or against "decrees with rank, value and force of law" issued by the Government.[606] This lack of distinction with respect to Decree-Laws further undermines the Claimant's submission that the 2007 Nationalization Decree, as a Decree-Law and thus a "legislative act", is an act of "particular" applicability.[607]

iv.  The Claimant argues that the 2007 Nationalization Decree is an act of general character (i.e. normative) but with determinable and determinate addressees, (i.e. what the Claimant defines as "particular applicability"). However, the Claimant has been unable to point to any other example of such type of act.

In this regard, the Tribunal specifically inquired with the Parties whether an act of general effect could ever have determinable or determinate addressees.[608] The Claimant answered that "Venezuelan law does not preclude a law of 'general effect' from being of 'particular applicability'",[609] and pointed to the 2008 Transfer Decree as an example of such type of act.[610] According to the Claimant, the 2008 Transfer Decree was "published in the Official Gazette and creates norms with respect to its subject-matter, but which applies only to a single addressee, PetroSucre".[611]

The Tribunal cannot accept the Claimant's rationale. The 2008 Transfer Decree constitutes a case in point for what Prof. Brewer-Carías and Prof. Lares Martínez jointly refer to as an "individual act", which both deem to be always of

---

[605] OLCAJ, **CLA-111**, Articles 9.1, 23.5 (additional translation by the Tribunal, emphasis added); Organic Law of the Supreme Tribunal of Justice, **CLA-112**, Article 26 (additional translation by the Tribunal, emphasis added).

[606] Organic Law of the Supreme Tribunal of Justice, **CLA-112**, Articles 25.3, 25.14 (additional translation by the Tribunal).

[607] *Supra*, § 309.

[608] Tribunal's letter to the Parties of 3 December 2018, § 8; *supra*, §§ 118-119.

[609] C-PHB, § 92.

[610] *Supra*, § 53.

[611] C-PHB, § 92.

particular effect (i.e. non-normative).[612] Moreover, the publication of an act is not determinative of its normative content. As explained above, normative acts (i.e. acts of general effects or character) are not the only ones that must be published pursuant to the OLAP.[613]

v.   The specialized doctrine does appear to use the terms "general" or "particular" with respect to an act's addressees, although not consistently. Indeed, there appears to be some divergence in the doctrine as to the classification of acts with multiple determinable or determined addressees.[614] In any event, the Tribunal has considerable doubt – and the record certainly does not show – that the phrase "not of general applicability" would have been introduced into Clause 28.1 in consideration of high-level doctrinal debates.

vi.   The distinction between acts of general, particular, or individual applicability and, more broadly, the categorization of state acts according to their addressees, appears to be irrelevant in a private law context.[615] Moreover, the Claimant was unable to determine whether references to such public law distinctions and discussions are common or usual in contracts with public entities in Venezuela.[616] Therefore, it was not established and, in any event, it remains very unlikely to say the least, that the term "general applicability" in Clause 28.1 was intended to reflect Venezuelan public law.

339.   Conversely, to the extent that the phrase "act […] not of general applicability" in Clause 28.1 does "track Venezuelan law" as argued by the Claimant,[617] the Tribunal has established that the 2007 Nationalization Decree may well be considered an act of general applicability for two main reasons. First, the 2007 Nationalization Decree is normative and therefore has indeterminable addressees, which means that the Decree is an act of "general applicability" as defined by the Claimant.[618] As rightly put by the

---

[612] *Supra*, § 326.iii.

[613] *Supra*, §§ 332-333.

[614] *Supra*, § 328.iii.

[615] Transcript, p. 739:3-13 (Brewer-Carías) ("**PRESIDENT LÉVY**: If I may go a little beyond your core competence, but I saw that you have really published a lot, so I'm sure that you may have some examples. Would you have some examples in private law? […]. Would you have any example of when this distinction is used in private law, if it exists at all? **THE WITNESS**: No, in general, it's used the distinction basically by **public lawyers**. You won't find it in texts of **general civil law** because the matters for a civil lawyer is basically **if it is a norm or not**.") (emphasis added)

[616] Transcript, p. 740:19-741:8 (Brewer-Carías).

[617] Reply, § 69; *supra*, §§ 309, 317, 338.

[618] *Supra*, §§ 328.ii, 334.ii, 336-337.

Respondents, "[a]ll normative acts are acts of general applicability".[619] Second, even if deemed to have multiple determinable and determinate addressees, namely, what the Claimant defines as "particular applicability", the 2007 Nationalization Decree would still be considered a "general act" and therefore an act of "general applicability".[620] This reflects the Respondents' submission that, to the extent that the writings of Prof. Brewer-Carías are relevant, and they are, the 2007 Nationalization Decree "would qualify as an act of general effects and as a general act".[621]

340.   The Tribunal could end its analysis here and dismiss the Claimant's Non-Performance Claim. However, for the sake of completeness, the Tribunal will briefly address the third prong of the Parties' dispute regarding the phrase "not of general applicability" in Clause 28.1, namely, the Respondent's submission that, if the phrase "not of general applicability" in Clause 28.1 is interpreted as "commonly understood", the 2007 Nationalization Decree should be considered an act of general applicability as it is non-discriminatory.[622]

> ### iii. Third prong: the interpretation of the phrase "not of general applicability" as "commonly understood"

341.   According to the Respondents, the phrase acts "not of general applicability" in Clause 28.1 must be interpreted as "commonly understood".[623] In particular, they argue that, considering that the Corocoro AA and all other association agreements concluded during the *Apertura Petrolera* constituted a special regime under the 1975 Nationalization Law,[624] the term "not of general applicability" in Clause 28.1 refers to state measures not being applied uniformly within a said special regime, namely, in a "discriminatory fashion".[625] In this regard, the Respondents submit that the 2007

---

[619] R-PHB, fn. 142.

[620] *Supra*, §§ 328.iii, 334.iii.

[621] Rejoinder, § 74.

[622] *Supra*, § 298.

[623] Transcript, p. 1270:3-12 (Respondents' Closing Statement).

[624] *Supra*, §§ 17 ss; 1975 Nationalization Law, **C-6/R-3**, Article 5 ("The State shall carry out the activities indicated in Article 1 of this Law **directly** through the National Executive or **through State-owned entities**, being able to enter into operating agreements necessary for the better performance of its functions, but in no case shall such transactions affect the essence of the reserved activities. **In special cases** and if **convenient for the public interest**, the National Executive or such entities **may**, in the exercise of any of the indicated activities, **enter into association agreements with private entities**, with a participation that guarantees control on the part of the State and with a specified duration. The execution of such agreements shall require the prior authorization of the [Congressional] Chambers in joint session, within the conditions that they establish, once they have been duly informed by the National Executive of all the pertinent circumstances") (emphasis added).

[625] Transcript, p. 1025:1 (García Montoya); *supra*, § 311.iii.

Nationalization Decree is not discriminatory, as it applied to all companies outside the framework of the 2001 Hydrocarbons Law without drawing any differences between its addressees.[626]

342. The Claimant appears to share the Respondents' allegedly common understanding of Clause 28.1. Indeed, in describing the scope of Clause 28.1 as a risk-allocation clause, the Claimant concedes that Clause 28.1 seeks to protect the private parties of the Corocoro AA against "discriminatory act[s] of the Venezuelan state".[627] However, as seen below, the Tribunal fails to see how the 2007 Nationalization Decree results in discriminatory treatment.

343. Under the 2001 Hydrocarbons Law, all activities related to the exploration and extraction of hydrocarbons were reserved to the Venezuelan State. Consequently, any involvement in the exploration and extraction of hydrocarbons required the constitution of an *empresa mixta* in which the State would own more than 50% of the shares.[628] In essence, the 2001 Hydrocarbons Law scaled back the special regime under the 1975 Nationalization Law that led to the conclusion of the association agreements during the *Apertura Petrolera*. Therefore, upon the 2001 Hydrocarbons Law entering into force, all of the said association agreements, including the Corocoro AA and notably the Corocoro CA (executed only in May 2003),[629] fell outside the newly established framework governing the Venezuelan oil industry.

344. The Enabling Law, passed in February 2007 following President Chávez's Speech of January that year announcing the nationalization of *inter alia* the oil industry, sought to address the above anomaly of private associations still operating in the Venezuelan oil industry notwithstanding the 2001 Hydrocarbons Law. Indeed, the Enabling Law expressly mandated the issuance of "Decrees with Rank, Effect and Force of Law", like the 2007 Nationalization Decree, to "regularize and adjust [the] activities" of the associations operating in the New Areas and in the Orinoco Belt. In particular, the Enabling Law intended to make these associations compliant with the "legal framework

---

[626] R-PHB, §§ 69-71; Transcript, p. 850:21-24 (García Montoya).

[627] C-PHB, § 55.

[628] 2001 Hydrocarbons Law, **C-48**, Articles 9, 22.

[629] *Supra*, §§ 36, 38.

[…] govern[ing] the national oil industry" (i.e. the 2001 Hydrocarbons Law), "through the contractual form of mixed enterprises or wholly-owned companies of the State".[630]

345.    In this context, it is recalled that Paragraph 1 of the 2007 Nationalization Decree refers to all "existing associations" between PDVSA's subsidiaries and "the private sector",[631] and, "as a result of the foregoing", Paragraph 2 lists all existing associations.[632] Paragraph 2 of the 2007 Nationalization Decree is therefore redundant, as it adds nothing to the scope of the Decree set out in Paragraph 1.[633] Indeed, as stated by Prof. García Montoya at the Hearing, there was "no other possible party to whom [the] provisions [in the 2007 Nationalization Decree] could apply".[634] In fact, it is undisputed that, by the time the 2007 Nationalization Decree was passed, the associations under its scope were the only ones in Venezuela operating outside the framework of empresas mixtas.[635] Accordingly, the fact that the Corocoro Project was listed in Paragraph 2 among other associations subject to the Decree is irrelevant and not discriminatory. It is true that the 2007 Nationalization Decree could "only apply to the named projects", as argued by the Claimant.[636] However, the result would have been exactly the same with Paragraph 1 alone, which does not name any particular project. Notably, the Claimant does not seem to argue that Paragraph 1 is discriminatory and rightfully so.

346.    It is thus clear that the 2007 Nationalization Decree uniformly achieved its policy aim by bringing all projects not in conformity with the 2001 Hydrocarbons Law into line with other participants in the national oil industry, pursuant to the Enabling Law's mandate. In doing so, the content of the 2007 Nationalization Decree "applie[d] equally" to all projects falling under Paragraph 1 (and by extension Paragraph 2), including the Corocoro Project.[637] In the words of Prof. García Montoya, the 2007 Nationalization

---

[630] Enabling Law, 1 February 2007, **R-59**, Article 1.11 (emphasis added).

[631] 2007 Nationalization Decree, **C-103/R-2**, Article 1, Paragraph 1.

[632] 2007 Nationalization Decree, **C-103/R-2**, Article 1, Paragraph 2.

[633] Supra, § 328.ii.

[634] Transcript, p. 850:21-22 (García Montoya).

[635] R-PHB, § 69; Transcript, p. 34:22-35-1 (Claimant's Opening Statement) ("And let me be clear, this Nationalization Decree could not apply to anyone else because these were the only Associations that pre-dated the 2001 Hydrocarbons Law and, therefore, this Decree was directed at them and only at them."); Transcript, p. 726:1-5 (Brewer-Carías) ("This Act, Decree-Law 5.200, is, on the contrary, an act directed specifically to the existing Association Agreements that existed at the moment on which the Act was 4 enacted").

[636] C-PHB, § 83.

[637] Transcript, p. 850:10-17 (García Montoya).

Decree "could not be any more general",[638] and hence of "general applicability" under Clause 28.1.

347.   In sum, the Claimant has been unable to establish that the 2007 Nationalization Decree singled out or otherwise targeted the Corocoro Project in any way. Therefore, to the extent that the 2007 Nationalization Decree indiscriminately applied to all addressees not already compliant with the *empresas mixas* framework in the 2001 Hydrocarbons Law, the Tribunal finds that the 2007 Nationalization Decree is of "general applicability" for the purposes of Clause 28.1.

### iv. Conclusion on the Non-Performance Claim

348.   For all the reasons set out above, the Tribunal determines that:

   i.   The Respondents failed to perform the Corocoro Contracts from 1 May 2007.

   ii.   The Respondents' non-performance was caused by the 2007 Nationalization Decree, which both Parties agree is external and non-attributable to the Respondents (i.e. a *causa extraña*).

   iii.   The Claimant cannot refer to Clause 28.1 to argue that the Respondents are precluded from relying on the 2007 Nationalization Decree to excuse their non-performance of the Corocoro Contracts. Indeed, Clause 28.1 was not designed to apply against state measures, such as the 2007 Nationalization Decree, that rendered the obligations in the Corocoro Contracts impossible to perform and precluded the continuation of the Corocoro Project. For the same reasons, the Claimant may not refer to Clause 28.1 to claim compensatory damages against the Respondents for their non-performance of the Corocoro Contracts.

   iv.   Even assuming that Clause 28.1 were designed and applicable against state measures such as the 2007 Nationalization Decree, the Decree is an act of "general applicability" in accordance with Clause 28.1. This is so irrespective of whether Clause 28.1 is construed in accordance with Venezuelan administrative law or as "commonly understood". Therefore, the Respondents' failure to perform their obligations under the Corocoro Contracts is excused by the Force Majeure Clause in Clause 28 of the Corocoro Contracts.

---

[638] Transcript, p. 1025:24 (García Montoya).

349.    Consequently, the Tribunal dismisses the Claimant's Non-Performance Claim in its entirety.

### 3.2    Surviving Obligations and Particular Breaches claims

350.    In the previous sections, the Tribunal has established that the Respondents cannot be deemed liable for breaching of the Corocoro Contracts so long as their conduct underlying the alleged breach in question was carried out pursuant to the 2007 Nationalization Decree. It follows that in assessing the Claimant's claims regarding the alleged positive breaches of the Corocoro Contracts, namely, the Surviving Obligations and Particular Breaches claims,[639] the Tribunal must determine whether these are attributable directly to the Respondents' actions and not the result of the 2007 Nationalization Decree.

351.    For the reasons explained in further detail below, the Tribunal finds that only the first *tranche* of the Particular Breaches claims (i.e. the claim concerning the non-repayment of the loan extended to CVP for the acquisition of its 35% interest in the Corocoro Discovery) is attributable directly to the Respondents.[640] Conversely, it is not the Respondents' direct conduct, but rather actions attributable to or stemming from the 2007 Nationalization Decree that amount to all other alleged positive breaches of the Corocoro Contracts.

### a.  _The Surviving Obligations Claim_

352.    The Tribunal has already noted that the Claimant itself argues that the primary basis of its Surviving Obligations Claim is the "Respondents' non-performance" of their obligations under the Corocoro Contracts.[641] Differently stated, the Surviving Obligations Claim and the Non-Performance Claim are, in principle, indistinguishable. For this reason alone, the Tribunal can dismiss the Surviving Obligations Claim because of its dismissal of the Non-Performance Claim.

353.    That said, the Tribunal notes that the Claimant attempts to provide an alternative basis for its Surviving Obligations Claim. In particular, the Claimant argues that, by

---

[639] The Parties' positions with respect to the Surviving Obligations and Particular Breaches claims are set out both in the Overview of the Parties' Positions (*supra*, § I.C) and again in the Parties' detailed positions (*supra*, §§ 186-200, 210, 216).

[640] *Supra*, § 57.ii.b), 196, 214; *infra*, § 365 ss.

[641] Reply, § 43 ("Therefore, Claimant's rights to develop the Corocoro Discovery and to share pro rata in its production and revenue survive the termination of the AA (and the CA). **Respondents' non-performance has denied Claimant its rights under each of these surviving provisions**") (emphasis added); *supra*, §§ 191, 228.

developing the Corocoro Discovery through the formation of an *empresa mixta* with Eni, the Respondents contravened the explicit mandates in the Corocoro AA, according to which the Corocoro Discovery could only be developed by mutual agreement of CVP and the Investors.[642] Moreover, the Claimant argues that by impeding the Claimant from receiving its 32.2075% share of the Project's production and revenue, and instead allocating 74% to CVP and 26% to Eni, the Respondents breached various production and revenue sharing provisions in the Corocoro AA, as well as their good faith obligation under Venezuelan law not to frustrate the interests that the Claimant sought to achieve through the Corocoro Contracts.[643]

354.    In the Tribunal's view, all of the foregoing allegations are the natural result of the Respondents carrying out the mandate set out in the 2007 Nationalization Decree. As is well known, the 2007 Nationalization Decree required the transformation of the associations operating in the New Areas into *empresas mixtas*, where PDVSA (or its designated subsidiary) would hold at least 60% of the shareholding, and the Investors of the formerly private associations would hold the rest. These *empresas mixtas* would then continue to operate primary hydrocarbon activities in the New Areas at issue *in lieu* of the corresponding former private association.

355.    The Claimant therefore cannot seek to attribute any fault to CVP for entering into an *empresa mixta* with Eni (i.e. PetroSucre),[644] where CVP holds a participation in excess of the 35% envisaged in the Corocoro Contracts, and where Conoco, as an Investor not willing to migrate to the *empresas mixtas* model, could no longer develop and thus profit from the exploitation of the Corocoro Discovery. Simply put, the cause of all of the Claimant's complaints under its Surviving Obligations Claim is the direct consequence of the 2007 Nationalization Decree. For that reason, the Surviving Obligations Claim has to be dismissed in its entirety.

> ### b. *The Particular Breaches Claim*

356.    The Claimant's Particular Breaches claim has three *tranches*: **(i)** the alleged replacement of the Corocoro Project's management structure; **(ii)** the execution of the CVP-Eni MoU and the CVP-Eni Conversion Contract; and **(iii)** the non-repayment of

---

[642] *Supra*, § 192.

[643] *Supra*, § 193-194.

[644] *Supra*, §§ 199-200.

the loan granted by the Investors to CVP for it to acquire its 35% interest in the Corocoro Discovery. The Tribunal addresses each *tranche* in turn.

### i. The replacement of the Corocoro Project's management structure

357.  The Claimant argues that, by instituting the Transition Committee in March 2007 and relieving the Claimant as Operator on 1 May 2007, the Respondents replaced the existing management structure of the Corocoro Project in breach of various specific provisions of the Corocoro AA providing for the Claimant's rights of oversight and control of Project activities.[645] However, even if the Claimant's allegations are *arguendo* accepted to be correct, the Claimant has failed to establish how any of the measures taken by the Transition Committee were not the mere result of the 2007 Nationalization Decree.

358.  First, the Tribunal recalls that, pursuant to Article 3 of the 2007 Nationalization Decree, PDVSA assumed full operational control of the Corocoro Project from 1 May 2007 onwards.[646] Second, it is not controversial that Article 3 of the 2007 Nationalization Decree also required the constitution of a Transition Committee for the Corocoro Project. This Transition Committee was to be "incorporated to the current board of directors of the respective association, in order to guarantee the transfer of control to the state company of all the activities being performed by the associatio[n]".[647] Therefore, both the institution of the Transition Committee and the direct operatorship of the Project by PDVSA (as opposed to through Conoco as a contractually regulated Operator), directly stem from the implementation of the 2007 Nationalization Decree.

359.  Moreover, the Claimant has not individualized the instances of how exactly the Transition Committee allegedly prevented the Management Company and the Control Committee from directing and supervising the Project's activities, nor the resulting harm. In any event, the Transition Committee could not have enforced the governance provisions in the Corocoro AA if it were to "guarantee" the transfer of control of all the Project's primary activities "performed" by the "associatio[n]", as required by Article 3 of the 2007 Nationalization Decree.

---

[645] Supra, §§ 197-198.

[646] *Supra*, § 49.i.

[647] 2007 Nationalization Decree, **C-103/R-2,** Article 3.

360.    For the above reasons, the Tribunal finds that the Claimant's submissions with respect to the replacement of the Project's management structure fail.

### ii. The execution of the CVP-Eni MoU and Conversion Contract

361.    According to the Claimant, the Respondents "affirmatively disclaimed" all of their obligations under the Corocoro Contracts while still afoot by entering into the CVP-Eni MoU and the CVP-Conversion Contract on 26 June 2007 and 30 November 2007, respectively.[648] In particular, the Claimant argues that "nothing in the Nationalization Decree or any other Venezuelan law mandated Respondents to enter into [these contracts] with Eni prior to the termination of the Corocoro AA".[649]

362.    The Tribunal cannot accept the Claimant's submissions. As rightly pointed out by the Respondents, the Claimant's position on this point cannot be reconciled with the terms of the 2007 Nationalization Decree.[650] The 2007 Nationalization Decree gave the "private sector companies" formerly operating the Corocoro Project until 26 June 2007 to "agree on the terms and conditions of their possible participation" in a new *empresa mixta*.[651] Unlike the Claimant, Eni did agree to participate in a new *empresa mixta* and recorded its "basic agreement" to that effect in the MoU concluded with CVP by the statutory cut-off date of 26 June 2007.[652] Eni subsequently confirmed this "basic agreement" to migrate to the *empresas mixtas* regime by entering into the more detailed Conversion Contract with CVP. In short, "everything CVP did" was in strict compliance with the 2007 Nationalization Decree.[653]

363.    Therefore, it is irrelevant that the MoU and the Conversion Contract were concluded prior to the formal extinguishment of the Corocoro Contracts through the 2008 Transfer Decree.[654] Likewise, the fact that CVP and Eni entered into negotiations that would lead to the execution of their MoU prior to 26 June 2007 adds nothing to the Claimant's case. The Investors were expected to agree to the basic terms of their possible

---

[648] *Supra*, §§ 199-200.

[649] Reply, § 57.

[650] *Supra*, § 216.

[651] 2007 Nationalization Decree, **C-103/R-2,** Article 4.

[652] CVP-Eni MoU, **R-100**, § 1 ("The Parties confirm that they have reached a **basic agreement** for the constitution and operation of a mixed company in accordance with the Organic Hydrocarbons Law (the "Mixed Company"), which will assume the operations and activities of the Project in accordance with what is established in the Decree-Law.") (emphasis added).

[653] *Supra*, § 216.i.

[654] *Supra*, § 53.

participation in a new *empresa mixta* by 26 June 2007. By definition, any negotiations for that to occur must have commenced prior to 26 June 2007 pursuant to the 2007 Nationalization Decree. The Tribunal thus finds no merit in the Claimant's submissions that CVP breached the good faith principle by engaging in negotiations with Eni even "before the Respondents assumed the activities of the Project on 26 June 2007".[655]

364.    In sum, the Claimant's submissions regarding the CVP-Eni MoU and the CVP-Conversion Contract fail.

### iii. The non-repayment of the loan

365.    The Claimant argues that the Respondents have breached the Corocoro Contracts by not repaying the loan extended by the Investors to CVP for it to acquire its 35% interest in the Corocoro Discovery.[656]

366.    The Respondents do not contest that the loan to CVP remains unpaid, but submit that (i) the Claimant's claim with respect to the non-repayment of its portion of the loan "is not the basis of any request for relief";[657] and that (ii) "the condition for repayment of the loan [(pursuant to Clause 8.5 of the Corocoro AA and of Section 8.2 of Annex D of the AA)] was never met".[658]

367.    The Tribunal turns to each of the Respondents' two arguments.

368.    The Respondents' first argument is unavailing. It is true that the Claimant does not dedicate a specific prayer for relief to requesting the repayment of its portion of the loan. However, the Claimant does seek a declaration from the Tribunal that CVP "breached its contractual obligations under [*inter alia*] the Association Agreement", including CVP's obligation to repay the loan, and that both CVP and PDVSA are "liable fully to compensate Claimant accordingly".[659] Moreover, the Claimant also requests the Tribunal to "awar[d] any other appropriate restitutionary compensation [or] gran[t] such additional or other relief as may be justified in law and equity".[660]To that effect, the value of the loan and accrued interest (up to an earlier date) were included as part of the

---

[655] C-PHB, § 45; *supra*, § 200.

[656] *Supra*, § 35-37.

[657] SoD, § 123; Rejoinder, fn. 68.

[658] Rejoinder, fn. 68; SoD, § 123.

[659] *Supra*, § 140.

[660] *Supra*, § 140.

Claimant's damages calculation from the very outset.[661] Indeed, Messrs. Abdala's and Zadicoff's first quantum expert report stated the following:

> According to the Association Agreement, all costs related to exploration and discovery at the fields were financed solely by the private investors. In exchange for not sharing financing risks with its private partners in the early investment stages, CVP agreed to allow the joint venture to transfer to the private investors (including Claimant), cash flows to which CVP would otherwise have been entitled as an equity holder, up to an amount that would **allow the private partners to recover CVP's pro-rata portion of the exploration and discovery costs already incurred**. Payment of this reimbursement was to take the form of an interest-bearing loan, which would be deemed to be loaned to CVP in dollars by the private investors at the date of declaration of commerciality. **The loan would constitute the payment of CVP's purchase of its participation in the joint venture, and would bear interest at a rate of LIBOR +1%**.
>
> Based on its **50% participation** stake in the Project during the **exploration** and **discovery stages**, we forecast that ConocoPhillips will recover half of the reimbursements in any year, paid out of available cash at the Project, until all costs have been fully recovered by the private investors.[662]
>
> […]
>
> According to the 2006 Project financial statements, the estimated acquisition price to be paid by CVP for its participation in the Project equaled **US$67.4 million**, plus **US$6.2 million** in accumulated interest as of **December 2005**.[663]

369.   The Respondents or their quantum experts have not challenged the Claimant's calculation of the principal amount of the loan to CVP (i.e. USD 67.4 million). Similarly, the Respondents do not question that, considering Conoco's 50% participation in the Corocoro Project at the moment the loan was extended to CVP,[664] the amount payable by CVP to the Claimant for the repayment of its portion of the loan would be 50% of the loan's principal amount (i.e. USD 33.7 million). It is likewise not controversial that, pursuant to Clause 8.5 of the Corocoro AA, the principal loan amount carried interest at a "rate of LIBOR plus 1% *per annum*, accruing from the date of the […] Declaration of Commerciality" of the Corocoro Discovery until payment.[665] Consequently, not only does the Claimant's prayer for relief cover the non-repayment of the loan by CVP (both on the basis of the Corocoro Contract and Venezuelan law), but the amount payable

---

[661] C-PHB, § 50.

[662] Abdala & Zadicoff ER I, **CER-3**, § 166-167 (emphasis and underline added).

[663] Abdala & Zadicoff ER I, **CER-3**, fn. 140, referring to Proyecto Golfo de Paria Oeste, Informe Especial de los Contadores Públicos Independientes y Reporte del Uniform Reporting System (URS), 31 December 2006, **CLEX-54**, Note 9, p. 16 (emphasis added).

[664] *Supra*, § 29, 35-36.

[665] Corocoro AA, **C-1**, Clause 8.5 and Annex D, Section 8.2.2; Letter from the Investors to CVP, 22 October 2002, **C-53**; *supra*, § 32.

by CVP to the Claimant for its portion of the loan and corresponding interest are undisputed.

370. The Tribunal now turns to the Respondents' second argument, namely, the alleged non-fulfillment of the "condition" for the loan repayment. According to Clause 8.5 of the Corocoro AA, the "principal and interest" on the loan to CVP "shall be payable" by CVP "solely" with CVP's "net after-tax cash flow from the related Development Area, […] calculated in accordance with the Accounting Procedures" in Annex D of the Corocoro AA.[666] In particular, Section 8.2.3 of Annex D of the Corocoro AA states that the loan "shall be payable" in "quarterly installments", with the "amount payable" being the "lesser of" (i) "the entire outstanding principal amount and all accrued interest"; or (ii) CVP's net after-tax cash flow for the relevant quarterly installment as determined pursuant to the formula set out in Section 8.4 of Annex D.[667] In this regard, the Tribunal notes the following:

    i.  While the Respondents affirm that the "condition" for the repayment of the loan "was never met",[668] the Respondents do not sufficiently, if at all, explain why that is the case.

    ii. Conversely, other than asserting that the Respondents have received "substantial cash flows from the Corocoro Development Area (although it may now be named something else)",[669] the Claimant has not attempted to establish whether or to what extent CVP's cash flows from the Corocoro Development Area can be deemed "net after-tax" pursuant to the accounting procedures in Annex D of the Corocoro AA.

    iii. The Claimant points to CVP's agreement to repay Eni for its portion of the loan, as recorded in the CVP-Eni Conversion Contract,[670] to argue that the

---

[666] Corocoro AA, **C-1**, Clause 8.5; Corocoro AA, **C-1**, Clause 8.5 (original in Spanish), p. 209 of PDF ("*El capital y los intereses de ese préstamo serán pagaderos por CVP, únicamente con el flujo de caja neto reputado después de impuestos de CVP, proveniente de esa Área de Desarrollo, calculado de acuerdo con los Procedimientos Contables*").

[667] Corocoro AA, **C-1**, Annex D, Sections 8.2.3, 8.4.1.

[668] Rejoinder, fn. 68; SoD, § 123.

[669] Reply, § 59; C-PHB, § 49.

[670] CVP-Eni Conversion Contract, **C-267/R-101**, Article 2 ("As part of the process of creating the Mixed Company and the effects of paying the amounts owed by CVP to Eni for exploration expenses and costs incurred by the latter during the Exploration Phase of the **Association Agreement**, CVP hereby **assigns** to Eni the **right** to receive any distributions of dividends or other sums which would otherwise have corresponded to CVP **until such time as the amount reaches** thirty million, seven hundred fifty-nine thousand United States dollars (**US $30,759,000**) plus the respective interest calculated beginning on the date of the **commercial discovery declaration** associated with the

Respondents' own conduct suggests that the "condition" for the repayment of the loan has been met.[671] However, unlike the Corocoro AA, the CVP-Eni Conversion Contract does not appear to subject Eni's loan repayment to any particular requirement. In any event, the fact that CVP has agreed to repay Eni for its portion of the loan under the CVP-Eni Conversion Contract is not necessarily indicative of the fulfillment of the conditions set out in the Corocoro AA.

371.   Therefore, the Claimant has not established whether the Respondents have failed to repay the loan to the Claimant pursuant to the specific terms of the Corocoro Contracts. That said, as explained below, the non-fulfillment of the requirements in Clause 8.5 of the Corocoro AA and in Annex D of the same has no impact on CVP's obligation to repay the Claimant's portion of the loan.

372.   It is correct that the requirements set out both in Clause 8.5 and Annex D of the Corocoro AA presumed the continuation of the Corocoro Project. As repeatedly stated by the Tribunal, the 2007 Nationalization Decree rendered the performance of the Corocoro Contracts impossible from 1 May 2007 onwards, and precluded the continuation of the Corocoro Project in its entirety as of 26 June 2007. It follows that the requirements in Clause 8.5 and Annex D could not be given any effect as of then.

373.   However, contrary to what appears to be the Respondents' submission, neither the requirements in Clause 8.5 nor Annex D purport to act as conditions precedent for CVP's obligation to repay the loan with an interest "rate of LIBOR plus 1% *per annum*, accruing from the date of the […] Declaration of Commerciality" of the Corocoro Discovery until payment.[672] Rather, these provisions constitute simple modalities of payment and identify the origin of the cash flows from where CVP expected to fulfill its loan repayment obligation, nothing more. Therefore, the fact that the 2007 Nationalization Decree may have rendered the loan's payment modalities and cash flow origin requirement inoperative has no bearing on CVP's independent obligation to repay the loan with all accrued interest, more so considering that this obligation is of monetary character. Money, by definition, represents an imperishable class of goods. Accordingly, a *causa extraña* such as the 2007 Nationalization Decree cannot

---

exploration expenses and until the date on which the sum is paid in full, at an annual rate equal to the LIBOR plus one (1) percentage point")(emphasis added).

[671] Reply, § 59; C-PHB, § 49.

[672] Corocoro AA, **C-1**, Clause 8.5 and Annex D, Section 8.2.2; Letter from the Investors to CVP, 22 October 2002, **C-53**; *supra*, § 32.

extinguish or otherwise excuse CVP's failure to comply with its loan repayment obligation.

374. Furthermore, unlike the requirements in Clause 8.5 and Annex D of the Corocoro CA, CVP's loan repayment obligation is not contingent on the overall performance of the Corocoro Contracts made impossible in light of the 2007 Nationalization Decree. The Decree ordered that "all activities carried out by the strategic associations of the Orinoco Belt [and the New Areas] shall be transferred to the new mixed companies".[673] It was the transfer of these primary exploration and exploitation "activities" that prevented the Investors and CVP from performing the Corocoro Contracts. Yet, neither the loan nor its repayment can be characterized as an "activity", as exploration or as exploitation, for the purposes of the 2007 Nationalization Decree. Consequently, the Respondents cannot rely on the Decree and/or on Clause 28.1 to excuse their failure to repay the loan.

375. For the reasons set-out above, the Tribunal finds that the Respondents have breached their obligation to repay to the Claimant its portion of the loan extended to CVP for the acquisition of its 35% interest in the Corocoro Discovery, and that this breach is directly attributable to the Respondents as opposed to the 2007 Nationalization Decree. In this regard, the Tribunal will order the Respondents to repay the Claimant's undisputed portion of the loan, which, as seen above (i) amounts to USD 33.7 million; and (ii) carries interest of LIBOR plus 1% *per annum*, accruing from the date of the Declaration of Commerciality of the Corocoro Discovery (i.e. 22 October 2002) until payment.

### 3.3    Damages for the breach of the Corocoro Contracts

376. In the preceding sections the Tribunal has concluded that, assuming (*arguendo*) that the Claimant retained the right to seek damages for the alleged breach of the Corocoro Contracts (despite the implementation of the 2007 Nationalization Decree), only one of the Claimant's Contractual Claims can give rise to the Respondents' civil liability for breach of contract under Venezuelan law. In particular, the Tribunal has concluded that the Respondents have failed to repay to the Claimant its portion of the loan extended to CVP for the acquisition of its 35% interest in the Corocoro Discovery. Accordingly, as indicated at the outset of its analysis,[674] the Tribunal will now address the Respondents' broader submission in this arbitration: that no case of contractual breach

---

[673] 2007 Nationalization Decree, **C-103/R-2**, Article 1, paragraph 2.

[674] *Supra*, § 235.

may exist in the present case because, following the expropriation and extinguishment of the Corocoro Contracts pursuant to the 2007 Nationalization Decree, no substantive obligations remained to be breached and, by consequence, no rights to be claimed or enforced by the Claimant.[675]

377. As explained below, the Tribunal cannot accept the Respondents' expropriation defense with respect to the failure to repay the Claimant's portion of the loan.

378. In short, the Tribunal agrees with the Claimant's submission that the 2007 Nationalization Decree "did not and could not apply retroactively so as to strip the Claimant of rights that had vested prior to the dispossession of the Corocoro Project".[676] Such a retroactive application of law would run contrary to Article 24 of the Venezuelan Constitution,[677] as confirmed by the Venezuelan Supreme Court.[678] Thus, to the extent that the 2007 Nationalization Decree could only apply prospectively from the moment of its issuance, it does not preclude a claim for damages for contractual breach in relation to "already vested rights".[679] Notably, Prof. García Montoya confirmed the Tribunal's foregoing understanding at the Hearing.[680]

379. In this context, the Tribunal finds that the Claimant's right to the repayment of its portion of the loan vested prior to the 2007 Nationalization Decree and the subsequent extinguishment of the Corocoro Contracts. In particular, the Tribunal is of the view that

---

[675] *Supra*, §§ 231-232, 235.

[676] C-PHB, § 14.

[677] C-PHB, § 119, referring to ICC P&H Arbitration, **R-0** (Venezuelan Constitution, **CMB-22**, Article 24) ("No legislative provision shall have retroactive effect, except where it imposes a lesser penalty. Procedural laws shall apply from the moment they go into effect, even to proceedings already in progress; however, in criminal proceedings, evidence already admitted shall be weighed in accordance with the laws that were in effect when the evidence was admitted, insofar as this benefits the defendant. When there are doubts as to the rule of law that is to be applied, the most beneficial to the defendant will prevail").

[678] C-PHB, § 120, referring to Supreme Court of Justice (Constitutional Chamber), Decision No. 15, 15 February 2005, **CLA-124** ("[W]hen the new law affects the past legal consequences of a legal premise consolidated before its entry into force [....] there is no doubt that the new Law will have authentic retroactive effects, because it affects the very existence of factual premises (acts, facts or legal transactions) or the legal consequences already consolidated of such factual premises that occurred before the new Law entered into force, in contradiction with the principle '*tempus regit actum*,' and consequently, with the rule of article 24 of the Constitution").

[679] C-PHB, § 14.

[680] Transcript, p. 936:4-13, 938:12-24 (García Montoya) ("The subjective right that Conoco had, had already been born; and, in my opinion, in [ICC P&H Arbitration], it was a vested right, an acquired right. But the Agreement, of course, it was extinguished for the future. We have to differentiate two things, the rights acquired before the Decree, well, I think this is undoubted, those have could have existed. Now, contractual rights were terminated, and you cannot acquire rights after the termination of the Contract. [...] **Q.** I've understood that you accept that if there is a vested right that is already vested before the extinguishment; obviously the extinguishment cannot impair that right; yes? **A.** Those prior to a public policy law are rights 16 vested. We have no vested right after. [...] **Q.** So, I think your answer to my question was "yes." If there is a right that is already vested before the 21 extinguishment, the extinguishment cannot impair it; yes? **A.** That is correct [...]).

said right vested upon the Claimant's extension of the loan to CVP in 2003 at the latest.[681] Indeed, as already established, the requirements in Clause 8.5 and Annex D of the Corocoro AA, which could have only materialized after the 2007 Nationalization Decree, have no bearing on the Respondents' obligation to repay the loan.

380.  Importantly, the Tribunal notes that, according to the Respondents, the "Claimant's theory of vested rights cannot be sustained under the applicable law for two fundamental reasons: (i) [the 2007 Nationalization Decree] is unquestionably a law of public policy in Venezuela; and (ii) under well-established Venezuelan doctrine, no one may assert rights opposed to a law of public policy".[682] In this regard, the Tribunal recalls that it is common ground between the Parties that the 2007 Nationalization Decree is a law of public policy.[683] However, neither the Claimant's right to the repayment of its portion of the loan with interest, nor the Tribunal's decision to enforce that right, overrides or otherwise ignores the provisions of the 2007 Nationalization Decree. As confirmed by Prof. García Montoya at the Hearing, only rights or claims concerning loss of profit or equating to the specific performance of the Corocoro Contracts run contrary to the Decree.[684] Evidently, the repayment of the Claimant's portion of the loan with interest does not fall within either of these two categories of claims. Therefore, the Tribunal dismisses the Respondents' expropriation defense.

381.  In any event, to support its decision further if at all necessary, the Tribunal will now assume, for the sake of argument, that Venezuelan law, including the principle that the Parties should by law perform their contractual obligations, would not uphold its above reasoning and finding with respect to the Respondents' obligation to repay the Claimant's portion of the loan. In this context, the Tribunal relies on its *amiable compositeur* powers. In particular, the Tribunal notes that the loan intended to finance CVP's proportional contribution to all the exploration and discovery costs. Up to the declaration of commerciality of the Corocoro Discovery,[685] only the private Investors incurred these exploration and discovery costs. In other words, the repayment of the loan sought to place CVP in the same position in terms of incurred costs as the private Investors, in order to justify CVP's participation in the distribution of revenues stemming from the exploitation of the Corocoro Discovery. Therefore, it would be manifestly unjust

---

[681] *Supra*, § 35.

[682] R-PHB, § 29.

[683] *Supra*, § 165

[684] Transcript, p. 1020:24-1021:4, 1029:1-10 (García Montoya).

[685] *Supra*, § 32.

and unfair if CVP were allowed to enjoy proceeds from the exploitation of the Corocoro Discovery (as it currently does), without first re-paying its portion of the exploration and discovery costs that led to the Corocoro Discovery. The unfairness and inequity of this would be underscored by the fact that, as noted by the Claimant, the "Respondents have identified no provision of Venezuelan law [entitling] them to retain the value of Claimant's portion of the loan that it extended to CVP".[686]

382.   To ensure that the Claimant is not placed in an unfair and inequitable situation, the Tribunal confirms its determination that the Respondents must repay USD 33.7 million for its portion of the loan. Moreover, also on the basis of its *amiable compositeur* powers, the Tribunal finds it appropriate to grant interest on the foregoing principal amount at a rate of LIBOR plus 1% *per annum*, accruing from 22 October 2002 until payment.[687]

383.   It is undisputed that, according to Clause 8.5 of the Corocoro AA, the loan extended to CVP would carry interest at a "rate of LIBOR plus 1% *per annum*" as of the date of the "Declaration of Commerciality" of the Corocoro Discovery.[688] This "Declaration of Commerciality" occurred on 22 October 2002.[689] Therefore, the fact that interest on the loan's principal amount accrues as of 22 October 2002 should not be controversial, especially when the Parties have not discussed any other interest applicable to the repayment of the loan. In any event, as seen above, the loan sought to finance CVP's share of exploration and discovery costs. The Tribunal thus finds no reason to condition the interest on the loan to any date that, being later than 22 October 2002, would deal with the distinct aspect of the development or exploitation of the Corocoro Discovery. Overall, in light of equity and fairness considerations, the Tribunal finds that both the aforementioned interest rate and interest accrual date are appropriate, given that they represent the Parties' expectations with respect to the repayment of the loan extended to CVP, at the relevant time.

384.   For the avoidance of doubt, the Tribunal is aware that, in exercising its *amiable compositeur* powers, it may not contradict mandatory rules of public policy under Venezuelan law.[690] However, as explained earlier, the Tribunal's decision that the Respondents must repay to the Claimant its portion of the loan extended to CVP for its

---

[686] C-PHB, § 176.

[687] *Supra*, § 369.

[688] *Supra*, §§ 368-369.

[689] *Supra*, § 32.

[690] *Supra*, § 165.

acquisition of 35% of the Corocoro Discovery, does not contradict Venezuelan public policy.

**C.**   *HECHO ILÍCITO CLAIM*

   *1. The Claimant's Position*

385.   In the alternative to its Contractual Claims, the Claimant argues that the Respondents' "conduct in destroying" the Corocoro AA also attracts liability under the principle of *hecho ilícito* enshrined in Article 1185 of the VCC, as the Respondents "intentionally caused"[691] harm to the Claimant by "obtain[ing] the Nationalization Decree".[692] Pursuant to Article 1185 of the VCC:

> Whoever intentionally, negligently or recklessly, has caused damage to another has the obligation to repair it. Similarly, a party who has caused someone else damage, surpassing in the exercise of his rights the limits established by good faith, or by the object in light of which that right has been granted, is equally bound to repair it.[693]

386.   In light of the above, the Claimant reiterates the sequence of events leading up to its dispossession and destruction of the Corocoro AA. Accordingly, it argues that all four elements constitutive of an *hecho ilícito* requiring reparation (i.e. existence of fault, damage, liability to indemnify, and causation) have been satisfied in the case at hand.[694]

387.   In this context, the Claimant clarifies that "the same conduct and relationship may give rise to both contractual and extra-contractual liability (as alternative claims), and thus *hecho ilícito* can arise despite the existence of a contractual relationship".[695]

   *2. The Respondents' Position*

388.   The Respondents note that, despite being listed as an alternative prayer for relief in its Reply, the Claimant has not developed or otherwise put forward its claim for *hecho ilícito* since its Statement of Claim. In this context, the Respondents submit that: (i) as a matter of Venezuelan law, the Claimant cannot assert *hecho ilícito* alongside its claim

---

[691] SoC, § 217.

[692] SoC, §§ 198, 218(d).

[693] VCC, **CLA-2**, Article 1185.

[694] SoC, § 218.

[695] SoC, § 219.

for breach of contract; (ii) compliance with law cannot constitute unlawful conduct; and (iii) the element of causation necessary for a claim of *hecho ilícito* is not satisfied.[696]

389. Moreover, the Respondents stress that the Tribunal in the ICC P&H Arbitration already dismissed the ICC P&H Claimants' identical claim for *hecho ilícito*, on the basis that the requirements for coexistence of contractual and extra-contractual liability had not been met.[697] According to the Respondents, the same reasoning is equally applicable in the present case, which, in their view, presumably explains why the Claimant remained silent on this issue in its Reply.[698]

### 3. *Analysis*

390. The Tribunal notes that the Claimant's *hecho ilícito* claim, as formulated in its SoC, is premised on the Respondents' alleged conduct in destroying the Corocoro AA by being instrumental in the issuance of the 2007 Nationalization Decree. The Claimant has not updated its position since. As noted by the Respondents, despite appearing in the Claimant's prayer for relief,[699] the *hecho ilícito* claim was not broached or otherwise developed in either of the Claimant's subsequent written submissions or at the Hearing.[700]

391. As a threshold matter, the Tribunal notes that the Claimant conceded at the Hearing that the 2007 Nationalization is extraneous and non-attributable to the Respondents.[701] Differently stated, the basis for the Claimant's *hecho ilícito* claim is no longer alleged. In any case, there is no ground for the Tribunal to depart from its reasoning in the ICC P&H Award,[702] as possibly also recognized by the Claimant which remained silent on this claim after the SoC. Therefore, the Tribunal dismisses the Claimant's *hecho ilícito* claim in its entirety.

---

[696] Rejoinder, § 87.

[697] Rejoinder, § 88.

[698] Rejoinder, § 89.

[699] *Supra*, § 140.

[700] R-PHB, fn. 7.

[701] *Supra*, § 229.

[702] ICC P&H Award, **CLA-120**, §§ 494-513.

### D.   *UNJUST ENRICHMENT CLAIM*

#### 1.   *The Claimant's Position*

392.   In the further alternative, the Claimant submits that pursuant to Article 1184 of the VCC, the Respondents are liable for unjust enrichment as a result of the "confiscation" of the Claimant's interests in the Project.[703] Article 1184 of the VCC reads as follows:

> A person who receives unjust enrichment to the detriment of another person, shall be obligated to indemnify such person, within the limits of his own enrichment, of all amounts by which the other party has been impoverished.[704]

393.   According to the Claimant, all four elements constitutive of unjust enrichment (i.e. the Claimant's impoverishment, the Respondents' enrichment, said enrichment being unjust, and causation) have been satisfied in the case at hand.[705] Regarding the unjust nature of the Respondents' alleged enrichment, the Claimant submits the following:

> Respondents had no valid legal right to Claimant's stake in the Project, and were instrumental in this taking. Respondents' direct involvement in the confiscation is fundamentally inconsistent with their actions in inducing Claimant to invest in Venezuela during the Apertura, and their promises to act as Claimant's long-term joint venture partner in the Project, and loyally promote its success. Respondents' actions were deliberate, and they cannot point to the confiscatory laws that they secured to justify or excuse their possession of Claimant's interest in the Corocoro Project".[706]

394.   Moreover, the Claimant argues that the 2007 Nationalization Decree itself is contrary to Venezuelan and international law.[707]

395.   Acknowledging that under Venezuelan law unjust enrichment is a "subsidiary" remedy (i.e. only available in the absence of any other legal remedy), the Claimant's claim for unjust enrichment is presented only in the alternative to its contractual breach claims and extra-contractual claim of *hecho ilícito*.[708]

---

[703] SoC, § 220.

[704] VCC, **CLA-2**, Article 1184.

[705] SoC, § 221.

[706] SoC, § 221(c).

[707] C-PHB, §§ 170-176.

[708] SoC, § 222.

### 2.   *The Respondents' position*

396.   Similarly to the Claimant's position, the Respondents state that the four elements for unjust enrichment to arise pursuant to Article 1184 of the VCC are: (i) the enrichment of one party; (ii) the impoverishment of the other party; (iii) a relationship of cause and effect between the impoverishment and the enrichment; and (iv) the absence of a cause or legal justification for the enrichment.[709] Moreover, and albeit not expressly dealing with the causal link between the impoverishment and the enrichment, the Respondents do not seem to dispute that the Claimant was impoverished while the Respondents were enriched.[710]

397.   The Respondents argue, however, that the Claimant has failed to establish the absence of a legal justification or cause for their enrichment to be deemed unjust. According to the Respondents, Venezuelan doctrine and jurisprudence (in line with French and Italian law)[711] is unanimous on how an enrichment is not without cause (hence not unjust) if it is "derived by operation of law".[712] Therefore, in light of the fact that the Respondents' enrichment was mandated by law (i.e. the 2007 Nationalization Decree and its implementation), "the possibility of any claim based on a theory of unjust enrichment is clearly excluded".[713] According to the Respondents, the Claimant's argument that the 2007 Nationalization Decree is unlawful and therefore cannot constitute a legal justification for the alleged impoverishment is baseless. A law enacted in Venezuela, such as the 2007 Nationalization Decree, is presumed valid until overturned by a Venezuelan court, and that has not happened in this case.[714]

398.   Turning to the principle of subsidiarity governing a claim for unjust enrichment,[715] the Respondents submit that the Claimant misapplies its content. According to the Respondents, Venezuelan doctrine and jurisprudence (again tracking Italian and French law)[716] is unanimous on how, correctly applied, this principle requires that a claim for unjust enrichment may only be exercised when there is no other action

---

[709] SoD, § 128.

[710] SoD, § 133.

[711] SoD, § 132.

[712] SoD, § 131-132.

[713] Rejoinder, § 92.

[714] R-PHB, §§ 95-98.

[715] *Supra*, § 395.

[716] SoD, § 136.

available to the impoverished party arising out of any other source of obligations that can be exercised instead.[717] Therefore, as the Claimant has asserted various claims for breach of contract and an *hecho ilícito* claim against the Respondents (in addition to the action brought against Venezuela before ICSID in order to obtain compensation for the expropriation of its rights in the Corocoro Project), its claim for unjust enrichment is inadmissible.[718]

### 3. *Analysis*

399. The Parties essentially agree on the elements necessary for unjust enrichment to arise pursuant to Article 1184 of the VCC. In particular, it is common ground between the Parties that unjust enrichment claims under Venezuelan law can only be brought: (i) in the absence of any other legal remedy (i.e. the so-called subsidiarity principle); and (ii) when the enrichment of one party at the expense of the impoverished party has no legal justification or cause. As seen below, the Claimant's unjust enrichment claim does not meet either of the above two threshold requirements.

#### 3.1 *The subsidiarity principle requirement*

400. The Claimant's unjust enrichment claim in this arbitration does not comply with the subsidiarity principle governing unjust enrichment claims. According to the Claimant, its unjust enrichment claim is only "asserted on an alternative, and therefore subsidiary basis".[719] However, the Respondents have provided ample authority showing that, under Venezuelan law, an action for unjust enrichment cannot be raised if another cause of action providing for a potential remedy (be it for breach of contract or *hecho ilícito*) may be initiated.[720] More pertinently, Venezuelan courts have held that "unjust enrichment action [cannot] proceed when a contractual relation existed between the parties".[721] Notably, the Claimant has not rebutted any of the Respondents' authorities.

---

[717] SoD, § 134-137.

[718] Rejoinder, § 93.

[719] C-PHB, § 169.

[720] Eloy Maduro Luyando, COURSE ON OBLIGATIONS: CIVIL LAW III (9th ed., Universidad Católica Andrés Bello 1995), **App. GM-3,** pp. 723-724; CIVIL CODE OF VENEZUELA: BACKGROUND / CODIFYING COMMISSIONS / PARLIAMENTARY DEBATES / JURISPRUDENCE / DOCTRINE / CONCORDANCES (Universidad Central de Venezuela 1981), **App. GM-18**, pp. 418-419, *citing* Antonio Planchart Hernández, *Annotated Jurisprudence*, in B.T.D.F. (Editorial Sucre 1958), pp. 16-17; Emilio Pittier Sucre, *Unjust Enrichment*, in CENTENARIO DEL CÓDIGO DE COMERCIO VENEZOLANO DE 1904, VOL. I (Academia de Ciencias Políticas y Sociales 2004), **App. GM-6,** p. 265; Rafael Bernad Mainar, PATRIMONIAL CIVIL LAW: OBLIGATIONS, VOL. II (Universidad Católica Andrés Bello 2006), **App. GM-4,** pp. 449-450; Oscar E. Ochoa G., GENERAL THEORY OF OBLIGATIONS, CIVIL LAW III, VOL. II (Universidad Católica Andrés Bello 2009), **App. GM-19**, p. 529.

[721] CIVIL CODE OF VENEZUELA: BACKGROUND / CODIFYING COMMISSIONS / PARLIAMENTARY DEBATES / JURISPRUDENCE / DOCTRINE / CONCORDANCES (Universidad Central de Venezuela 1981), **App. GM-18,**

Therefore, that the Claimant brings its unjust enrichment claim alternatively to its other contractual and extra contractual claims is insufficient to comply with the subsidiarity principle. On this basis alone, the Claimant's unjust enrichment claim fails.

### 3.2   The lack of a legal justification or cause requirement

401. The Tribunal also finds that the Claimant has failed to establish that its purported impoverishment has no cause or legal justification. The Claimant's primary argument in this respect is that the 2007 Nationalization Decree cannot serve as a legal justification for the Respondents' enrichment (at the expense of the Claimant) given the Respondents' allegedly essential participation in procuring the 2007 Nationalization Decree.[722] However, the Claimant raised this argument in its SoC, "not a word about unjust enrichment" was included in the Reply,[723] and is now moot in light of the Claimant's unavoidable concession at the Hearing (in view of the ICC P&H Award) that the 2007 Nationalization Decree is extraneous and non-attributable to the Respondents.[724]

402. The Claimant's secondary argument that the 2007 Nationalization Decree is itself unlawful for being contrary to international law and allegedly in breach of Venezuelan law, is equally meritless.[725] First, the Claimant only attempted arguing the alleged unlawfulness of the 2007 Nationalization Decree for the first time at the Hearing during the cross-examination of Prof. García Montoya and, subsequently, in its PHB. The belatedness of the Claimant's unlawfulness argument may be indicative of the merits or lack thereof of its unjust enrichment claim.

403. Second, the fact that the tribunal in the ICSID Arbitration found the expropriation of the Corocoro Project to be unlawful,[726] or that the issuance of the 2007 Nationalization Decree arguably did not meet the strictures of the Venezuelan Constitution for it to be deemed a legal expropriation under Venezuelan law,[727] adds nothing to the Claimant's

---

pp. 429, *citing* First Superior Court of the Judicial Circumscription of the Federal District and Miranda State, Judgment dated October 25, 1965, in J.R.G. VOL. XIII, p. 40; *Plásticos del Guárico C.A. v. Corporación de Desarrollo de la Pequeña y Mediana Industria (CORPOINDUSTRIA)*, Supreme Court of Justice (Political-Administrative Chamber), Judgment, 6 November 1991, in J.R.G. VOL. CXIX, **App. GM-24**, p. 596.

[722] *Supra*, § 393.

[723] R-PHB, § 94.

[724] *Supra*, § 229.

[725] *Supra*, § 394.

[726] C-PHB, § 172.

[727] C-PHB, §§ 169-171.

case for unjust enrichment. The findings of the tribunal in the ICSID Arbitration were made on the basis of international law only, which does not apply to the present dispute. In turn, under Venezuelan law, the Claimant has never questioned the constitutionality of the 2007 Nationalization Decree before the appropriate forum, namely, Venezuelan courts.[728]

404.   The Claimant contends that "any challenge to the Nationalization Decree in Venezuelan courts would have been an exercise in futility".[729] Yet, the futility argument was raised for the first time in its PHB and the Claimant has not substantiated whether, how, and to what extent futility has a place in the context of unjust enrichment claims under Venezuelan law. Without a supporting authority, the Claimant submits that "Venezuelan law does not require a party to engage in futile acts, and Claimant should not be required to pursue a futile challenge to a law that resulted in the unconstitutional confiscation of its assets […]".[730] Nevertheless, the issue is not whether Venezuelan law requires engaging in futile acts, but whether Venezuelan law recognizes futility as a legal institution that may override the established principle (confirmed by Prof. Brewer-Carías) that state measures are presumed valid until declared otherwise by Venezuelan courts.[731] However, nothing on the record points to that conclusion.

405.   Third, the Claimant's argument that the 2007 Nationalization Decree is unlawful directly contradicts the position it assumes to contest the Respondents' arbitrability arguments, where the Claimant submits that it does not challenge the legality or constitutionality of the Decree.[732]

406.   In view of the above, the Tribunal dismisses the Claimant's unjust enrichment claim in its entirety.

---

[728] R-PHB, § 98.

[729] C-PHB, § 174.

[730] C-PHB, § 175.

[731] Allan R. Brewer-Carías, *The Effects of Constitutional Judgments in Venezuela*, in ANUARIO IBEROAMERICANO DE JUSTICIA CONSTITUCIONAL NO. 12 (2008), **RLA-159**, p. 43 ("In these cases [when the Constitutional Chamber annuls a law on unconstitutionality grounds], the Chamber, as part of the Constitutional Jurisdiction, exercises its powers established under Article 336 of the Constitution and 'declares the nullity' of the law, which until the publication of the judgment of the Chamber **is valid and effective, and produces all of its legal effects notwithstanding its unconstitutionality**. Therefore, the decision **is not retroactive**; it has *ex nunc* effects or effects for the future; and this is so in light of the **presumption of constitutionality that the laws have, which is equivalent, mutatis mutandis, to the presumption of legality of administrative acts**.")(emphasis added); see also, *Revision of the Partial Disapplication of Article 376 of the Organic Code of Criminal Procedure*, Supreme Tribunal of Justice (Constitutional Chamber) (Venezuela), Case No. 04-2293, Judgment dated 22 April 2005, **RLA-158**, p. 6.

[732] *Supra*, §§ 143, 151.

## IV.    COSTS

### A.    THE PARTIES' POSITION

407.   Each Party contends that all costs incurred in this arbitration, including the fees and expenses of legal representation, experts and party representatives, the fees and expenses of the Tribunal, as well as the ICC administrative expenses should be borne by the other side.[733]

408.   The Claimant submits that a full award of costs in its favor is warranted in light of the following:[734]

  i.   The costs must be borne by the unsuccessful party. In this regard, the "Respondents do not contest the fact of their non-performance of their contractual obligations and have previously confirmed Claimant's interpretation of the effect of Clause 28.1, thereby removing any excuse for such non-performance".[735] Therefore, the Respondents should not prevail on their defense in this proceeding and should bear all costs of the arbitration.

  ii.   The Respondents have flouted their procedural obligations in this arbitration by repeatedly failing to pay their share of the ICC's advance on costs.

  iii.   The Respondents have mischaracterized Claimant's claims and failed to raise their defense to those claims in a timely manner, in violation of the obligation to arbitrate in good faith. In particular, the Respondents have accused the Claimant of evolving case theories, while Claimant has maintained its claims in this arbitration since the outset. In contrast, the Respondents ignored the key elements of the Claimant's claims and seriously engaged with Clause 28.1 only in their Rejoinder.

  iv.   The Respondents "have adopted frivolous, vexatious and abusive tactics". Specifically, the Respondents disregarded the Tribunal's document production order in respect of the CVP-Eni MoU, yet submitted this same document with their Rejoinder. Moreover, the Respondents raised a "disloyal delay" defense

---

[733] C-PHB, § 362(i); R-PHB, §§ 224-225.

[734] Claimant's letter to the Tribunal, 1 March 2019.

[735] Claimant's letter to the Tribunal, 1 March 2019, p. 2.

notwithstanding the fact that it was expressly excluded by the Parties' agreement under the Corocoro Guarantee.

409.    The Claimant therefore requests the following amounts:[736]

| No. | Description | Amount Charged (in USD) |
|-----|-------------|-------------------------|
| 1. | Fees and expenses of the Tribunal<br>Expenses of the Tribunal Secretary<br>ICC administrative costs | 1,457,500.00 |
| 2. | Total Legal Fees | 5,245,299.15 |
| 3. | Fees charged by experts[737] | 2,139,314.08 |
| 4. | Travel and other expenses | 565,868.81 |
|  | **TOTAL COSTS CLAIMED** | **9,406,982.04** |

410.    In contrast, the Respondents request that all costs be assessed against the Claimant for the following reasons:[738]

   i.    At the "beginning of this case", the Respondents suggested bifurcation and that the Parties should await the outcome of the ICC P&H Arbitration. This would have had an important impact on the Claimant's claims in this arbitration. However, the Claimant resisted the Respondents' requests and insisted on immediate briefing of all issues, which resulted in increased costs.

   ii.    The Claimant's claims are "utterly baseless [thus] requiring Respondents to spend considerable time and energy to answer theory after theory that finds no support in any legal text".

   iii.    The Claimant's theory of the case constantly evolved throughout the proceedings.

---

[736] Fees and Expenses incurred by Conoco of 1 March 2019; Fees and Expenses of Freshfields Bruckhaus Deringer US LLP of 1 March 2019; Fees and Expenses of Three Crowns LLP of 1 March 2019.

[737] The Claimant has indicated that the fees charged by two of its expert witnesses, i.e. Prof. Brewer-Carías and Prof. Mares form part of the expenses claimed by its Counsel (*see* Fees and Expenses incurred by Conoco of 1 March 2019, fn. 1; Fees and Expenses of Three Crowns LLP of 1 March 2019, fn. 1). In order to reflect the Parties' break-up of costs in a similar manner, the Tribunal has reflected the fees charged by the experts separately and deducted the total amount charged by Prof. Brewer-Carías and Prof. Mares from the expenses claimed by the Claimant's Counsel.

[738] R-PHB, § 224.

iv. The Claimant maintained its *hecho ilícito* claim despite such claim being dismissed in the ICC P&H Arbitration and raised an indefensible claim for unjust enrichment. Notably, "by the end of the case" the Claimant did not even "mention" these heads of claim.

v. At "the beginning of this case" the Claimant "trumpeted" the concept of *amiable compositeur* as an important distinction between these proceedings and the ICC P&H Arbitration. However, the Claimant was ultimately unable to explain the significance of *amiable compositeur* in the present case.

vi. The Claimant has not answered the "basic question of why it waited almost a decade after the 2007 Nationalization to bring its case". In this regard, the "Respondents should not have to bear the costs of Claimant's penchant for interminable litigation".

vii. On quantum, the Claimant presented "surrealistic damage calculations".

411.   Accordingly, the Respondents request the following amounts:[739]

| Sr. No. | Description | Amount Charged (in USD) |
|---|---|---|
| 1. | Fees and expenses of the Tribunal<br>Expenses of the Tribunal Secretary<br>ICC administrative fees | 162,489.00 |
| 2. | Legal Fees | 4,766,422.35 |
| 3. | Fees charged by experts | 678,926.05 |
| 4. | Travel and other expenses | 273,669.62 |
|  | **TOTAL COSTS CLAIMED** | **5,881,507.02** |

412.   With due regard to the Parties' submissions, the Tribunal will first set out the relevant legal provisions on costs under the ICC Rules and the *lex arbitri*, and then proceed to assess the allocation of costs under these rules.

---

[739] Respondents' Costs Declaration, 25 February 2019.

## B.   RELEVANT PROVISIONS ON COSTS

### 1.   The ICC Rules

413.   The relevant provisions of the ICC Rules on allocation of costs are set out in Article 20, which provides as follows:

> 1)   The arbitrator's award shall, in addition to dealing with the merits of the case, fix the costs of the arbitration and decide which of the parties shall bear the costs or in what proportions the costs shall be borne by the parties.
>
> 2)   The costs of the arbitration shall include the arbitrator's fees and the administrative costs fixed by the International Court of Arbitration in accordance with the scale annexed to the present Rules, the expenses, if any, of the arbitrator, the fees and expenses of any experts, and the normal legal costs incurred by the parties.
>
> 3)   The Court may fix the arbitrator's fees at a figure higher or lower than that which would result from the application of the annexed scale if in the exceptional circumstances of the case this appears to be necessary.

### 2.   Lex Arbitri

414.   Under the *lex arbitri*, i.e. New York law, subject to the parties agreeing to the contrary, "the arbitrator's expenses and fees, together with other expenses, not including attorney's fees, incurred in the conduct of the arbitration, shall be paid as provided in the award."[740] This provision thus also refers the Tribunal to Article 20 of the ICC Rules on allocation of costs, which encapsulates the Parties' agreement in this regard.

## C.   ANALYSIS

415.   The above legal provisions accord to the Tribunal wide discretion in determining the allocation of costs of the arbitration, including legal fees and expenses. That said, such discretion should be exercised with care and with due regard to the relevant legal criteria and circumstances of the case.

416.   In this respect, the Tribunal agrees with the Claimant that the key principle governing the allocation of costs in international commercial arbitration is that costs "follow the event, i.e. for the costs to be borne by the unsuccessful party".[741] Notably, the Respondents do not contest the Claimant's assertion in this respect. Thus, "[a] claimant

---

[740] ICC P&H Arbitration, **R-0** (N.Y. C.P.L.R., **CLA-117,** § 7513).

[741] Claimant's letter to the Tribunal, 1 March 2019, p. 1; ICC P&H Arbitration, **R-0** (ICC Commission Report, *Decisions on Costs in International Arbitration,* ICC Dispute Resolution Bulletin, Issue 2 (2015), **CLA-116 (RLA-155**), pp. 11, 13).

that succeeds in its primary claim, which took up much of the time and effort of the arbitration, may be entitled to recover a substantial portion of its costs, even if it fails on a number of secondary or ancillary claims. Similarly, if a claimant succeeds with its major liability claim and is awarded a significant amount of damages sought under that claim, then it is reasonable to conclude that the claimant was in essence the successful party and is entitled to be treated as such."[742] Conversely, if the claimant is unsuccessful in its primary and major liability claim, it is not entitled to recover a significant portion and/or its entire claim for costs.

417.    In a nutshell, in determining the allocation of costs, the Tribunal may take into consideration "the relative success or failure of the parties […] by: (i) assuming that if a claimant or respondent succeeded in its core or primary claim or outcome, then it is entitled to all of its reasonable costs; (ii) apportioning costs on a claim-by-claim or issue-by-issue basis according to relative success and failure; or (iii) apportioning success against the amount of damages originally claimed or the value of the property in dispute."[743]

418.    In addition to the above, another factor that the Tribunal may take into consideration is the manner in which the Parties have conducted the case, keeping in mind the complexity of the case that a party has prosecuted/defended.

419.    With these considerations in mind, the Tribunal notes that the Claimant has only prevailed with respect to the claim concerning the repayment of the Claimant's portion of the loan extended to CVP. Conversely, save for in relation to the above *tranche* of the Particular Breaches Claim, the Claimant has not prevailed in its primary claims, namely, its Non-Performance Claim, its Surviving Obligations Claim, or in the remaining two *tranches* of its Particular Breaches Claim. Nor has the Claimant succeeded in its non-contractual claims, namely, its *hecho ilícito* and unjust enrichment claims.

420.    On the other hand, the Respondents did not succeed either on their arbitrability or disloyal delay defenses. Moreover, the Respondents have made but one payment towards the advance on costs fixed by the ICC. This has compelled the Claimant to pay both its share of ICC arbitration costs and the Respondents' respective deficit. Indeed, as determined by the ICC Court, out of a total of USD 1,620,000, the final

---

[742] ICC P&H Arbitration, **R-0** (Michael W. Bühler, *Costs of Arbitration: Some Further Considerations*, *in* LIBER AMICORUM IN HONOUR OF ROBERT BRINER (2005), **CLA-112**, p. 189).

[743] ICC P&H Arbitration, **R-0** (ICC Commission Report, *Decisions on Costs in International Arbitration*, ICC Dispute Resolution Bulletin, Issue 2 (2015), **CLA-116 (RLA-155)**, pp. 11).

amount of arbitration costs paid by the Claimant is USD 1,457,500, while the amount paid by the Respondents is USD 162,500. This equates to USD 647,500 payed by the Claimant in substitution of the Respondents.

421. Notwithstanding the foregoing, this case has raised several complex legal questions, the determination of which has not been a straightforward exercise. In this regard, the Tribunal would like to acknowledge the well-reasoned and detailed pleadings of both Parties, as well as the highly professional and skillful presentation of the Parties' cases by their respective Counsel at the Hearing. These have greatly aided the Tribunal in its task of determining the outcome of this case. Overall, the Tribunal considers that both sides conducted this arbitration fairly and professionally, and avoided conduct that would justify an allocation of costs in favor of one Party.

422. In these circumstances, and in consideration of the Parties' relative success and failure in submitting their claims and defenses, the Tribunal is of the view that the following costs allocation would be appropriate and fair:

  i.  The Claimant should bear 75% of the costs of the arbitration, including the fees and expenses of the Tribunal and the expenses of the Tribunal's Secretary, as well as the ICC administrative expenses, while the Respondents should bear the remaining 25%. On 17 July 2019, the ICC Court fixed the total costs of the arbitration at EUR 1,424,949 (equivalent to USD 1,620,000).[744] Accordingly, EUR 1,068,711.75 (equivalent to USD 1,215,000) must be borne by the Claimant and EUR 356,237.25 (equivalent to USD 405,000.00) by the Respondents. As seen above, the Parties have not paid the costs of the arbitration in equal shares. In this regard, the Respondents must reimburse **EUR 213,302.55** (equivalent to USD 242,500.00) to the Claimants for their 25% share of total arbitration costs. The Tribunal does not find it appropriate to order any interest on the amount to be reimbursed by the Respondents.

  ii. The Claimant must bear its own legal fees, and other costs and expenses, including the expenses related to its expert witnesses, as well as pay the Respondents **USD 2,500,000** towards their legal fees, and other costs and expenses. The payment of this total amount to the Respondents shall not carry interest, as the Respondents' prayer for relief does not include interest on

---

[744] On 25 July 2019, the ICC informed the Tribunal that the total costs of the arbitration fixed by the ICC Court in EUR corresponds to the totality of the advances on costs paid by the Parties in USD (*supra*, § 420), which in turn corresponds to a EUR/USD conversion rate of 0.8796. For the ease of reference, the Tribunal thus also indicates the corresponding amounts in USD by applying the same conversion rate.

arbitration costs and legal fees or other costs and expenses, and, in any event, the Tribunal does not find it justified.

iii. The Tribunal recalls that, on 8 December 2017, following Prof. Giardina's request, the ICC Secretariat asked the Parties to pay an advance of USD 26,758.80 in a special account created and administered by the ICC for the purposes of "collect[ing]" Arbitrator Giardina's "4% Mandatory Contribution to the Italian Lawyers Fund" ("MCLF"). To that effect, the Parties deposited a total of USD 26,363.87 into the special account, where the Claimant paid USD 13,379.40 and the Respondents paid USD 13,257.47. In this context, the Tribunal notes that the 4% MCLF applicable to the fees and expenses of Prof. Giardina corresponds to EUR 12,725.40. This sum is to be paid from the amount deposited by the Parties in the special account in equal shares. The ICC will return to the Parties any remaining balance in the special account in proportion to the amount paid by each Party, namely, 50.23% to the Claimant and 49.77% to the Respondents.

## V.    DECISION

423.    In light of all the foregoing considerations and determinations, the Tribunal:

    i.    **DECLARES** that the present dispute is arbitrable and that CGP's claims are admissible.

    ii.    **GRANTS** CGP's Particular Breaches Claim with respect to CVP's and PDVSA's failure to repay the loan extended by Conoco to CVP for the acquisition of its 35% participation in the Corocoro Discovery, and therefore **ORDERS** CVP and PDVSA to restitute to CGP the portion of the loan extended by Conoco to CVP in the amount of USD 33,700,000.00.

    iii.    **AWARDS** CGP interest to run from 22 October 2002 until the date of full and final payment of the amount indicated in paragraph 423.ii above, at a rate of LIBOR plus 1% *per annum*.

    iv.    **DISMISSES** all of the remaining Contractual Claims by CGP regarding the alleged breaches by CVP and/or PDVSA of their contractual obligations and duty of good faith with respect to the Corocoro AA, the Corocoro CA, the Corocoro Guarantee, and/or Venezuelan law.

    v.    **DECLARES** that CVP's and PDVSA's conduct does not constitute an *hecho ilícito* under Venezuelan law and dismisses CGP's claim in this regard.

    vi.    **DECLARES** that CVP and PDVSA have not been unjustly enriched and dismisses CGP's claim in this regard.

    vii.    **DECLARES** that CGP is to bear its own legal fees and other costs and expenses, and pay to CVP and PDVSA the amount of USD 2,500,000.00 to cover part of the CVP's and PDVSA's legal fees, and other costs and expenses.

    viii.    **DECLARES** that the fees and expenses of the Tribunal and the expenses of the Tribunal's Secretary as well as the ICC administrative expenses are to be borne 75% by CGP and 25% by CVP and PDVSA. CVP and PDVSA must thus reimburse to CGP the amount of EUR 213,302.55, which represents the amount payed by CGP in substitution of CVP and PDVSA, for CVP and PDVSA to cover their 25% share of the total arbitration costs fixed by the ICC Court.

    ix.    **DECLARES** that the amounts indicated in paragraphs 423.vii and 423.viii above shall not carry any pre or post-award interest.

    x.    **DISMISSES** any and all other claims and requests.

**Place of the arbitration:** New York City, New York (U.S.A.)

**Date:** 29 July 2019

_____
Prof. Laurent Aynès
Co-arbitrator

_____
Prof. Andrea Giardina
Co-arbitrator

_____
Dr. Laurent Lévy
President